# EXHIBIT 1

1  Mark S. Bostick (Bar No. 111241)
   Lisa Lenherr (Bar No. 258091)
2  **WENDEL ROSEN LLP**
   1111 Broadway, 24th Floor
3  Oakland, California 94607-4036
   Telephone: (510) 834-6600
4  Fax: (510) 834-1928
   Email: mbostick@wendel.com
5  Email: llenherr@wendel.com
   Attorneys for Lois I. Brady, Trustee

6

7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                    OAKLAND DIVISION

11

12  In re                                    Case No. 20-40990-RLE

13  FAIRN & SWANSON, INC.                    Chapter 7

14
                    Debtor.                  **CASH COLLATERAL STIPULATION**
15

16

17

18         This Stipulation by and among LOIS I. BRADY, as Chapter 7 Trustee ("**Trustee**") of the

19  above-captioned Fairn & Swanson, Inc. ("**Debtor**") bankruptcy estate, and WELLS FARGO

20  BANK, NATIONAL ASSOCIATION ("**Lender**") is made by and through their undersigned

    counsel with respect to the following facts:
21
           A.      On November 10, 2017, Lender and Debtor entered into that certain Credit
22
    Agreement (as amended, modified or supplemented from time to time, the "**Credit Agreement**")
23
    where Lender agreed to extend Debtor a line of credit not to exceed $34,000,000.00 (the "**Loan**").
24
    A true and correct copy of the initial Credit Agreement is attached hereto as **Exhibit A**.
25
           B.      In order to insure repayment of the Loan, Debtor executed that certain Guaranty
26
    and Security Agreement dated November 10, 2017 (the "**Security Agreement**") which granted
27
    Lender a security interest in certain collateral (as more particularly described in section 3 of the
28

Wendel Rosen LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Security Agreement) (the "**Pre-Petition Collateral**"). A true and correct copy of the Security Agreement is attached hereto as **Exhibit B**.

C.    Evidence of Lender's security interests are described as "[a]ll assets of Debtor, whether now or existing hereafter acquired" by that certain UCC-1 Financing Statement filed as Document No. 17-7608906670 on October 3, 2017, with the California Secretary of State (the "**UCC-1**"). A true and correct copy of the UCC-1 is attached hereto as **Exhibit C**.

D.    On May 15, 2018, the parties entered into a First Amendment to Credit Agreement and Waiver of Defaults (the "**First Amendment**"). A true and correct copy of the First Amendment is attached hereto as **Exhibit D**.

E.    On July 10, 2018, the parties entered into a Second Amendment to Credit Agreement (the "**Second Amendment**"). A true and correct copy of the Second Amendment is attached hereto as **Exhibit E**.

F.    On February 18, 2020, the parties entered into a Third Amendment to Credit Agreement (the "**Third Amendment**"). A true and correct copy of the Third Amendment is attached hereto as **Exhibit F**.

G.    On June 2, 2020 (the "**Petition Date**"), Debtor filed a voluntary petition (the "**Petition**") under Chapter 7 of the United States Bankruptcy Code.[1] (Docket No. 1.)

H.    According to Debtor, on the Petition Date its assets had a value of $42,939,730.22. (Docket No. 1, p. 6, filed June 2, 2020 (Schedules).)

I.    According to Debtor, on the Petition Date, Lender held a secured claim in the amount of $19,052,398.23. (Docket No. 1, p. 23, filed June 2, 2020.)

J.    Lender asserts that the cash in Debtor's bank accounts at Lender on the Petition Date, and any amounts deposited post-Petition into those accounts as the proceeds of Lender's Pre-Petition Collateral, are cash collateral, as that term is defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

K.    Trustee requires the use of the Cash Collateral to preserve and liquidate the estate

---

[1] 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**").

Wendel Rosen LLP
1111 Broadway, 24 $^{th}$ Floor
Oakland, California 94607 -4036

assets for payment, among other things, of the balance of the Loan; and in order to accomplish these tasks, Lender has agreed to permit Trustee, as provided below, to use its Cash Collateral.

L.    The terms below have been negotiated at arm's length and in good faith.

M.    Under the circumstances of this Case, this stipulation is fair and reasonable and in the best interest of Debtor's estate and its creditors.

**NOW THEREFORE,** with reference to the facts and circumstances set forth above, and in consideration for the mutual covenants and promises set forth below, the parties hereto stipulate and agree as follows:

1.    Consent. Lender consents to the use of Cash Collateral through the earliest occurrence of a Termination Event (defined in Paragraph 7 below), in accordance with all the terms, conditions, and provisions hereof, to pay the costs of preserving and liquidating the estate's assets as set forth in the budget attached hereto as **Exhibit G** (the "**Budget**"). Trustee may deviate from line items contained in the Budget by not more than 15% on an aggregate basis (per line item) other than with respect to amounts designated for Rent and professional fees,  provided, however, costs for Security, Insurance, and Utilities/Security Deposits shall be the actual, necessary and reasonable cost thereof irrespective of budgeted cost.

2.    Adequate Protection.

a.    Equity. The parties believe that Lender is adequately protected by its equity cushion which, according to the Debtor's Schedules, exceeds $20,000,000.00; provided, however, that nothing herein shall prejudice Lender's right to later: (1) assert that its interests in the Pre-Petition Collateral lack adequate protection; and (2) seek a valuation of the Pre-Petition Collateral.

b.    Replacement Liens. In addition to the equity cushion, as adequate protection for Trustee's use of Cash Collateral, Lender shall have a replacement lien (the "**Replacement Lien**") in all post-Petition assets of the nature and type described in the Security Agreement and the proceeds thereafter acquired (the "**Post-Petition Collateral**"), to the same extent and priority as Lender's interests presently attach to the Collateral. For clarity, Post-Petition Collateral exclude claims and proceeds arising under 11 U.S.C. §§ 544, 547, 548, 549, 550 and 553.

Wendel Rosen LLP
1111 Broadway, 24th Floor
Oakland, California 94607 -4036

002644.0031\5895689.1
STIPULATION

3.      Underline{Carveouts}.

        a.      Underline{Professionals' Carveout.} The liens of Lender shall be subject to the payment of the allowed fees and costs of Trustee's professionals as may be awarded to from time to time pursuant to Code § 330 (the "**Professionals' Carveout**"), subject to the terms of this Paragraph 3(a). The Professionals' Carveout is limited in amount to the lesser of (i) the aggregate amount provided in the Budget, plus any amount in a subsequent budget(s) agreed in writing by the parties, for such professional for the period commencing on the Petition Date and ending on the earliest occurrence of a Termination Event and (ii) the aggregate amount of allowed fees and expenses for such professional that actually accrues during the period commencing on the Petition Date and ending on the earliest occurrence of a Termination Event. The Professionals' Carveout shall, with respect to each professional, be reduced dollar-for-dollar by any payments of fees and expenses to such professional from sale proceeds of the Pre-Petition Collateral. No portion of the Professionals' Carveout may be used to pay any fees or expenses incurred in connection with claims or causes of action adverse to Lender's claim against Debtor or Lender's interests in the Pre-Petition Collateral, provided, however, that the Professionals' Carveout may be used to pay allowed fees and expenses incurred by the professionals in connection with the negotiation and preparation of the Stipulation, motion for approval of the Stipulation, and entry of order approving the Stipulation or any amendment hereto consented to by Lender.

        b.      <u>Trustee's Carveout.</u> The liens of Lender shall be subject to the payment of the allowed amount of Trustee's fee under 11 U.S.C. § 326 that accrues through the Termination Date, up to the sum of $100,000.00. ("**Trustee's Carveout"**).

        c.      For the avoidance of doubt, the Professionals' Carveout and the Trustee's Carveout shall be paid from Pre-Petition Collateral and Post-Petition Collateral proceeds before Lender's Claim on the basis set forth above, but neither Lender's Claim nor the extent of Lender's liens in the Pre-Petition Collateral or Post-Petition Collateral shall be reduced by the amount of the Professionals Carvout or Trustee's Carveout.

4.      <u>Lender's Claim</u>. Lender shall file its proof of claim (the "**Lender Claim**") within seven (7) days of entry of the Order approving this Stipulation. Trustee will have until July 31,

Wendel Rosen LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

Wendel Rosen LLP
1111 Broadway, 24th Floor
Oakland, California 94607-4036

2020, to file an objection to the Lender Claim. In all events, Trustee shall have three (3) weeks to object to (i) any amended claim filed by Lender, or (ii) any amounts that Lender asserts in writing to Trustee (with supporting detail) are allowable under 11 U.S.C. § 506(b). To the extent that Trustee does not timely file an objection to the Lender Claim, or any amendment thereto or related notice of 11 U.S.C. § 506(b) amounts, the Lender Claim (or, as applicable, 11 U.S.C. § 506(b) amounts) shall be an allowed claim under 11 U.S.C. § 502(a) secured by valid, perfected and first priority liens on the Pre-Petition Collateral.

5. <u>Use of Lockbox Bank Account</u>. To avoid disruption to and delay of Trustee's efforts to collect the Debtor's outstanding accounts receivables, Trustee shall seek Bankruptcy Court approval for the continued use of that certain deposit account x5969 (the "Lockbox Bank Account") established with Lender. Any cleared funds deposited into the Lockbox Bank Account shall be promptly transferred by Lender to the estate's deposit account designated by Trustee, <u>provided</u> <u>that</u> until such amounts are disbursed by Trustee, they shall be deemed to remain Cash Collateral and subject to Lender's interests and liens.

6. <u>Termination</u>.

a. Unless extended by agreement of the parties in writing, this Stipulation expires on the earliest occurrence of one of the following termination events (the "**Termination Events**"):

    i. July 31, 2020;

    ii. Trustee's failure to comply with the terms of this Stipulation provided, however, that this shall not be a Termination Event until Lender first provides written notice of the failure to comply via email to mbostick@wendel.com and llenherr@wendel.com, and allows three (3) business days from the date of such notice to cure the non-compliance;

    iii. Trustee files a 11 U.S.C. § 363 sale motion proposing to sell the Pre-Petition Collateral (a "**Sale Motion**") on terms unacceptable to Lender, or Trustee does not file a Sale Motion and related motion to approve sale procedures that are acceptable to Lender on or before July 10, 2020; provided, however, that this shall not be a Termination Event until Lender first provides written notice of Lender's disapproval via email to mbostick@wendel.com and llenherr@wendel.com;

Wendel Rosen LLP
1111 Broadway, 24ᵗʰ Floor
Oakland, California 94607 -4036

iv.  Trustee files a motion to incur debt under 11 U.S.C. § 364 from a party other than Lender;

v.  this Case is dismissed; or

vi.  Trustee or another party in interest commences a proceeding objecting to or challenging the extent, validity, perfection, enforceability or priority of the liens or claims alleged by Lender in this case.

b.  On the occurrence of a Termination Event, Trustee's authorization to use Cash Collateral will automatically end and Trustee shall be prohibited from using Cash Collateral for any purpose other than:

i.  payment of Professionals' Carveout amounts that were incurred prior to the Termination Event (and subject to the terms of Paragraph 3(a) above);

ii.  payment of Trustee's Carveout (subject to the terms of Paragraph 3(b) above); and

iii.  payment of any other budgeted expense incurred prior to the Termination Event.

c.  The Stipulation may be extended by agreement of the parties in-writing without further Court order. If Lender for whatever reason refuses to extend the agreement, Trustee must seek Bankruptcy Court approval for any further use of Cash Collateral.

7.  <u>Disposition of Sale Proceeds</u>. Upon receipt of proceeds from the sale of the Pre-Petition Collateral, Trustee shall disburse such proceeds to Lender to be applied to Lender's secured claim, and such applications shall be final upon allowance of the Lender Claim pursuant to Paragraph 4, except that Trustee shall retain amounts for all budgeted items identified in Paragraph 6(b).

8.  <u>Bankruptcy Court Approval</u>. This Stipulation shall not become effective until entry of an Order acceptable to both Trustee and Lender approving the Stipulation.

9. This Stipulation may be executed in counterparts, each of which shall be deemed an original copy of this Stipulation and all of which taken together shall be deemed to constitute one and the same agreement.

DATED: June 25, 2020    WENDEL ROSEN LLP


By: _/s/ Mark S. Bostick_     
   Mark S. Bostick
   Lisa Lenherr
   Attorneys for Lois I. Brady, Trustee


DATED: June 25, 2020    PILLSBURY WINTHROP SHAW PITTMAN LLP


By: _/s/ Jonathan Doolittle_     
   Jonathan Doolittle
   Attorneys for Wells Fargo Bank, National
   Association

Wendel Rosen LLP
1111 Broadway, 24th Floor
Oakland, California 94607 -4036

002644.0031\5895689.1
STIPULATION

# EXHIBIT A

# CREDIT AGREEMENT

**THIS CREDIT AGREEMENT** is entered into as of November 10, 2017 (the "Closing Date"), by and among FAIRN & SWANSON INC., a California corporation ("Fairn & Swanson"; Fairn & Swanson, together with any other Person that joins this Agreement as a "Borrower" in accordance with the terms hereof, are referred to hereinafter each individually as a "Borrower", and individually and collectively, jointly and severally, as the "Borrowers"), and WELLS FARGO BANK, NATIONAL ASSOCIATION ("Lender"). Certain capitalized terms used in this Agreement are defined in Section 7.1. The parties agree as follows:

## ARTICLE I
## CREDIT TERMS

### SECTION 1.1. LINE OF CREDIT.

(a) **Line of Credit**. Subject to the terms and conditions of this Agreement, Lender agrees to make advances to Borrowers under this Section 1.1 ("Advances"), from time to time up to and including the Termination Date, in a total amount at any time outstanding not to exceed the lesser of (a) $32,000,000 (the "Maximum Revolver Amount") minus Letter of Credit Usage, and (b) the sum of the following (the "Borrowing Base"):

      (i)      85% of the amount of Eligible Accounts, *less* the amount, if any, of the Dilution Reserve, *plus*



EXHIBIT A

DB2/ 32051652.10



The Borrowing Base will be determined by Lender upon receipt and review of all collateral reports required under this Agreement and such other documents and collateral information as Lender may from time to time require. Anything to the contrary notwithstanding, Lender shall have the right (but not the obligation) at any time, in the exercise of its Permitted Discretion, to establish and increase or decrease Reserves against the Borrowing Base or the Maximum Revolver Amount.

"<u>Account</u>" means an account as that term is defined in the Code.

"<u>Account Debtor</u>" means any Person who is obligated on an Account, chattel paper, or a general intangible.



"<u>Bank Product Reserves</u>" means, as of any date of determination, those reserves that Lender deems necessary or appropriate to establish (based upon the Bank Product Provider's determination of the liabilities and obligations of each Loan Party in respect of Bank Product Obligations) in respect of Bank Products then provided or outstanding.

"<u>Dilution</u>" means, as of any date of determination, a percentage, based upon the experience of the immediately prior 12 months, that is the result of dividing the Dollar amount of (a) bad debt write-downs,

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 11 of 175

WFB_000002

discounts, advertising allowances, credits, or other dilutive items with respect to Borrowers' Accounts during such period, by (b) Borrowers' billings with respect to Accounts during such period.

"Dilution Reserve" means, as of any date of determination, an amount sufficient to reduce the advance rate against Eligible Accounts by the extent to which Dilution is in excess of 5%.

"Eligible Accounts" means those Accounts created by a Borrower in the ordinary course of its business, that arise out of such Borrower's sale of goods or rendition of services, that comply with each of the representations and warranties respecting Eligible Accounts made in the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Lender in Lender's Permitted Discretion to address the results of any information with respect to the Borrowers' business or assets of which Lender becomes aware after the Closing Date, including any field examination performed by or received by Lender from time to time after the Closing Date. In determining the amount to be included, Eligible Accounts shall be calculated net of customer deposits, unapplied cash, taxes, finance charges, service charges, discounts, credits, allowances, and rebates. Eligible Accounts shall not include the following:

      (i)    Accounts that the Account Debtor has failed to pay within 90 days of original invoice date or 60 days of due date,

      (ii)    Accounts owed by an Account Debtor (or its Affiliates) where 25% or more of all Accounts owed by that Account Debtor (or its Affiliates) are deemed ineligible under clause (i) above,

      (iii)    Accounts (other than Accounts owing by Royal Caribbean, Carnival Corp., Norwegian Cruise Line, and their respective Affiliates) with selling terms of more than 45 days; and Accounts owing by Royal Caribbean, Carnival Corp., Norwegian Cruise Line, and their respective Affiliates with selling terms of more than 60 days; provided that up to $250,000 in the aggregate of Accounts (other than Accounts owing by Royal Caribbean, Carnival Corp., Norwegian Cruise Line, and their respective Affiliates) with selling terms of more than 45 days but no more than 60 days may be included as Eligible Accounts (if all other eligibility criteria are satisfied for such Accounts),

      (iv)    Accounts with respect to which the Account Debtor is an Affiliate of any Borrower or an employee or agent of any Borrower or any Affiliate of any Borrower,

      (v)    Accounts (a) arising in a transaction wherein goods are placed on consignment or are sold pursuant to a guaranteed sale, a sale or return, a sale on approval, a bill and hold, or any other terms by reason of which the payment by the Account Debtor may be conditional, or (b) with respect to which the payment terms are "C.O.D.", cash on delivery or other similar terms,

      (vi)    Accounts that are not payable in Dollars,

      (vii)    Accounts with respect to which the Account Debtor either (a) does not maintain its chief executive office in the United States or Canada, or (b) is not organized under the laws of the United States or Canada or any state or province thereof, or (c) is the government of any foreign country or sovereign state, or of any state, province, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof, unless (A) the Account is supported by an irrevocable letter of credit reasonably satisfactory to Lender (as to form, substance, and issuer or domestic confirming bank) that has been delivered to Lender and, if requested by Lender, is directly drawable by Lender, (B) the Account is covered by credit insurance in form, substance, and amount, and by an insurer, reasonably satisfactory to Lender, or (C) the Account is covered by an Export-Import Bank working capital guaranty in form, substance, and amount, reasonably satisfactory to Lender,

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 12 of 175     WFB_000003

(viii)    Accounts with respect to which the Account Debtor is either (a) the United States or any department, agency, or instrumentality of the United States (exclusive, however, of Accounts with respect to which Borrowers have complied, to the reasonable satisfaction of Lender, with the Assignment of Claims Act, 31 USC §3727), or (b) any state of the United States or any other governmental authority,

(ix)    Accounts with respect to which the Account Debtor is a creditor of a Borrower, has or has asserted a right of recoupment or setoff, or has disputed its obligation to pay all or any portion of the Account, to the extent of such claim, right of recoupment or setoff, or dispute,

(x)    (a) Accounts with respect to a single Account Debtor or a group of Affiliated Account Debtors (other than Royal Caribbean and Carnival Corp.) whose Eligible Accounts owing to Borrowers exceed 15% (such percentage, as applied to a particular Account Debtor, being subject to reduction by Lender in its Permitted Discretion if the creditworthiness of such Account Debtor deteriorates) of all Eligible Accounts, to the extent of the obligations owing by such Account Debtor in excess of such percentage, (b) Accounts with respect to Royal Caribbean and its Affiliates whose Eligible Accounts owing to Borrowers exceed 45% (such percentage being subject to reduction by Lender in its Permitted Discretion if the creditworthiness of Royal Caribbean or its Affiliates deteriorates) of all Eligible Accounts, to the extent of the obligations owing by Royal Caribbean and its Affiliates in excess of such percentage, and (c) Accounts with respect to Carnival Corp. and its Affiliates whose Eligible Accounts owing to Borrowers exceed 40% (such percentage being subject to reduction by Lender in its Permitted Discretion if the creditworthiness of Carnival Corp. or its Affiliates deteriorates) of all Eligible Accounts, to the extent of the obligations owing by Carnival Corp. and its Affiliates in excess of such percentage; provided that the aggregate amount of Accounts described in clauses (b) and (c) of this paragraph that may be treated as Eligible Accounts shall not exceed 70% of all Eligible Accounts; provided, further, that in each case, the amount of Eligible Accounts that are excluded because they exceed the foregoing applicable percentages shall be determined by Lender based on all of the otherwise Eligible Accounts prior to giving effect to any eliminations based upon the foregoing concentration limits,

(xi)    Accounts with respect to which the Account Debtor is subject to an Insolvency Proceeding, is not Solvent, has gone out of business, or as to which any Borrower has received notice of an imminent Insolvency Proceeding or a material impairment of the financial condition of such Account Debtor,

(xii)    Accounts, the collection of which, Lender, in its Permitted Discretion, believes to be doubtful, including by reason of the Account Debtor's financial condition,

(xiii)    Accounts that are not subject to a valid and perfected first priority Lender's Lien,

(xiv)    Accounts with respect to which (a) the goods giving rise to such Account have not been shipped and billed to the Account Debtor, or (b) the services giving rise to such Account have not been performed and billed to the Account Debtor,

(xv)    Accounts with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity,

(xvi)    Accounts (a) that represent the right to receive progress payments or other advance billings that are due prior to the completion of performance by the applicable Borrower of the subject contract for goods or services, or (b) that represent credit card sales,

(xvii)    Accounts owned by a Person that is joined to this Agreement as a Borrower until the completion of a field examination with respect to such Accounts, in each case, satisfactory to Lender in its Permitted Discretion, or

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 13 of 175

WFB_000004

(xviii)   any other Accounts deemed ineligible by Lender in Lender's Permitted Discretion.

"Eligible Excess Inventory" means those items of Inventory that do not qualify as Eligible In-Line Inventory solely because they are in excess of 52 weeks of demand or with no recorded sales for the prior twelve-month period.

"Eligible In-Line Inventory" means Inventory of a Borrower that consists of first quality finished goods held for sale in the ordinary course of Borrowers' business, that complies with each of the representations and warranties respecting Eligible In-Line Inventory made in the Loan Documents, and that is not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Lender in Lender's Permitted Discretion to address the results of any information with respect to the Borrowers' business or assets of which Lender becomes aware after the Closing Date, including any field examination or appraisal performed by or received by Lender from time to time after the Closing Date.  In determining the amount to be so included, Inventory shall be valued at the lower of cost or market on a basis consistent with Borrowers' historical accounting practices.  An item of Inventory shall not be included in Eligible In-Line Inventory if:

(i)        a Borrower does not have good, valid, and marketable title thereto,

(ii)       a Borrower does not have actual and exclusive possession thereof (either directly or through a bailee or agent of a Borrower), including as a result of the lease thereof by a Borrower,

(iii)      it is not located at one of the locations in the continental United States set forth on Schedule B to this Agreement (as such Schedule B may be amended from time to time with the prior written consent of Lender),

(iv)      it is stored at locations holding less than $100,000 of the aggregate value of such Borrower's Inventory; provided that all locations within the same city shall constitute one location for purposes of this clause (iv),

(v)       it is in-transit to or from a location of a Borrower,

(vi)      it is located on real property leased by a Borrower or in a contract warehouse or with a bailee, in each case, unless it is subject to a Collateral Access Agreement executed by the lessor or warehouseman, as the case may be, and it is segregated or otherwise separately identifiable from goods of others, if any, stored on the premises,

(vii)     it is the subject of a bill of lading or other document of title,

(viii)    it is not subject to a valid and perfected first priority Lender's Lien,

(ix)      it consists of goods returned or rejected by a Borrower's customers,

(x)       it consists of goods that are obsolete, slow moving, spoiled or are otherwise past the stated expiration, "sell-by" or "use by" date applicable thereto, restrictive or custom items or otherwise is manufactured in accordance with customer specific requirements, work-in-process, raw materials, or goods that constitute spare parts, packaging and shipping materials, supplies used or consumed in Borrowers' business, bill and hold goods, damaged, defective, contaminated or discontinued goods, "seconds," or Inventory acquired on consignment, or Inventory on consignment with other Persons (where any Borrower is the consignor),

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 14 of 175

WFB_000005

(xi)     it is subject to third party intellectual property, licensing or other proprietary rights, unless Lender is satisfied that such Inventory can be freely sold by Lender on and after the occurrence of an Event of a Default despite such third party rights,

(xii)     it is owned by a Person that is joined to this Agreement as a Borrower until the completion of an Acceptable Appraisal of such Inventory and the completion of a field examination with respect to such Inventory that is satisfactory to Lender in its Permitted Discretion,

(xiii)     it is in excess of 52 weeks of demand or with no recorded sales for the prior twelve-month period; or

(xiv)     it is Inventory otherwise deemed ineligible by Lender in Lender's Permitted Discretion.

"Eligible In-Transit Inventory" means those items of Inventory that do not qualify as Eligible In-Line Inventory solely because they are in-transit from one location within the continental United States set forth on Schedule B to this Agreement to another location within the continental United States set forth on Schedule B to this Agreement (as such Schedule B may be amended from time to time with the prior written consent of Lender).

"Inventory" means inventory as that term is defined in the Code.

"Inventory Reserves" means, as of any date of determination, (a) Landlord Reserves in respect of Inventory, and (b) those reserves that Lender deems necessary or appropriate, in its Permitted Discretion, to establish and maintain (including reserves for slow moving Inventory and Inventory shrinkage) with respect to Eligible In-Line Inventory, Eligible In-Transit Inventory, Eligible Excess Inventory or the Maximum Revolver Amount, including based on the results of appraisals.

"Line of Credit" means the line of credit established under this Section 1.1.

"Net Recovery Percentage" means, as of any date of determination, the percentage of the book value of Borrowers' Inventory that is estimated to be recoverable in an orderly liquidation of such Inventory net of all associated costs and expenses of such liquidation, such percentage to be determined as to each category of Inventory and to be as specified in the most recent Acceptable Appraisal of Inventory.

"Receivable Reserves" means, as of any date of determination, those reserves that Lender deems necessary or appropriate, in its Permitted Discretion, to establish and maintain (including Landlord Reserves for books and records locations and reserves for rebates, discounts, warranty claims, and returns) with respect to the Eligible Accounts or the Maximum Revolver Amount.

"Reserves" means, as of any date of determination, Inventory Reserves, Receivable Reserves, Bank Product Reserves, and those other reserves that Lender deems necessary or appropriate, in its Permitted Discretion, to establish and maintain (including reserves with respect to (a) sums that any Loan Party or its Subsidiaries are required to pay under any Section of this Agreement or any other Loan Document (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay, and (b) amounts owing by any Loan Party to any Person to the extent secured by a Lien on, or trust over, any of the Collateral (other than a Permitted Lien), which Lien or trust, in the Permitted Discretion of Lender likely would have a priority superior to Lender's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for ad valorem, excise, sales, or other taxes where

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 15 of 175

WFB_000006

given priority under applicable law) in and to such item of the Collateral) with respect to the Borrowing Base or the Maximum Revolver Amount.

(b)    <u>Letter of Credit Subfacility</u>.  As a subfacility under the Line of Credit, subject to the terms and conditions of this Agreement, Lender agrees during the term of this Agreement to issue or cause an Affiliate to issue standby letters of credit or sight commercial letters of credit for the account of one or more Borrowers for purposes acceptable to Lender ("Letters of Credit"); <u>provided</u>, (i) that the aggregate Letter of Credit Usage will not at any time exceed $750,000 and (ii) Lender shall have determined that there is Availability for any such Letter of Credit. The form and substance of each Letter of Credit will be subject to approval by Lender, in its sole discretion, and Borrowers shall execute and deliver such additional letter of credit agreements, applications and other documents required by Lender as a condition to the issuance of any Letter of Credit. Each Letter of Credit will be issued for a term not to exceed 365 days, as designated by any Borrower; <u>provided</u>, that no Letter of Credit will have an expiration date after the Maturity Date. Each Letter of Credit will be issued under, and subject to, the additional terms and conditions of the letter of credit agreements, applications and any related documents required by Lender. Each drawing paid under a Letter of Credit will be deemed an Advance under the Line of Credit and will be repaid by Borrowers in accordance with the terms and conditions of this Agreement applicable to such Advances; <u>provided</u>, that if Advances under the Line of Credit are not available for any reason at the time any drawing is paid by Lender, then Borrowers will immediately pay to Lender the full amount drawn, together with interest on such amount from the date such drawing is paid to the date such amount is fully repaid by Borrowers, at the rate of interest then applicable to Advances under the Line of Credit. In such event Borrowers agree that Lender may debit any account maintained by any of the Borrowers with Lender for the amount of any such drawing. "<u>Letter of Credit Usage</u>" means, as of any date, the sum of (i) the aggregate undrawn amount of all outstanding Letters of Credit, and (ii) the aggregate amount of outstanding reimbursement obligations with respect to Letters of Credit which remain unreimbursed or which have not been paid through an Advance.

(c)    <u>Borrowing and Repayment</u>.  So long as Lender has not separately agreed that Borrowers may use Lender's Loan Manager service ("Loan Manager"), each of the Borrowers may from time to time during the term of the Line of Credit request Advances, partially or wholly repay amounts outstanding under the Line of Credit, and reborrow the same, subject to all of the limitations, terms and conditions contained in this Agreement.  Any request for an Advance must be received by Lender no later than 10:00 a.m. (Pacific time) on the Business Day that funding is requested.  If at any time the aggregate outstanding Advances under the Line of Credit exceeds the lesser of (i) the Maximum Revolver Amount minus Letter of Credit Usage or (ii) the Borrowing Base, Borrowers will immediately pay Lender such excess.  No request for an Advance will be deemed received until Lender acknowledges the request.  All Advances will be repaid by Borrowers even if the Person requesting the Advance on behalf of any Borrower lacks authorization.

(d)    <u>Advances Through Loan Manager</u>.  If Lender has separately agreed that Borrowers may use Loan Manager, Advances (i) will be made solely by Loan Manager, and (ii) will be initiated by Lender and credited to a Borrower's operating account maintained with Lender as Advances as of the end of each Business Day in an amount sufficient to maintain an agreed upon ledger balance in such Borrower's operating account maintained with Lender, subject to Availability.  Lender may terminate Borrowers' access to the Loan Manager service at any time in its sole discretion.  If Lender terminates Borrowers' access to Loan Manager, each Borrower may continue to request Line of Credit Advances as provided in <u>Section 1.1(c)</u> so long as no Default or Event of Default shall have occurred and be continuing.  Lender will have no obligation to make an Advance through Loan Manager in an amount in excess of Availability or if a Default or Event of Default has occurred and is continuing.

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 16 of 175

WFB_000007

(e)     <u>Protective Advances; Advances to Pay Obligations Due</u>.  Lender may make Advances under the Line of Credit in its sole discretion for any reason at any time without request of any Borrower and without any Borrower's compliance with any of the conditions of this Agreement, and (i) disburse the proceeds directly to third Persons in order to protect Lender's interest in Collateral or to perform any of Borrowers' obligations under this Agreement, or (ii) apply the proceeds to any Obligations then due and payable.

(f)     <u>Payments; Lockbox and Collection Account</u>.  All payments by Borrowers will be made as directed by Lender or as otherwise specified in the other Loan Documents, without setoff, counterclaim or defense.  Loan Parties will instruct all Account Debtors to make payments either directly to the lockbox established with Lender (the "<u>Lockbox</u>"), for deposit by Lender directly to a deposit account established with Lender for the exclusive benefit of Lender (the "<u>Lender's Account</u>"), or instruct them to deliver such payments to Lender by wire transfer, ACH, or other means as Lender may direct for deposit to the Lockbox or Lender's Account or for direct application to reduce outstanding Advances or such other Obligations as Lender shall determine.  All payments received by Lender will be applied to reduce outstanding Obligations in such manner as Lender determines in its sole discretion.  If any Loan Party receives payment or the proceeds of Collateral directly, such Loan Party will promptly deposit the payment or proceeds into the Lender's Account.  Until deposited, each Loan Party will hold all such payments and proceeds in trust for Lender without commingling with other funds or property.  For purposes of calculating Availability, each payment will be applied to the Obligations as of the first Business Day following the Business Day of deposit to the Lender's Account of immediately available funds or other receipt of immediately available funds by Lender, provided such payment is received in accordance with Lender's usual and customary practices as in effect from time to time.  Any payment received by Lender that is not a transfer of immediately available funds will be considered provisional until the item or items representing such payment have been finally paid under applicable law.  Each reduction in outstanding Obligations resulting from the application of such payment to the outstanding Obligations will be accompanied by an equal reduction in the amount of outstanding Accounts.  In the event of any inconsistency between the provisions of this section and the provisions of any cash management agreement, the provisions of this section shall control.

(g)     <u>Charges to Loan Account</u>.  Lender will maintain an account on its books and records in the name of Borrowers (the "<u>Loan Account</u>") in which will be recorded all Advances made by Lender, all Letters of Credit issued and all other payment Obligations.  Borrowers authorize Lender to collect all principal, interest and fees due under the Line of Credit by charging the Loan Account, or any other deposit account maintained by any Borrower with Lender.  Should there be insufficient funds in the Loan Account or any such other account to pay all such sums when due, the full amount of such deficiency will be immediately due and payable by Borrowers.  All cash, checks, notes, instruments, and other items of payment (including insurance proceeds, cash proceeds of asset sales, rental proceeds, and tax refunds) (collectively, "<u>Collections</u>") received by Lender will be applied as provided in <u>Section 1.1(f)</u>.  All monthly statements relating to the Loan Account or such account will be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and Lender unless Borrowers deliver written objection to Lender within 30 days after receipt by Borrowers.

(h)     <u>Mandatory Payment of Advances</u>.  If at any time the sum of the outstanding Advances and Letter of Credit Usage exceeds either the Maximum Revolver Amount or the most recent Borrowing Base calculated without regard to Letter of Credit Usage (the "<u>Overadvance Amount</u>"), then Borrowers shall immediately upon demand by Lender repay the Obligations in an aggregate amount equal to the Overadvance Amount.  If payment in full of outstanding Advances is insufficient to eliminate the Overadvance Amount and Letter of Credit Usage continues to exceed the Borrowing Base, Borrowers shall cash collateralize the Letter of Credit Usage in an amount sufficient to eliminate such Overadvance Amount.

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 17 of 175

WFB_000008

**SECTION 1.2. INTEREST/FEES.**

(a)     <u>Interest</u>.  Except as provided in <u>Section 1.2(b)</u>, all Obligations (except for undrawn Letters of Credit) will bear interest at a variable per annum rate equal to Daily Three Month LIBOR plus the Applicable Margin.

(b)     <u>Default Rate</u>.  (i) Automatically upon the occurrence and during the continuation of an Event of Default under <u>Section 6.1(e)</u>, and (ii) upon the occurrence and continuation of any other Event of Default (other than an Event of Default under <u>Section 6.1(e)</u>), at the election of Lender and upon written notice by Lender to Borrowers of such election (<u>provided</u>, that such notice shall not be required for any Event of Default under <u>Section 6.1(a)</u>), (A) the outstanding principal balance of Advances and all other Obligations (other than undrawn Letters of Credit) will bear interest at a per annum rate equal to 2% above the per annum rate otherwise applicable under <u>Section 1.2(a)</u>; and (B) the Letter of Credit fee provided for in <u>Schedule A</u> will be increased by 2% above the per annum rate otherwise applicable under <u>Schedule A</u> (such rate under this <u>Section 1.2(b)</u>, the "<u>Default Rate</u>").  For the avoidance of doubt in the case of an Event of Default described in <u>clause (ii)</u> above, Lender may elect to impose the Default Rate under <u>subclauses (A)</u> and <u>(B)</u> above effective as of the date of the occurrence of such Event of Default or as of any date after the occurrence of such Event of Default regardless of the date Lender received notice of, or obtained knowledge of, such Event of Default.

(c)     <u>Payment of Interest</u>.  Interest will be payable monthly in arrears on the first day of each month and on the Termination Date.

(d)     <u>Payment of Fees</u>.  Borrowers will pay to Lender the fees set forth on <u>Schedule A</u>.

(e)     <u>Computation of Interest and Fees</u>.  Interest and fees will be computed on the basis of a three hundred sixty (360)-day year for the actual number of days elapsed.

**SECTION 1.3. ADDITIONAL COSTS**.

(a)     <u>Capital Requirements</u>.  Borrowers will pay Lender, on demand, for Lender's costs or losses arising from any Change in Law which are allocated to this Agreement or any credit outstanding under this Agreement.  The allocation will be made as determined by Lender, using any reasonable method.  The costs include, without limitation, (i) any reserve or deposit requirements (excluding any reserve requirement already reflected in the calculation of the interest rate in this Agreement); and (ii) any capital requirements relating to Lender's assets and commitments for credit.  "<u>Change in Law</u>" means the occurrence, after the date of this Agreement, of the adoption or taking effect of any new or changed law, rule, regulation or treaty, or the issuance of any request, rule, guideline or directive (whether or not having the force of law) by any governmental authority; provided that (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives issued in connection with that Act, and (y) all requests, rules, guidelines or directives promulgated by Lender for International Settlements, the Basel Committee on Banking Supervision (or any successor authority) or the United States regulatory authorities, in each case pursuant to Basel III, will in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

(b)     <u>Illegality; Impracticability; Increased Costs</u>.  In the event that (i) any change in market conditions or any Change in Law shall, in the reasonable opinion of Lender, make it unlawful or impractical for Lender to fund or maintain extensions of credit with interest based upon Daily Three Month LIBOR or to continue to so fund or maintain, or to determine or charge interest rates based upon Daily Three Month LIBOR, or (ii) Lender determines that the interest rate based on the Daily Three Month LIBOR will not adequately and fairly reflect the cost to Lender of maintaining or funding

Case: 20-40990     Doc# 17-1     Filed: 06/26/20     Entered: 06/26/20 08:45:29     Page 18 of 175

WFB_000009

Advances at the interest rate based upon Daily Three Month LIBOR, Lender will give notice of such changed circumstances to Borrowers and (a) interest on the principal amount of such extensions of credit will then accrue interest at a rate equal to the Base Rate plus 0.75%, and (b) Borrowers will not be entitled to elect Daily Three Month LIBOR until Lender determines that the conditions described in clauses (i) and (ii) no longer exist.

**SECTION 1.4. TERM AND TERMINATION**.

(a)     Termination Date.  Lender's obligations under this Agreement will continue for a term ending on the earliest of the following (the "Termination Date"):  (i) November 10, 2022 (the "Maturity Date"), or (ii) the date the Line of Credit has been terminated by Borrowers, or (iii) the date the Lender's obligation to extend further credit under this Agreement terminates following an Event of Default.  On the Termination Date, all obligations of Lender to provide Advances or other extensions of credit under this Agreement will automatically terminate and all of the Obligations (other than Obligations under any Hedge Agreement, which will be terminated pursuant to the applicable Hedge Agreement) will immediately become due and payable without notice or demand, and Borrowers will immediately repay all of the Obligations in full (including providing cash collateral (on terms and conditions and pursuant to agreements required by Lender (the "L/C Collateral Conditions")) to be held by Lender for the benefit of Lender in an amount equal to 110% of the then existing Letter of Credit Usage).  No termination of the obligations of Lender will relieve or discharge Borrowers of their duties, obligations, or covenants under this Agreement or under any other Loan Document.  The relevant Bank Product Provider and Lender may require cash collateralization of Obligations with respect to any then existing Bank Product in an amount acceptable to such Bank Product Provider and Lender.

(b)     Termination of Liens.  Provided that there are no suits, actions, proceedings or claims pending or threatened against any Person whom Borrowers have agreed to indemnify under this Agreement, Lender will, at Borrowers' expense, release or terminate any filings or other agreements that perfect the Lender's Liens in the Collateral upon Lender's receipt of each of the following, in form and content satisfactory to Lender: (i) cash payment in full of all Obligations (including termination of all Obligations under any Hedge Agreement, which will be terminated and paid pursuant to the applicable Hedge Agreement) and completed performance by Borrowers with respect to its other obligations under this Agreement and the other Loan Documents (including providing cash collateral to be held by Lender for the benefit of Lender in an amount equal to 110% of the then existing Letter of Credit Usage and subject to satisfaction of the L/C Collateral Conditions), (ii) evidence that any obligation of Lender to make Advances to Borrowers, issue Letters of Credit or provide any further extensions of credit to or for the benefit of Borrowers has been terminated, (iii) a general release of all claims against Lender and its Affiliates by each Borrower and each other Loan Party relating to the Line of Credit and Lender's performance and obligations under the Loan Documents, and (iv) an agreement by Borrowers and each other Loan Party to indemnify Lender and its Affiliates for any payments received by Lender or its Affiliates that are applied to the Obligations as a final payoff that may later be returned or otherwise not paid for any reason.

(c)     Termination by Borrowers.  Borrowers may terminate the Line of Credit at any time prior to the Maturity Date, if they (i) deliver a written notice to Lender of their intention at least 10 days prior to the proposed action, (ii) pay to Lender the applicable termination and prepayment fees specified in this Agreement, and (iii) pay the Obligations in full and satisfy the L/C Collateral Conditions (to the extent of any outstanding Letter of Credit Usage).  Any such termination will be irrevocable.

**SECTION 1.5. GUARANTY AND SECURITY AGREEMENT**.  To secure the Obligations, each Loan Party and Lender are entering into a Guaranty and Security Agreement (as amended from time to time, the "Guaranty and Security Agreement"), pursuant to which, among other things, (a) each Loan

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 19 of 175

WFB_000010

Party is granting Lender, for the benefit of Lender and Lender's Affiliates, a security interest in the Collateral, and (b) each Loan Party which is a Guarantor thereunder is guaranteeing payment and performance of the Obligations.

**SECTION 1.6. ADMINISTRATIVE BORROWER**. Each Borrower hereby irrevocably appoints Fairn & Swanson as the borrowing agent and attorney-in-fact for all Borrowers (the "Administrative Borrower") which appointment shall remain in full force and effect unless and until Lender shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower. Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (a) to provide Lender with all notices with respect to Advances, Letters of Credit and other extensions of credit obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and the other Loan Documents (and any notice or instruction provided by Administrative Borrower shall be deemed to be given by Borrowers hereunder and shall bind each Borrower), (b) to receive notices and instructions from Lender (and any notice or instruction provided by Lender to the Administrative Borrower in accordance with the terms hereof shall be deemed to have been given to each Borrower), and (c) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Advances, Letters of Credit and other extensions of credit and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement. It is understood that the handling of the Loan Account and Collateral in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Borrowers in order to utilize the collective borrowing powers of Borrowers in the most efficient and economical manner and at their request, and that Lender shall not incur liability to any Borrower as a result hereof. Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group. To induce Lender to do so, and in consideration thereof, each Borrower hereby jointly and severally agrees to indemnify Lender and hold Lender harmless against any and all liability, expense, loss or claim of damage or injury, made against Lender by any Borrower or by any third party whosoever, arising from or incurred by reason of (i) the handling of the Loan Account and Collateral of Borrowers as herein provided, or (ii) Lender's relying on any instructions of the Administrative Borrower*,* except that Borrowers will have no liability to Lender or its Affiliates, Subsidiaries, directors, officers, employees, representatives, agents, and attorneys under this Section 1.6 with respect to any liability that has been finally determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of any such Person, as the case may be.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

Each of the Borrowers makes the following representations and warranties to Lender, which representations and warranties will survive the execution of this Agreement and will continue in full force and effect until the termination of all commitments to lend of Lender and the full and final payment, and satisfaction and discharge, of all Obligations:

**SECTION 2.1. LEGAL STATUS**. Each Loan Party is duly organized, validly existing and in good standing under the laws of the State of its organization and is qualified or licensed to do business and is in good standing in all jurisdictions in which such qualification or licensing is required or in which the failure to so qualify or to be so licensed could reasonably be expected to cause a Material Adverse Effect. Each Loan Party possesses, and will hereafter possess, all permits, consents, approvals, franchises and licenses required and rights to all trademarks, trade names, patents, and fictitious names, if any, necessary to enable it to conduct the business in which it is now engaged in compliance with applicable law.

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 20 of 175

WFB_000011

**SECTION 2.2. AUTHORIZATION AND VALIDITY**. The Loan Documents have been duly authorized and constitute legal, valid and binding agreements and obligations of each Loan Party or the party which executes the same, enforceable in accordance with their respective terms. The execution, delivery and performance by each Loan Party of each of the Loan Documents to which it is a party do not violate any provision of any law or regulation, or contravene any provision of such Loan Party's organizational documents or result in any breach of or default under any contract, obligation, indenture or other instrument to which such Loan Party is a party or by which such Loan Party or its assets may be bound.

**SECTION 2.3. LITIGATION**. There are no pending, or to the best of each Loan Party's knowledge threatened, actions, claims, investigations, suits or proceedings by or before any governmental authority, arbitrator, court or administrative agency which involve more than $200,000 or which could reasonably be expected to cause a Material Adverse Effect, other than those disclosed on Schedule B.

**SECTION 2.4. FINANCIAL STATEMENTS**. The annual financial statements of each Loan Party dated for such Loan Party's most recent fiscal year ended, and all interim financial statements delivered to Lender since such date and prior to the date of this Agreement (a) are complete and correct and present fairly the financial condition of such Loan Party, (b) disclose all liabilities of such Loan Party that are required to be reflected or reserved against under generally accepted accounting principles ("GAAP"), whether liquidated or unliquidated, fixed or contingent, and (c) have been prepared in accordance with GAAP consistently applied. Since the dates of such financial statements there has been no Material Adverse Effect.

**SECTION 2.5. TAXES**. Each Loan Party has timely filed all tax returns and reports of such Loan Party required to be filed by it, and paid when due all taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon such Loan Party and its assets, income, businesses and franchises that are due and payable. None of the Loan Parties are aware of any unpaid tax or assessment or proposed tax or assessment against any Loan Party except (i) as set forth on Schedule B and (ii) taxes owing for current or future periods that are not yet due and payable.

**SECTION 2.6. EMPLOYEE BENEFITS**. No Loan Party nor any of its ERISA Affiliates maintains or contributes to any Benefit Plan.

**SECTION 2.7. OTHER OBLIGATIONS**. None of the Loan Parties are in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation.

**SECTION 2.8. ENVIRONMENTAL MATTERS**. Except as set forth on Schedule B, each of the Loan Parties is in compliance in all material respects with all applicable federal or state environmental, hazardous waste, health and safety statutes, and any rules or regulations related to such statutes, which govern or affect any Loan Party's operations and/or properties. None of the operations of any Loan Party is the subject of any federal or state investigation evaluating whether any remedial action involving a material expenditure is needed to respond to a release of any toxic or hazardous waste or substance into the environment. No Loan Party has any material contingent liability in connection with any release of any toxic or hazardous waste or substance into the environment.

**SECTION 2.9. COMPLIANCE WITH LAWS, ETC**. No Loan Party is an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act. No Loan Party is engaged as one of its important activities in extending credit for margin stock (under Regulations T and U of the Federal Reserve Board of Governors). Each Loan Party has complied in all material respects with the Federal Fair Labor Standards Act. No Loan Party has violated any laws,

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 21 of 175

WFB_000012

ordinances or rules, the violation of which could reasonably be expected to result in a Material Adverse Effect or subject Loan Parties to costs or liability in excess of $200,000.

**SECTION 2.10.  MATERIAL CONTRACTS**.  Set forth on Schedule B is a detailed description of the Material Contracts of each Loan Party as of the Closing Date.  Except for matters which could not reasonably be expected to result in a Material Adverse Effect, each Material Contract (a) is in full force and effect and is binding upon and enforceable against such Loan Party and, to such Loan Party's knowledge, after due inquiry, each other Person that is a party in accordance with its terms, (b) has not been otherwise amended or modified, and (c) is not in default due to the action or inaction of such Loan Party.

**SECTION 2.11.  PERFECTION CERTIFICATE**.  All of the information, disclosures, representations, and warranties contained in the Perfection Certificate are true, complete, correct and accurate as of the Closing Date.

**SECTION 2.12.  NO EVENT OF DEFAULT**.  No Default or Event of Default has occurred and is continuing under this Agreement.

**SECTION 2.13.  NO OTHER LIENS**.  No Loan Party has mortgaged, pledged, granted a security interest or other Lien in or otherwise encumbered any of its assets or properties except in favor of Lender and except for Permitted Liens.

**SECTION 2.14.  OFAC; SANCTIONS; ANTI-CORRUPTION LAWS; ANTI-MONEY LAUNDERING LAWS**.  No Loan Party or any of its Subsidiaries is in violation of any Sanctions.  No Loan Party or any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  Each of the Loan Parties and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Laundering Laws.  No proceeds of any Advance made or Letter of Credit issued hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Person (including Lender, Bank Product Provider, or other individual or entity participating in any transaction).

**SECTION 2.15.  LOCATION OF INVENTORY**.  The Inventory of Borrowers is not stored with a bailee, warehouseman, consignee or similar party and is located only at, or in-transit between, the locations identified on Schedule B to this Agreement (as such Schedule may be updated pursuant to Section 4.13).

<div align="center">

**ARTICLE III**
**CONDITIONS**

</div>

**SECTION 3.1.  CONDITIONS OF INITIAL EXTENSION OF CREDIT**.  The obligation of Lender to make the initial Advance or other initial extension of credit under this Agreement is subject to the fulfillment to Lender's satisfaction of each of the following conditions: (i) all Loan Documents and all other documents relating to this Agreement will have been executed and delivered, and Lender will have

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 22 of 175

WFB_000013

received copies of each Loan Party's organizational documents, satisfactory authorizing resolutions and recent good standing certificates for each Loan Party, (ii) Lender will have confirmed to its satisfaction that there has been no Material Adverse Effect since the date of the last financial statements provided to Lender, (iii) Uniform Commercial Code and other searches and all Uniform Commercial Code and other filings deemed necessary by Lender will have been completed and will have confirmed Lender's first-priority Liens in the Collateral and the results thereof will be otherwise satisfactory to Lender, (iv) all insurance policies and other documents, agreements and actions required by this Agreement and the other Loan Documents will have been completed and will be in place, (v) no event which would constitute a Default or an Event of Default will have occurred, (vi) Lender will have received all required Collateral Access Agreements, (vii) Lender shall have received all financial information of each Loan Party required by this Agreement, including, without limitation, all financial projections, (viii) Lender will have completed its business, legal, and Collateral due diligence, including (a) a Collateral examination, appraisals and review of each Loan Party's books and records and verification of each Loan Party's representations and warranties to Lender, the results of which must be satisfactory to Lender, and (b) an inspection of each of the locations where the Inventory of each Loan Party is located, the results of which must be satisfactory to Lender, (ix) Lender shall have confirmed receipt of cash in an amount required by Lender from Fairn & Swanson's accounts maintained at JPMorgan Chase and City National Bank to Lender's Account (the "Closing Date Cash Transfer Amounts"), which amounts may be applied by Lender to the Obligations on or after the Closing Date, (x) the sum of Excess Availability plus the Closing Date Cash Transfer Amounts shall be at least $4,250,000 after giving effect to (A) the initial Advance and other initial extensions of credit under this Agreement, (B) the payment of all fees and Lender Expenses required to be paid by Borrowers on the Closing Date under this Agreement or the other Loan Documents, and (C) the repayment of all amounts owing to the Existing Lender (defined below); (xi) Lender will have obtained final credit approval, (xii) a letter, acceptable to Lender, from City National Bank ("Existing Lender") to Lender confirming the amount necessary to repay in full all of the obligations of the Loan Parties and its Subsidiaries owing to Existing Lender and obtain a release of all of the Liens existing in favor of Existing Lender in and to the assets of the Loan Parties and their Subsidiaries, (xiii) each Loan Party will have received all licenses, approvals and certifications required by any governmental authority necessary in connection with the execution of this Agreement and the Loan Documents and the completion of the transactions contemplated by this Agreement, and (xiv) all other conditions required by Lender shall have been fulfilled to Lender's satisfaction and all other deliverables required by Lender shall have been delivered to Lender's satisfaction, including without limitation the following:

(a)    the Guaranty and Security Agreement executed by each Borrower and each Guarantor on Lender's standard form;

(b)    subordination agreements in such form as Lender will specify executed by Andrew J. Armanino and Elke Uhlig, as co-trustees of the Uhlig Survivor's Trust;

(c)    Control Agreements executed by the applicable Loan Party and each Controlled Account Bank;

(d)    establishment of Wells Fargo cash management, operating accounts and collection accounts; and

(e)    execution and delivery of Letter of Credit applications and agreements.

**SECTION 3.2.  CONDITIONS OF EACH EXTENSION OF CREDIT**.  The obligation of Lender to make any Advance or any other extension of credit requested by Borrowers at any time will be subject to the fulfillment to Lender's satisfaction of each of the following conditions:

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 23 of 175

WFB_000014

(a)     The representations and warranties of the Loan Parties contained in this Agreement and in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier is not applicable to any representations or warranties already qualified or modified by materiality in the text thereof) on and as of the date of such Advance or such extension of credit as though made on and as of such date; and

(b)     No Default or Event of Default shall have occurred and be continuing on the date of such Advance or such extension of credit, nor shall either result from the making of such Advance or extension of credit.

Any request for an Advance or for any other extension of credit will be deemed to be a representation by Borrowers that the statements set forth in this Section 3.2 are correct as of the time of such request and if such request is for an Advance or a Letter of Credit, sufficient Availability exists for such Advance to be made or such Letter of Credit to be issued.

**SECTION 3.3.  CONDITIONS SUBSEQUENT**.   The obligation of Lender to continue to make Advances or otherwise extend credit under this Agreement is subject to the fulfillment, on or before the applicable date, of the conditions subsequent set forth on Schedule F.  The failure by any Borrower to so satisfy such conditions subsequent on or before the applicable date will constitute an immediate Event of Default.

<div align="center">

**ARTICLE IV**
**AFFIRMATIVE COVENANTS**

</div>

Each Borrower covenants that so long as Lender remains committed to make any Advance or extend any other credit to Borrowers or any Obligations remain outstanding, each Borrower will and will cause each other Loan Party to:

**SECTION 4.1.  FINANCIAL STATEMENTS**.  Provide to Lender the financial information set forth on Schedule C, in form and detail satisfactory to Lender, within the time periods set forth in Schedule C.

**SECTION 4.2.  COLLATERAL REPORTING**.  Provide to Lender all of the information set forth on Schedule D, in form and detail satisfactory to Lender, within the time periods set forth in Schedule D, and delivered electronically if Borrowers have implemented electronic reporting.

**SECTION 4.3.  FINANCIAL COVENANTS**.  Comply with each of the following financial covenants:

(a)     Minimum EBITDA.  Achieve EBITDA, measured on a month-end basis, of at least the required amount set forth in the following table for the applicable period set forth opposite thereto ((numbers appearing between "< >" are negative):

| **Applicable Amount** | **Applicable Period** |
|---|---|
| $<100,000> | For the 1 month period ending October 31, 2017 |
| $<50,000> | For the 2 month period ending November 30, 2017 |
| $250,000 | For the 9 month period ending December 31, 2017 |

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 24 of 175

**WFB_000015**

| | |
|---|---|
| $<100,000> | For the 1 month period ending January 31, 2018 |
| $<50,000> | For the 2 month period ending February 28, 2018 |
| $150,000 | For the 3 month period ending March 31, 2018 |
| $50,000 | For the 4 month period ending April 30, 2018 |
| $100,000 | For the 5 month period ending May 30, 2018 |
| $200,000 | For the 6 month period ending June 30, 2018 |
| $200,000 | For the 7 month period ending July 31, 2018 |
| $200,000 | For the 8 month period ending August 31, 2018 |
| $450,000 | For the 9 month period ending September 30, 2018 |
| $450,000 | For the 10 month period ending October 31, 2018 |
| $450,000 | For the 11 month period ending November 30, 2018 |
| $850,000 | For the 12 month period ending December 31, 2018 |
| $850,000 | For the 10 month period ending January 31, 2019 |
| $950,000 | For the 11 month period ending February 28, 2019 |

(b)     <u>Fixed Charge Coverage Ratio</u>.  Borrowers will have a Fixed Charge Coverage Ratio, measured on a month-end basis, of at least the required amount set forth in the following table for the applicable period set forth opposite thereto:

| **Applicable Ratio** | **Applicable Period** |
|---|---|
| 1.00 to 1.00 | For the twelve month period ending March 31, 2019 |
| 1.05 to 1.00 | For the twelve month period ending April 30, 2019 |
| 1.10 to 1.00 | For the twelve month period ending May 31, 2019 |
| 1.10 to 1.00 | For the twelve month period ending each month thereafter |

**SECTION 4.4.  ACCOUNTING RECORDS; INSPECTIONS**.  Maintain a system of accounting that enables Borrowers to produce financial statements in accordance with GAAP.  Each Loan Party will permit any representative of Lender, at any reasonable time, to inspect, audit and examine such books and records, to make copies of the same, and to inspect the Collateral and the other assets and properties of such Loan Party and to do inspections, exams and appraisals of the Collateral and any other

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 25
of 175
WFB_000016

assets of such Loan Party at Borrowers' expense. Borrowers will also permit Lender, in Lender's name or in the name of a nominee of Lender, to verify the validity, amount or any other matter relating to any Account, by mail, telephone, facsimile transmission or otherwise, and, at the request of Lender, Borrowers will send requests for verification of Accounts or send notices of assignment of Accounts to Account Debtors.

**SECTION 4.5. COMPLIANCE**. Preserve and maintain all licenses, permits, governmental approvals, rights, privileges and franchises necessary for the conduct of its business; and comply with the provisions of all documents under which each Loan Party is organized and/or which govern each Loan Party's continued existence, and with the requirements of all laws, rules, regulations and orders of any governmental authority applicable to each Loan Party and/or its business, the failure to maintain or comply with which could reasonably be expected to cause a Material Adverse Effect.

**SECTION 4.6. MAINTENANCE OF PROPERTIES**. Keep all properties useful or necessary to each Loan Party's business in good repair and condition, and from time to time make necessary repairs, renewals and replacements so that such properties will be fully and efficiently preserved and maintained.

**SECTION 4.7. TAXES AND OTHER LIABILITIES**. Pay and discharge when due any and all indebtedness, obligations, assessments and taxes, both real or personal, including without limitation federal and state income taxes and state and local property taxes and assessments.

**SECTION 4.8. NOTICE TO LENDER**. Promptly (but in no event more than five (5) days after the occurrence of each such event or matter) give written notice to Lender in reasonable detail of: (a) the occurrence of any Default or Event of Default; (b) any change in the name or the organizational structure of any Loan Party, and if any Loan Party is an individual, any change in the name set forth on such Loan Party's drivers license or other special identification card issued by any state; (c) a violation of any law, rule or regulation, the non-compliance with which reasonably could be expected to result in a Material Adverse Effect; (d) any termination or cancellation of any insurance policy which any Loan Party is required to maintain, or any loss through liability or property damage, or through fire, theft or any other cause affecting such Loan Party's property in excess of an aggregate of $100,000; (e) any litigation pending or threatened against any Loan Party which could reasonably be expected to cause a Material Adverse Effect or which involves more than $150,000; or (f) (i) any dispute, claims or offsets by any of Borrowers' customers exceeding $50,000 individually or $100,000 in the aggregate during any fiscal year or (ii) any Inventory returned to or recovered by a Loan Party outside of the ordinary course of business with a fair market value exceeding $50,000 individually or in the aggregate.

**SECTION 4.9. INSURANCE**. Maintain insurance customary for the business in which it is engaged and maintain all risk property insurance coverage covering the full replacement cost of the Collateral, together with general liability insurance, in each case, in form, substance, amounts, under agreements and with insurers acceptable to Lender in its Permitted Discretion. The insurance policies must be issued by an insurance company acceptable to Lender in its Permitted Discretion and contain a lender loss payable endorsement acceptable to Lender in its Permitted Discretion naming Lender as first and sole loss payee with regard to property coverage and as additional insured with regard to liability coverage.

**SECTION 4.10. DEPOSITORY RELATIONSHIP**. Within 45 days following the Closing Date (the "Interim Treasury Period"), establish and maintain all of its cash management, collection, and operating accounts with Lender; provided that Borrowers may maintain operating accounts at JPMorgan Chase (in connection with Borrowers' El Paso, Texas location) and with International Bank of Commerce (in connection with Borrowers' Eagle Pass and Laredo, Texas locations), so long as: (i) the balance maintained at JPMorgan Chase for the El Paso, Texas location does not exceed $250,000 at any

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 26 of 175

WFB_000017

time, Lender receives, and at all times thereafter maintains, a Control Agreement regarding such deposit account within 30 days after the Closing Date, and balances in excess of $250,000 in such deposit account are swept to an account designated by Lender not less frequently than three (3) times per calendar week; and (ii) the balances maintained at International Bank of Commerce for the Eagle Pass and Laredo, Texas locations do not exceed $50,000 in the aggregate at any time, and the aggregate balance in excess of $50,000 in such deposit accounts are swept to an account designated by Lender not less frequently than three (3) times per calendar week. During the Interim Treasury Period and until such time as such accounts have been established at Lender, Borrowers will maintain cash management services reasonably acceptable to Lender at another bank (a "Controlled Account Bank"). Borrowers will ensure that each Loan Party and all Account Debtors will deposit all collections of Accounts and all other items of payment directly to a bank account of Borrowers at such Controlled Account Bank (a "Controlled Account"). Except as permitted with respect the JPMorgan Chase and International Bank of Commerce deposit accounts to the extent provided above, during the Interim Treasury Period each Loan Party will maintain a deposit account control agreement acceptable to Lender in its Permitted Discretion (a "Control Agreement") with each Controlled Account Bank with respect to each Controlled Account at such Controlled Account Bank. Such Control Agreement will provide that the Controlled Account Bank will forward, by daily standing wire transfer, all amounts in the Controlled Account directly to a deposit account as directed by Lender.

SECTION 4.11.  MATERIAL CONTRACTS.  Deliver to Lender a copy of each Material Contract and amendment to Material Contract entered into since the delivery of the previous Compliance Certificate.  Each Loan Party shall maintain all Material Contracts in full force and effect and shall not default in the payment or performance of any obligations under any Material Contract.

SECTION 4.12.  COOPERATION.  Take such actions and execute and deliver to Lender such instruments and documents as Lender will request (including obtaining agreements from third parties as Lender deems necessary) to create, maintain, preserve and protect Lender's first-priority security interest in the Collateral and Lender's rights in the Collateral and to carry out the intent of this Agreement and the other Loan Documents.

SECTION 4.13.  LOCATION OF INVENTORY; CHIEF EXECUTIVE OFFICE.  Each Loan Party will keep (a) its Inventory only at the locations identified on Schedule B to this Agreement (provided that Borrowers may amend Schedule B to this Agreement so long as such amendment occurs by written notice to Lender not less than ten days prior to the date on which such Inventory is moved to such new location and so long as Lender has consented to such amendment and such new location is within the continental United States), and (b) their respective chief executive offices only at the locations identified on Schedule 7 to the Guaranty and Security Agreement.  Each Loan Party will use their commercially reasonable efforts to obtain Collateral Access Agreements for each of the locations identified on Schedule 7 to the Guaranty and Security Agreement and Schedule B to this Agreement.

SECTION 4.14.  OFAC; SANCTIONS; ANTI-CORRUPTION LAWS; ANTI-MONEY LAUNDERING LAWS.  Each of the Loan Parties and its Subsidiaries will implement and maintain in effect policies and procedures designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with, and each of the Loan Parties and their respective Subsidiaries and Affiliates will comply with, all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 27 of 175

WFB_000018

## ARTICLE V
## NEGATIVE COVENANTS

Each Borrower covenants that so long as Lender remains committed to make any Advance or extend any other credit to Borrowers, or any Obligations remain outstanding, no Borrower and no other Loan Party will:

**SECTION 5.1. USE OF FUNDS**. Use any of the proceeds of any Advance or any other credit extended under this Agreement for purposes other than (i) to repay in full, the outstanding principal, accrued interest, and accrued fees and expenses owing by Borrowers under Borrowers' existing credit facility with Existing Lender, (ii) to pay Lender Expenses incurred in connection with this Agreement and the other Loan Documents, and (iii) thereafter, consistent with the terms of this Agreement, for working capital and other business purposes of Borrowers. Borrowers will not use the proceeds of any extension of credit to (x) purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors, (y) directly or indirectly, to make any payments to a Sanctioned Entity or a Sanctioned Person, to fund any investments, loans or contributions in, or otherwise make such proceeds available to, a Sanctioned Entity or a Sanctioned Person, to fund any operations, activities or business of a Sanctioned Entity or a Sanctioned Person, or in any other manner that would result in a violation of Sanctions by any Person, and (z) directly or indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws.

**SECTION 5.2. OTHER INDEBTEDNESS**. Create, incur, assume or permit to exist any Indebtedness of any Loan Party, except (a) the Obligations and (b) Permitted Indebtedness.

**SECTION 5.3. MERGER, CONSOLIDATION, TRANSFER OF ASSETS, TRANSACTIONS OUTSIDE THE ORDINARY COURSE OF BUSINESS**. Cause, permit, participate in or suffer to occur, any of the following: (a) merge with or consolidate with any other Person; (b) make any substantial change in the nature of any Loan Party's business as conducted as of the Closing Date; (c) make any material change in the existing executive management personnel of any Loan Party; (d) liquidate or dissolve any Loan Party's business; (e) become a member or partner in a joint venture, partnership or limited liability company; (f) acquire all or substantially all of the assets of any other Person (or any division, business unit or line of business of any other entity), or acquire any assets outside the ordinary course of any Loan Party's business; (g) sell, lease, license, assign, transfer or otherwise dispose of any of any Loan Party's assets, except for the sale of Inventory in the ordinary course of its business, (h) create or acquire any Subsidiary; (i) enter into any other transaction outside the ordinary course of business (including any sale and leaseback transaction); or (j) liquidate, wind up, or dissolve itself or suspend or cease operation of a substantial portion of its business.

**SECTION 5.4. GUARANTIES**. Guarantee or become liable in any way as surety, endorser, accommodation endorser or otherwise for any liabilities or obligations of any other Person.

**SECTION 5.5. LOANS, ADVANCES, INVESTMENTS**. Make any investment in any Person, whether in the form of loans, advances, guarantees, capital contributions, or other investment (except (a) those existing as of the Closing Date and disclosed on Schedule B, and (b) additional other investments in amounts not to exceed an aggregate of $100,000 in any fiscal year, so long as not otherwise restricted or prohibited under any other Section of this Agreement) or acquisition of Equity Interests or Indebtedness of any Person.

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 28 of 175

WFB_000019

**SECTION 5.6.  RESTRICTED PAYMENTS; PAYMENTS REGARDING SUBORDINATED DEBT**.

(a)        Make any Restricted Payment; <u>provided</u>, that so long as it is permitted by law:

(i)        Fairn & Swanson may declare and pay distributions to such owners in the amount Pass-Through Tax Liabilities, net of any prior year loss carry-forwards, so long as (x) no Default or Event of Default has occurred and is continuing or would result from such distribution and (y) Fairn & Swanson is a "pass-through" tax entity for United States federal income tax purposes, and after first providing such supporting documentation as Lender may request (including the state and federal tax returns) of each owner of more than 10% of the Equity Interests in Fairn & Swanson; and

(ii)        Subsidiaries of Fairn & Swanson may declare and pay dividends or distributions to Fairn & Swanson.

(b)        Make any payments in respect of Indebtedness that has been subordinated to the Obligations; provided that with respect to the Uhlig Trust Debt, Fairn & Swanson may make payments of principal and interest when due and payable (but no prepayments), so long as the following conditions precedent are satisfied with respect to each such payment:  (A) no Event of Default has occurred or would result from any such payment; (B) Fairn & Swanson shall be in compliance with <u>Section 4.3</u> of this Agreement for the most-recently ended twelve-month period prior to any such payment, calculated on a pro forma basis as though such proposed payment was made during such twelve-month measurement period; (C) Excess Availability for the 30 day period prior to such payment (as though such payment was made on the first day of such 30-day period), and immediately after giving effect to such payment, shall not be less than $5,000,000; and (D) Fairn & Swanson shall provide notice to Wells Fargo of each such payment at least 15 days prior to making any such payment, together with a calculation of the pro forma financial covenant (if applicable under <u>Section 4.3</u> of the Credit Agreement) and the pro forma Excess Availability to evidence compliance with <u>clauses (B)</u> and <u>(C)</u> of this paragraph.

**SECTION 5.7.  LIENS**.  Mortgage, pledge, grant or permit to exist a security interest in, or Lien upon, all or any portion of any Loan Party's assets now owned or subsequently acquired, except (a) Liens in favor of Lender and (b) Permitted Liens.

**SECTION 5.8.  AGREEMENTS NOT TO ENCUMBER**.  Agree with any Person other than Lender not to grant or allow to exist a Lien upon any of its property, or covenant to any other Person that such Loan Party in the future will refrain from creating, incurring, assuming or allowing any Lien with respect to any of such Loan Party's property, other than Permitted Liens.

**SECTION 5.9.  AFFILIATE TRANSACTIONS**.  Directly or indirectly enter into, or permit to exist, any material transaction with any Affiliate of any Loan Party, except for (a) transactions that are in the ordinary course of such Loan Party's business, and are on fair and reasonable terms that are no less favorable to such Loan Party than would be obtained in an arm's length transaction with a non-affiliated Person, and (b) so long as it has been approved by such Loan Party's Board of Directors in accordance with applicable law, the payment of reasonable compensation, severance, or employee benefit arrangements to employees, officers, and directors of such Loan Party in the ordinary course of business and consistent with industry practice.

**SECTION 5.10.  ORGANIZATIONAL CHANGES**.  Change its name, chief executive office, principal residence, organizational documents, organizational identification number, state of organization, organizational identity or "location" as defined in Section 9-307 of the Code.

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 29 of 175

WFB_000020

**SECTION 5.11.  CHANGE OF ACCOUNTING METHOD**.  Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

**ARTICLE VI**
**EVENTS OF DEFAULT**

**SECTION 6.1.  EVENTS OF DEFAULT**.  The occurrence of any of the following will constitute an "Event of Default" under this Agreement:

(a)    Any Loan Party fails to pay when due any Obligation.

(b)    Any financial statement or certificate furnished to Lender in connection with, or any representation or warranty made or deemed made by any Borrower or any other Loan Party under this Agreement or any other Loan Document proves to be incorrect, false or misleading in any material respect when furnished or made (or deemed made).

(c)    Any Loan Party:

(i)    fails to perform or observe any covenant or other agreement contained in any of (A) Sections 3.3, 4.1, 4.2, 4.3, 4.4 (solely if any Loan Party refuses to allow Lender or its representatives or agents to visit any Loan Party's properties, inspect its assets or books or records, examine and make copies of its books and records, or discuss Loan Party's affairs, finances, and accounts with officers and employees of any Borrower), 4.8, or 4.9 of this Agreement, (B) Article V of this Agreement, or (C) Section 7 of the Guaranty and Security Agreement; or

(ii)    fails to perform or observe any covenant or other agreement contained in this Agreement, or in any of the other Loan Documents, in each case, other than any such covenant or agreement that is the subject of another provision of this Section 6.1 (in which event such other provision of this Section 6.1 shall govern), and such failure continues for a period of ten (10) days after the earlier of (x) the date on which such failure shall first become known to any officer or manager of any Loan Party, or (y) the date on which written notice thereof is given to the Loan Parties by Lender.

(d)    There is a default (i) in one or more agreements to which a Loan Party is a party with one or more third Persons relative to a Loan Party's Indebtedness involving an amount of $100,000 or more, for any one agreement, or in the aggregate for any combination of agreements, and such default (x) occurs at the final maturity of the obligations thereunder, or (y) results in a right by such third Person, irrespective of whether exercised, to accelerate the maturity of such Loan Party's obligations thereunder, or (ii) under or with respect to a Material Contract.

(e)    Any Loan Party becomes insolvent, or becomes the subject of an Insolvency Proceeding.

(f)    One or more judgments, orders, or awards for the payment of money involving $100,000 or more, individually, or $250,000 or more, in the aggregate (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage) is entered or filed against a Loan Party, or with respect to any of its assets, and either (i) there is a period of thirty consecutive days at any time after the entry of any such judgment, order, or award during which (x) the same is not discharged, satisfied, vacated, or bonded pending appeal, or (y) a stay of enforcement thereof is not in effect, or (ii) enforcement proceedings are commenced upon such judgment, order, or award.

(g)    A Change of Control shall occur, whether directly or indirectly.

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 30
of 175
**WFB_000021**

(h)     Any Loan Party makes any payment on any Indebtedness which is subject to a subordination agreement in favor of Lender, in violation of such subordination agreement.

(i)     Lender fails to have a first-priority security interest in any of the Collateral, subject to no other Liens except Permitted Liens.

(j)     Any Loan Party repudiates or revokes or purports to repudiate or revoke any obligation under its Guaranty and Security Agreement or under any other Loan Document to which it is a party, or if the obligation of any Guarantor under any Guaranty and Security Agreement is limited or terminated by operation of law or by such Guarantor (other than in accordance with the terms of this Agreement).

**SECTION 6.2.   REMEDIES**.  Upon the occurrence and during the continuation of an Event of Default, Lender may:  (a) by written notice to Borrowers, declare the Obligations (other than Obligations under any Hedge Agreement, which may be accelerated pursuant to the terms of the applicable Hedge Agreement) immediately due and payable, at which time such Obligations shall be immediately due and payable and each Borrower shall be obligated to immediately repay all of such Obligations in full, without presentment, demand, protest, notice of dishonor, or other notice of any kind or other requirement of any kind, all of which are hereby expressly waived by Borrowers; (b) by written notice to Borrowers, declare the obligations, if any, of Lender to make further Advances or other extensions of credit under this Agreement and any of the Loan Documents terminated, at which time such obligations will immediately cease and terminate; (c) by written notice to Borrowers, require Borrowers to cash collateralize the Letter of Credit Usage in an amount equal to 110% of such Letter of Credit Usage and (d) exercise any or all rights, powers and remedies available under the Guaranty and Security Agreement and each of the other Loan Documents, or accorded by law or equity.  All rights, powers and remedies of Lender may be exercised at any time by Lender and from time to time after the occurrence and during the continuation of an Event of Default, and the same are cumulative and not exclusive, and will be in addition to any other rights, powers or remedies provided by law or equity.  Upon the occurrence of any Default or Event of Default described in Section 6.1(e) with respect to Borrowers (without any notice to Borrowers), any obligation of Lender to make Advances or provide any further extensions of credit hereunder shall automatically terminate and the Obligations (other than Obligations under any Hedge Agreement, which may be accelerated pursuant to the terms of the applicable Hedge Agreement) shall automatically and immediately become due and payable.

**SECTION 6.3.   CURATIVE EQUITY**.

(a)     Subject to the limitations and requirements set forth in clauses (d) and (e) below, Borrowers may cure (and shall be deemed to have cured) an Event of Default arising out of a breach of the financial covenants set forth in Section 4.3 (the "Specified Financial Covenants") if they receive the cash proceeds of an investment of Curative Equity on or before the date that is ten (10) Business Days after the date that is the earlier to occur of (i) the date on which the Compliance Certificate is delivered to Lender in respect of the fiscal month with respect to which any such breach occurred (the "Specified Financial Month"), and (ii) the date on which the Compliance Certificate is required to be delivered to Lender pursuant to Section 4.1 and Schedule C in respect of the Specified Financial Month (such earlier date, the "Financial Statement Delivery Date"); provided, that Borrowers' right to so cure an Event of Default shall be contingent on their timely delivery of such Compliance Certificate and financial statements for the Specified Fiscal Month as required under Section 4.1 and Schedule C.

(b)     In connection with a cure of an Event of Default under this Section 6.3, on or before the Financial Statement Delivery Date for the Specified Financial Month, Borrowers shall deliver to Lender a certification of an authorized officer of the Borrowers which contains, or Borrowers shall include in the Compliance Certificate for the Specified Financial Month:  (i) an indication that Borrowers will receive

proceeds of Curative Equity for the Specified Fiscal Month and a statement setting forth the anticipated amount of such proceeds, (ii) a calculation of the financial results or prospective financial results of Borrowers for the Specified Fiscal Month (including for such purposes the proceeds of the Curative Equity (broken out separately) as deemed EBITDA as if received on such date), which shall confirm that on a pro forma basis after taking into account the receipt of the Curative Equity proceeds, Borrowers would have been or will be in compliance with the Specified Financial Covenants for the Specified Financial Month, (iii) a certification that the full amount of the cash proceeds of the equity investment made by the existing shareholders of Borrowers in connection with such cure of the Event of Default shall be used to prepay the Obligations, in any order selected by Lender in Lender's sole discretion, regardless of whether the amount of such cash proceeds is in excess of the amount that is sufficient to cause Borrowers to be in compliance with the Specified Financial Covenants for the Specified Fiscal Month, and (iv) a certification that any amount of the cash proceeds of the equity investment in excess of the amount that is sufficient to cause Borrowers to be in compliance with the Specified Financial Covenants for the Specified Fiscal Month shall not be included in the calculation of EBITDA for any fiscal month.

(c)     Borrowers shall promptly notify Lender of its receipt of any proceeds of Curative Equity (and shall immediately apply the full amount of the cash proceeds of the equity investment to the payment of the Obligations in the manner specified by Lender in Lender's sole discretion.

(d)     Any investment of Curative Equity shall be in immediately available funds and shall be in an amount that is equal to the ***sum of*** (i) an amount that is sufficient to cause Borrowers to be in compliance with the Specified Financial Covenants for the Specified Fiscal Month, calculated for such purpose as if such amount of Curative Equity were additional EBITDA of Borrowers as at such date, ***plus*** (ii) an additional amount of not less than $250,000.

(e)     Notwithstanding anything to the contrary contained herein, regardless of whether an investment of Curative Equity is made prior to the applicable Financial Statement Delivery Date, Borrowers' rights under this Section 6.3 may (i) be exercised not more than three (3) times during the term of this Agreement, (ii) not be exercised more than one (1) time in any twelve fiscal month period and not more than once during any calendar year, and (iii) not be exercised if the amount of the proposed investment of Curative Equity (required under Section 6.3(d)(i)) exceeds $350,000.  Regardless of whether an investment of Curative Equity is made prior to the applicable Financial Statement Delivery Date, any amount of Curative Equity that is in excess of the amount sufficient to cause Borrowers to be in compliance with all of the Specified Financial Covenants as at such date shall not constitute Curative Equity (but shall be required to be used to prepay the Obligations as provided above, including, without limitation the $250,000 of additional cash required by Section 6.3(d) above).

(f)     If Borrowers have (i) delivered a certification or a Compliance Certificate conforming to the requirements of Section 6.3(b), and (ii) received proceeds of an investment of Curative Equity in immediately available funds on or before the deadline set forth in Section 6.3(a) and in an amount that is sufficient to cause Borrowers to be in compliance with the Specified Financial Covenants for the Specified Fiscal Month, any Event of Default that occurs or has occurred and is continuing as a result of a breach of the Specified Financial Covenants for the Specified Fiscal Month shall be deemed cured with no further action required by the Lender.  Prior to satisfaction of the foregoing requirements of this Section 6.3(f), any Event of Default that occurs or has occurred as a result of a breach of the Specified Financial Covenants shall be deemed to be continuing and, as a result, the Lender shall have no obligation to make additional loans or otherwise extend additional credit hereunder.  In the event Borrowers do not cure all financial covenant violations as provided in this Section 6.3, the existing Event(s) of Default shall continue unless waived in writing by the Lender.

Case: 20-40990     Doc# 17-1     Filed: 06/26/20     Entered: 06/26/20 08:45:29     Page 32 of 175

WFB_000023

(g)     To the extent that Curative Equity is received and included in the calculation of the Specified Financial Covenants as deemed EBITDA for any fiscal month pursuant to this Section 6.3, such Curative Equity shall be deemed to be EBITDA for purposes of determining compliance with the Specified Financial Covenants for subsequent periods that include such fiscal month; provided that the amount required by, or contributed to Borrowers, under Section 6.3(d)(ii) shall not be deemed to be EBITDA for any purpose.  Curative Equity shall be disregarded for purposes of determining EBITDA for any pricing, financial covenant based conditions, or any baskets with respect to the covenants contained in this Agreement, if any.

## ARTICLE VII
## MISCELLANEOUS

**SECTION 7.1.  CERTAIN DEFINITIONS**.  The following terms will have the following meanings:

"Acceptable Appraisal" means, with respect to an appraisal of Inventory, the most recent current appraisal of such property received by Lender (a) from an appraisal company satisfactory to Lender, (b) the scope and methodology (including, to the extent relevant, any sampling procedure employed by such appraisal company) of which are satisfactory to Lender, and (c) the results of which are satisfactory to Lender, in each case, in Lender's Permitted Discretion.

"Account" has the meaning set forth in Section 1.1(a).

"Account Debtor" has the meaning set forth in Section 1.1(a).

"Administrative Borrower" has the meaning set forth in Section 1.6.

"Advances" has the meaning set forth in Section 1.1(a).

"Affiliate" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Equity Interests, by contract, or otherwise; provided, that, for purposes of the definition of Eligible Accounts and Section 5.9:  (a) any Person which owns directly or indirectly 10% or more of the Equity Interests having ordinary voting power for the election of directors or equivalent governing body of a Person or 10% or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership in which a Person is a general partner shall be deemed an Affiliate of such Person.

"Agreement" means this Credit Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Anti-Corruption Laws" means the FCPA, the U.K.  Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery, money laundering or corruption in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business.

"Anti-Money Laundering Laws" means the applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business that relates to

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 33 of 175

WFB_000024

money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Applicable Margin" means 2%; provided, however, that such margin shall be subject to a one-time reduction of 0.25% upon satisfaction of the following conditions precedent for such reduction: (a) after November 10, 2018, Borrowers' achieve a Fixed Charge Coverage Ratio for the twelve-month period ending on the last day of each of two consecutive fiscal quarters (each, an "Applicable Fiscal Period") of at least 1.25:1.0; (b) Lender has received financial statements required by Section 4.1 and Schedule C of this Agreement, together with calculations of Borrowers' Fixed Charge Coverage Ratio, for each Applicable Fiscal Period (certified by the chief financial officer of Borrowers); and (c) no Default or Event of Default is existing at the time of such reduction in the Applicable Margin. Only one such reduction of the Applicable Margin shall be permitted. Any such reduction in the Applicable Margin shall be effective on the first Business Day of the first calendar month after receipt by Lender of the foregoing required financial statements and calculations (and evidence of satisfaction of the other conditions precedent); provided that in the event that the information regarding such Fixed Charge Coverage Ratio contained in any certificate delivered pursuant to the foregoing requirements is shown to be inaccurate, and such inaccuracy, if corrected, would result in Borrowers not having satisfied the foregoing Fixed Charge Coverage Ratio requirements, then (x) Borrowers shall immediately deliver to Lender a correct certificate setting forth the correct calculation of Borrowers' Fixed Charge Coverage Ratio, as applicable, for such relevant periods, (y) the Applicable Margin shall be adjusted to reflect the correct Fixed Charge Coverage Ratio, as applicable, retroactive to the date that the Applicable Margin was previously reduced, and (C) Borrowers shall immediately deliver to Lender full payment in respect of the accrued additional interest as a result of such increased Applicable Margin for the applicable period.

"Availability" means, as of any date of determination, the amount that Borrowers are entitled to borrow as Advances under Section 1.1(a) after giving effect to all then outstanding Advances and Letter of Credit Usage.

"Availability Block Amount" has the meaning set forth in Section 1.1(a).

"Bank Product" means any one or more of the following financial products or accommodations extended to any Loan Party by a Bank Product Provider: (a) credit cards (including commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards")), (b) payment card processing services, (c) debit cards, (d) stored value cards, (e) Cash Management Services, or (f) transactions under Hedge Agreements.

"Bank Product Agreements" means those agreements entered into from time to time by any Loan Party or any of its Subsidiaries with a Bank Product Provider in connection with the obtaining of any of the Bank Products, including all Cash Management Documents.

"Bank Product Obligations" means (a) all obligations, liabilities, reimbursement obligations, fees, or expenses owing by each Loan Party to any Bank Product Provider pursuant to or evidenced by a Bank Product Agreement and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, (b) all Hedge Obligations, and (c) all amounts that Lender is obligated to pay to a Bank Product Provider as a result of Lender purchasing participations from, or executing guarantees or indemnities or reimbursement obligations to, a Bank Product Provider with respect to the Bank Products provided by such Bank Product Provider to a Loan Party or its Subsidiaries.

"Bank Product Provider" means Lender or any of its Affiliates that provide Bank Products to any Loan Party.

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 34 of 175

WFB_000025

"Bank Product Reserves" has the meaning set forth in Section 1.1(a).

"Bankruptcy Code" means Title 11 of the United States Code as in effect from time to time.

"Base Rate" means the greatest of (a) the Federal Funds Rate *plus* ½%, and (b) the rate of interest announced, from time to time, within Lender at its principal office in San Francisco as its "prime rate", with the understanding that the "prime rate" is one of Lender's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Lender may designate (and, if any such announced rate is below zero, then the rate determined pursuant to this clause (b) shall be deemed to be zero).

"Benefit Plan" means a "defined benefit plan" (as defined in Section 3(35) of ERISA) for which any Loan Party or any of its Subsidiaries or ERISA Affiliates has been an "employer" (as defined in Section 3(5) of ERISA) within the past six years.

"Board of Directors" means the board of directors (or comparable managers) of a Borrower or any other Loan Party or any committee thereof duly authorized to act on behalf of the board of directors (or comparable managers).

"Borrowers" has the meaning set forth in the preamble to this Agreement.

"Borrowing Base" has the meaning set forth in Section 1.1(a).

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the State of California.

"Capital Expenditures" means, with respect to any Person for any period, the amount of all expenditures by such Person and its Subsidiaries during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed, but excluding, without duplication with respect to the purchase price of assets that are purchased substantially contemporaneously with the trade-in of existing assets during such period, the amount that the gross amount of such purchase price is reduced by the credit granted by the seller of such assets for the assets being traded in at such time.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Capitalized Lease Obligation" means that portion of the obligations under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Cash Management Documents" means the agreements governing each of the Cash Management Services of Lender utilized by a Loan Party, which agreements shall currently include the Master Agreement for Treasury Management Services or other applicable treasury management services agreement, the "Acceptance of Services", the "Service Description" governing each such treasury management service used by a Loan Party, and all replacement or successor agreements which govern such Cash Management Services of Lender.

"Cash Management Services" means any cash management or related services including treasury, depository, return items, overdraft, controlled disbursement, merchant store value cards, e-payables services, electronic funds transfer, interstate depository network, automatic clearing house transfer

(including the Automated Clearing House processing of electronic funds transfers through the direct Federal Reserve Fedline system) and other cash management arrangements.

"Change in Law" has the meaning set forth in Section 1.3(a).

"Change of Control" means that:

(a) the Permitted Holders fail to own and control, directly or indirectly, 51%, or more, of the Equity Interests of Fairn & Swanson entitled (without regard to the occurrence of any contingency) to vote for the election of members of the Board of Directors of Fairn & Swanson,

(b) any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Exchange Act), other than the Permitted Holders, becomes the beneficial owner (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of 20%, or more, of the Equity Interests of Fairn & Swanson entitled (without regard to the occurrence of any contingency) to vote for the election of members of the Board of Directors of Fairn & Swanson,

(c) a majority of the members of the Board of Directors of Fairn & Swanson do not constitute Continuing Directors, or

(d) Fairn & Swanson fails to own and control, directly or indirectly, 100% of the Equity Interests of each other Loan Party.

"Closing Date" has the meaning set forth in the preamble to this Agreement.

"Code" means the California Uniform Commercial Code, as in effect from time to time. To the extent that defined terms set forth in this Agreement have different meanings under different Articles under the Uniform Commercial Code, the meaning assigned to such defined term under Article 9 of the Uniform Commercial Code will control.

"Collateral" means all assets and interests in assets and proceeds thereof now owned or hereafter acquired by any Loan Party or its Subsidiaries in or upon which a Lien is granted by such Person in favor of Lender under any of the Loan Documents.

"Collateral Access Agreement" means a landlord waiver, bailee letter, or acknowledgment agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in the books, Equipment, Accounts or Inventory of any Loan Party in favor of Lender, in each case, in form and substance satisfactory to Lender.

"Collections" has the meaning set forth in Section 1.1(g).

"Compliance Certificate" means a certificate in the form of Schedule E delivered by the chief financial officer of Administrative Borrower to Lender.

"Continuing Director" means (a) any member of the Board of Directors who was a director (or comparable manager) of Fairn & Swanson on the Closing Date, and (b) any individual who becomes a member of the Board of Directors after the Closing Date if such individual was approved, appointed or nominated for election to the Board of Directors by either the Permitted Holders or a majority of the Continuing Directors.

"Control Agreement" has the meaning set forth in Section 4.10.

Case: 20-40990     Doc# 17-1     Filed: 06/26/20     Entered: 06/26/20 08:45:29     Page 36 of 175

WFB_000027

"Controlled Account" has the meaning set forth in Section 4.10.

"Controlled Account Bank" has the meaning set forth in Section 4.10.

"Curative Equity" means the net amount of common equity contributions made to Borrowers in immediately available funds and which is designated "Curative Equity" by Borrowers under Section 6.3 of this Agreement at the time it is contributed. For the avoidance of doubt, the forgiveness of antecedent debt (whether Indebtedness, trade payables, or otherwise) shall not constitute Curative Equity.

"Daily Three Month LIBOR" means, for any day the rate per annum for United States dollar deposits determined by Lender for the purpose of calculating the effective interest rate for loans that reference Daily Three Month LIBOR as the Inter-Bank Market Offered Rate in effect from time to time for the 3 month delivery of funds in amounts approximately equal to the principal amount of such loans (and if such rate is below zero, the Daily Three Month LIBOR shall be deemed to be zero). Borrowers understand and agree that Lender may base its determination of the Inter-Bank Market Offered Rate upon such offers or other market indicators of the Inter-Bank Market as Lender, in its discretion, deems appropriate, including but not limited to the rate offered for U.S. dollar deposits on the London Inter-Bank Market. When interest is determined in relation to Daily Three Month LIBOR, each change in the interest rate will become effective each Business Day that Lender determines that Daily Three Month LIBOR has changed.

"Default" means an event, condition or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Default Rate" has the meaning set forth in Section 1.2(b).

"Dilution" has the meaning set forth in Section 1.1(a).

"Dilution Reserve" has the meaning set forth in Section 1.1(a).

"Disqualified Equity Interests" means any Equity Interests that, by their terms (or by the terms of any security or other Equity Interests into which they are convertible or for which they are exchangeable), or upon the happening of any event or condition (a) matures or are mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) are redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provide for the scheduled payments of dividends in cash, or (d) are or become convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 180 days after the Maturity Date.

"Dollars" means United States dollars.

"EBITDA" means, with respect to any fiscal period and with respect to Borrowers determined, in each case, on a consolidated basis in accordance with GAAP:

        (a)      the consolidated net income (or loss),

*minus*

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 37 of 175

WFB_000028

(b)     without duplication, the sum of the following amounts for such period to the extent included in determining consolidated net income (or loss) for such period:

        (i)     extraordinary gains, and

        (ii)    interest income,

               *plus*

(c)     without duplication, the sum of the following amounts for such period to the extent included in determining consolidated net income (or loss) for such period:

        (i)     non-cash extraordinary losses,

        (ii)    Interest Expense,

        (iii)   income taxes,

        (iv)    depreciation and amortization,

        (v)     one-time, non-recurring legal fees and expenses related solely to the lawsuit filed by the Alcohol and Tobacco Tax and Trade Bureau against Fairn & Swanson in an aggregate amount not to exceed $144,000 for the period commencing April 1, 2017 and ending June 30, 2017,

        (vi)    one-time costs and expenses incurred during July, August, and September 2017, with respect to the disposition of Inventory that has been held by Borrowers for more than 12 months (prior to any such disposition); provided that the amount included under this clause (vi) shall not exceed (A) $134,000 for July 2017, (B) $39,000 for August 2017, and (C) $55,000 for September 2017,

        (vii)   one-time costs and expenses incurred during the period October 1, 2017 through December 31, 2017, with respect to the disposition of Inventory that has been held by Borrowers for more than 12 months (prior to any such disposition); provided that the aggregate amount included under this clause (vii) shall not exceed $150,000, and

        (viii)  one-time severance costs and expenses incurred during the period October 1, 2017 through December 31, 2017, arising from the termination of employees during such period; provided that the amount included under this clause (viii) shall not exceed $60,000.

"Eligible Accounts" has the meaning set forth in Section 1.1(a).

"Eligible Excess Inventory" has the meaning set forth in Section 1.1(a).

"Eligible In-Line Inventory" has the meaning set forth in Section 1.1(a).

"Eligible In-Transit Inventory" has the meaning set forth in Section 1.1(a).

"Equipment" means equipment as that term is defined in the Code.

Case: 20-40990     Doc# 17-1     Filed: 06/26/20     Entered: 06/26/20 08:45:29     Page 38 of 175

WFB_000029

"Equity Interests" means, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in such Person, whether voting or nonvoting, including capital stock (or other ownership or profit interests or units), preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Affiliate" means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of any Loan Party or its Subsidiaries under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of any Loan Party or its Subsidiaries under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which any Loan Party or any of its Subsidiaries is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with any Loan Party or any of its Subsidiaries and whose employees are aggregated with the employees of such Loan Party or its Subsidiaries under IRC Section 414(o).

"Event of Default" has the meaning set forth in Section 6.1.

"Excess Availability" means, as of any date of determination, the amount equal to Availability *minus* the aggregate amount, if any, of all trade payables of the Loan Parties aged in excess of historical levels with respect thereto and all book overdrafts of the Loan Parties in excess of historical practices with respect thereto, in each case as determined by Lender in its Permitted Discretion.

"Exchange Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Existing Lender" shall have the meaning set forth in Section 3.1.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Lender from three Federal funds brokers of recognized standing selected by it (and, if any such rate is below zero, then the rate determined pursuant to this definition shall be deemed to be zero).

"Financial Statement Delivery Date" has the meaning set forth in Section 6.3.

"Fixed Charge Coverage Ratio" means, with respect to any relevant measurement period and with respect to the Borrowers determined on a consolidated basis in accordance with GAAP, the ratio of (a) EBITDA for such period *minus* Unfinanced Capital Expenditures made (to the extent not already incurred in a prior period) or incurred during such period, to (b) Fixed Charges for such period.

"Fixed Charges" means, with respect to any fiscal period and with respect to Borrowers determined on a consolidated basis in accordance with GAAP, the sum, without duplication, of (a)

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 39 of 175

WFB_000030

Interest Expense required to be paid (other than interest paid-in-kind, amortization of financing fees, and other non-cash Interest Expense) during such period, (b) scheduled principal payments in respect of Indebtedness that are required to be paid during such period, (c) all federal, state, and local income taxes required to be paid during such period, and (d) all Restricted Payments paid (whether in cash or other property, other than common Equity Interests) during such period.

"GAAP" has the meaning set forth in Section 2.4.

"Governmental Authority" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, county, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantor" means each Person that has guaranteed all or any part of the Obligations, including any Person that is a "Guarantor" under the Guaranty and Security Agreement.

"Guaranty and Security Agreement" has the meaning set forth in Section 1.5.

"Hedge Agreement" means any "swap agreement" as that term is defined in Section 101(53B)(A) of the Bankruptcy Code.

"Hedge Obligations" means any and all obligations or liabilities, whether absolute or contingent, due or to become due, now existing or hereafter arising, of each Loan Party arising under, owing pursuant to, or existing in respect of Hedge Agreements entered into with one or more of the Hedge Providers.

"Hedge Provider" means Lender or any of its Affiliates.

"Indebtedness" as to any Person means (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations of such Person as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices and, for the avoidance of doubt, other than royalty payments payable in the ordinary course of business in respect of non-exclusive licenses) and any earn-out or similar obligations, (f) all monetary obligations of such Person owing under Hedge Agreements (which amount shall be calculated based on the amount that would be payable by such Person if the Hedge Agreement were terminated on the date of determination), (g) any Disqualified Equity Interests of such Person, and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness which is limited or is non-recourse to a Person or for which recourse is limited to an identified asset shall be valued at the lesser of (A) if applicable, the limited amount of such obligations, and (B) if applicable, the fair market value of such assets securing such obligation.

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 40 of 175

WFB_000031

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Interest Expense" means, for any period, the aggregate of the interest expense of Borrowers for such period, determined on a consolidated basis in accordance with GAAP.

"Interim Treasury Period" has the meaning set forth in Section 4.10.

"Inventory" has the meaning set forth in Section 1.1(a).

"Inventory Reserves" has the meaning set forth in Section 1.1(a).

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"L/C Collateral Conditions" has the meaning set forth in Section 1.4(a).

"Landlord Reserve" means, as to each location at which a Borrower has Inventory, or books and records located and as to which a Collateral Access Agreement has not been received by Lender, a reserve in an amount equal to 3 months' rent, storage charges, fees or other amounts under the lease or other applicable agreement relative to such location or, if greater and Lender so elects, the number of months' rent, storage charges, fees or other amounts for which the landlord, bailee, warehouseman or other property owner will have, under applicable law, a Lien in the Inventory of such Borrower to secure the payment of such amounts under the lease or other applicable agreement relative to such location.

"Lender" has the meaning set forth in the preamble to this Agreement, and shall include its successors and assigns.

"Lender Expenses" has the meaning set forth in Section 7.4.

"Lender's Account" has the meaning set forth in Section 1.1(f).

"Letter of Credit" has the meaning set forth in Section 1.1(b).

"Letter of Credit Usage" has the meaning set forth in Section 1.1(b).

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Line of Credit" has the meaning set forth in Section 1.1(a).

"Loan Account" has the meaning set forth in Section 1.1(g).

"Loan Documents" means this Agreement, the Guaranty and Security Agreement, the Perfection Certificate, each letter of credit agreement and each contract, instrument, agreement and other document required by this Agreement or at any time entered into or delivered to Lender in connection with this Agreement or the Line of Credit, specifically excluding Bank Product Agreements.

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 41 of 175

WFB_000032

"Loan Manager" has the meaning set forth in Section 1.1(c).

"Loan Parties" means collectively, each Borrower and each Guarantor and each of them is a "Loan Party".

"Lockbox" has the meaning set forth in Section 1.1(f).

"Material Adverse Effect" means (a) a material adverse effect in the business, operations, results of operations, assets, liabilities or financial condition of the Loan Parties, taken as a whole, (b) a material impairment of the Loan Parties' ability to perform their obligations under the Loan Documents to which they are parties or of Lender's ability to enforce the Obligations or realize upon the Collateral (other than as a result of an action taken or not taken that is solely in the control of Lender), or (c) a material impairment of the enforceability or priority of Lender's Liens with respect to all or a material portion of the Collateral.

"Material Contract" means (i) each contract or agreement to which any Loan Party is a party involving aggregate consideration payable to or by such Loan Party of $500,000 or more (other than purchase orders in the ordinary course of the business of such Loan Party), (ii) each contract or agreement between a Loan Party and any of Royal Caribbean, Carnival Corp., Norwegian Cruise Line, or Top Brands for Less, and (iii) all other contracts or agreements, the loss of which could reasonably be expected to result in a Material Adverse Effect.

"Maturity Date" has the meaning set forth in Section 1.4(a).

"Maximum Revolver Amount" has the meaning set forth in Section 1.1(a).

"Monthly Reporting Period" means, at any time after December 31, 2017, the period commencing after the date on which Borrowers have achieved Excess Availability of at least $3,500,000 for 30 consecutive days and so long as no Default or Event of Default has occurred and is continuing as of such date, and continuing until the date on which Excess Availability is less than $3,500,000 or a Default or an Event of Default has occurred.

"Net Recovery Percentage" has the meaning set forth in Section 1.1(a).

"Obligations" means (a) all loans (including the Advances), debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), reimbursement or indemnification obligations with respect to Letters of Credit (irrespective of whether contingent), premiums, liabilities (including all amounts charged to the Loan Account), obligations (including indemnification obligations), fees, Lender Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), guaranties, and all covenants and duties of any other kind and description owing by any Loan Party arising out of, under, pursuant to, in connection with, or evidenced by this Agreement or any of the other Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due, and all other expenses or other amounts that any Loan Party is required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents, and (b) all Bank Product Obligations. Without limiting the generality of the foregoing, the Obligations of Borrowers under the Loan Documents include the obligation to pay (i) the principal of the Advances, (ii) interest accrued on the Advances, (iii) the amount necessary to reimburse Lender for amounts paid or payable pursuant to Letters of Credit, (iv) Letter of

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 42 of 175

WFB_000033

Credit fronting fees, commissions, fees and charges, (v) Lender Expenses, (vi) fees payable under this Agreement or any of the other Loan Documents, and (vii) indemnities and other amounts payable by any Loan Party under any Loan Document. Any reference in this Agreement or in the Loan Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations of the Obligations, both prior and subsequent to any Insolvency Proceeding.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Overadvance Amount" has the meaning set forth in Section 1.1(h).

"Pass-Through Tax Liabilities" means the amount of state and federal income tax paid or to be paid by the owner of any Equity Interest in a Loan Party on taxable income earned by such Loan Party and attributable to such owner as a result of such Loan Party's "pass-through" tax status, assuming the highest marginal income tax rate for federal and state (for the state or states in which any equity owner is liable for income taxes with respect to such income) income tax purposes, after taking into account any deduction for state income taxes in calculating the federal income tax liability and all other deductions, credits, deferrals and other reductions available to such owners from or through such Loan Parties.

"Patriot Act" means Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001).

"Perfection Certificate" means the Perfection Certificate dated as of the Closing Date, completed and executed by Borrowers and delivered to Lender.

"Permitted Discretion" means a determination made in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Holders" means the Elke Uhlig Survivors Trust, Uhlig Marital Trust Non-Exempt, Uhlig Marital Trust Exempt, and Uhlig Bypass Trust.

"Permitted Indebtedness" means (a) Indebtedness in respect of the Obligations, (b) Indebtedness as of the Closing Date set forth on Schedule B to this Agreement, (c) Permitted Purchase Money Indebtedness, (d) Indebtedness arising in connection with the endorsement of instruments or other payment items for deposit, (e) the incurrence by any Loan Party of Indebtedness under Hedge Agreements that is incurred for the bona fide purpose of hedging the interest rate, commodity, or foreign currency risks associated with such Loan Party's operations and not for speculative purposes, and (f) Indebtedness incurred in the ordinary course of business in respect of credit cards, credit card processing services, debit cards, stored value cards, commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards"), or Cash Management Services.

"Permitted Liens" means: (a) Liens granted to, or for the benefit of, Lender to secure the Obligations, (b) Liens for unpaid taxes, assessments, or other governmental charges or levies that are not yet delinquent, (c) Liens set forth on Schedule B to this Agreement, (d) the interests of lessors under operating leases and non-exclusive licensors under license agreements, and (e) purchase money Liens on fixed assets or the interests of lessors under Capital Leases to the extent that such Liens or interests secure Permitted Purchase Money Indebtedness and so long as (i) such Lien attaches only to the fixed asset purchased or acquired and the proceeds thereof, and (ii) such Lien only secures the Indebtedness that was incurred to acquire the fixed asset purchased or acquired.

"Permitted Purchase Money Indebtedness" means, as of any date of determination, Indebtedness (other than the Obligations, but including Capitalized Lease Obligations), incurred after the Closing Date

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 43 of 175

WFB_000034

and at the time of, or within 20 days after, the acquisition of any fixed assets for the purpose of financing all or any part of the acquisition cost thereof, in an aggregate principal amount outstanding at any one time not in excess of $500,000.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and their political subdivisions.

"Receivable Reserves" has the meaning set forth in Section 1.1(a).

"Reserves" has the meaning set forth in Section 1.1(a).

"Restricted Payment" means (a) any declaration or payment of any dividend or the making of any other payment or distribution, directly or indirectly, on account of Equity Interests issued by any Borrower (including any payment in connection with any merger or consolidation involving any Borrower) or to the direct or indirect holders of Equity Interests issued by any Borrower in their capacity as such, or (b) any purchase, redemption, making of any sinking fund or similar payment, or other acquisition or retirement for value (including in connection with any merger or consolidation involving any Borrower) any Equity Interests issued by any Borrower, or (c) any making of any payment to retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire Equity Interests of any Borrower now or hereafter outstanding.

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, (d) a Person resident in or determined to be resident in a country, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country sanctions program administered and enforced by OFAC.

"Sanctioned Person" means, at any time, (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any relevant Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by: (a) the United States of America, including those administered by the OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (d) any other governmental authority with jurisdiction over Lender or any Loan Party or any of their respective Subsidiaries or Affiliates.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Solvent" means, with respect to any Person as of any date of determination, that (a) at fair valuations, the sum of such Person's debts (including contingent liabilities) is less than all of such Person's assets, (b) such Person is not engaged or about to engage in a business or transaction for which

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 44 of 175

WFB_000035

the remaining assets of such Person are unreasonably small in relation to the business or transaction or for which the property remaining with such Person is an unreasonably small capital, (c) such Person has not incurred and does not intend to incur, or reasonably believe that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise), and (d) such Person is "solvent" or not "insolvent", as applicable within the meaning given those terms and similar terms under applicable laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"Specified Financial Covenants" has the meaning set forth in Section 6.3.

"Specified Financial Month" has the meaning set forth in Section 6.3.

"Subsidiary" of a Person means a corporation, partnership, limited liability company or other entity in which that Person directly or indirectly owns or controls the shares of Stock having ordinary voting power to elect a majority of the board of directors (or appoint other comparable managers) of such corporation, partnership, limited liability company or other entity.

"Taxes" has the meaning set forth in Section 7.5.

"Termination Date" has the meaning set forth in Section 1.4(a).

"Uhlig Trust Debt" means the Indebtedness owing by Fairn & Swanson to the Uhlig Survivor's Trust pursuant to the Promissory Note dated September 27, 2017, in the original principal amount of $500,000.

"Unfinanced Capital Expenditures" means Capital Expenditures (a) not financed with the proceeds of any incurrence of Indebtedness (other than the incurrence of any Advances), the proceeds of any sale or issuance of Equity Interests or equity contributions, the proceeds of any asset sale (other than the sale of Inventory in the ordinary course of business), or any insurance proceeds, and (b) that are not reimbursed by a third person (excluding any Loan Party or any of its Affiliates) in the period such expenditures are made pursuant to a written agreement.

**SECTION 7.2. NO WAIVER**. No delay, failure or discontinuance of Lender in exercising any right, power or remedy under any of the Loan Documents will affect or operate as a waiver of such right, power or remedy; nor will any single or partial exercise of any such right, power or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power or remedy. Any waiver, permit, consent or approval of any kind by Lender of any breach of or default (including any Default or Event of Default) under any of the Loan Documents must be in writing and will be effective only to the extent set forth in such writing.

**SECTION 7.3. NOTICES**. All notices, requests and demands which any party is required or may desire to give to any other party under any provision of this Agreement must be in writing delivered to each party at the address for such party set forth below each party's name on the signature pages of this Agreement or to such other address as any party may designate by written notice to all other parties. Each such notice, request and demand will be deemed given or made as follows: (a) if sent by hand delivery or overnight courier, upon delivery; (b) if sent by mail, upon the earlier of the date of receipt or three (3) days after deposit in the U.S. mail, first class and postage prepaid; (c) if sent by telecopy, upon receipt; and (d) if sent by electronic mail, upon sender's receipt of an acknowledgment from the intended

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 45
of 175
WFB_000036

recipient (such as by "return receipt requested" function, as available, return email or other written acknowledgment).

**SECTION 7.4. COSTS, EXPENSES AND ATTORNEYS' FEES**. Each Borrower and each other Loan Party will pay to Lender immediately upon demand the full amount of the following (collectively, "Lender Expenses"): all (a) costs or expenses (including taxes and insurance premiums) required to be paid by any Loan Party or its Subsidiaries under any of the Loan Documents that are paid, advanced, or incurred by Lender, (b) documented out-of-pocket fees or charges paid or incurred by Lender in connection with Lender's transactions with each Loan Party and its Subsidiaries under any of the Loan Documents, including, photocopying, notarization, couriers and messengers, telecommunication, public record searches, filing fees, recording fees, publication fees, real estate surveys, real estate title policies and endorsements, and environmental audits, (c) Lender's customary fees and charges imposed or incurred in connection with any background checks or OFAC/PEP searches related to any Loan Party or its Subsidiaries, (d) Lender's customary fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) to or for the account of any Borrower (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, (e) customary charges imposed or incurred by Lender resulting from the dishonor of checks payable by or to any Loan Party or its Subsidiaries, (f) reasonable, documented out-of-pocket costs and expenses paid or incurred by Lender to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (g) field examination, appraisal, and valuation fees and expenses of Lender related to any field examinations, appraisals, or valuation to the extent of the fees and charges provided in Schedule A of this Agreement, (h) Lender's reasonable, documented costs and expenses (including reasonable and documented attorneys' fees and expenses) relative to third party claims or any other lawsuit or adverse proceeding paid or incurred, whether in enforcing or defending the Loan Documents or otherwise in connection with the transactions contemplated by the Loan Documents, Lender's Liens in and to the Collateral, or Lender's relationship with any Loan Party or any of its Subsidiaries, (i) Lender's reasonable costs and expenses (including reasonable attorneys' fees and due diligence expenses) incurred in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), or amending, waiving, or modifying the Loan Documents, and (j) Lender's reasonable and documented costs and expenses (including reasonable and documented attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys', accountants', consultants', and other advisors' fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning any Loan Party or any of its Subsidiaries or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether a lawsuit or other adverse proceeding is brought, or in taking any enforcement action or any remedial action with respect to the Collateral. No later than 30 days following the Closing Date, Borrowers shall be provided a credit with respect to Lender Expenses in an amount equal to $40,000, which credit shall be applied to the Obligations. Each Loan Party's obligations set forth in this Section 7.4 will survive any termination of this Agreement or repayment of the Obligations and will for all purposes continue in full force and effect.

**SECTION 7.5. TAXES**. All payments made by Borrowers hereunder or under any note or other Loan Document will be made without setoff, counterclaim, or other defense. In addition, all such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or subsequently imposed by any jurisdiction or by any political subdivision or taxing authority and all related interest, penalties or similar liabilities (collectively, "Taxes") and in the event any deduction or withholding of such Taxes is required, each Borrower agrees to pay the full amount of such Taxes.

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 46 of 175

WFB_000037

**SECTION 7.6.  GENERAL**.  This Agreement will be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties; provided that no Borrower and no Loan Party may assign or transfer any of its interests, rights or obligations under this Agreement without Lender's prior written consent.  Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, Lender's rights and benefits under this Agreement and the other Loan Documents.  This Agreement and the other Loan Documents constitute the entire agreement between Borrowers and the other Loan Parties and Lender with respect to each credit subject hereto and supersede all prior negotiations, communications, discussions and correspondence concerning the subject matter of this Agreement.  This Agreement may be amended or modified only in writing signed by each party to this Agreement.  This Agreement is made and entered into for the sole protection and benefit of the parties hereto and their respective permitted successors and assigns, and no other Person will be a third party beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any other of the Loan Documents to which it is not a party.  Time is of the essence of each and every provision of this Agreement and each other of the Loan Documents.  If any provision of this Agreement or any other Loan Document will be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or any remaining provisions of this Agreement or the other Loan Documents.  This Agreement may be executed in any number of counterparts, each of which when executed and delivered will be deemed to be an original, and all of which when taken together will constitute one and the same Agreement.  Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement and any party's failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

**SECTION 7.7.  JOINT AND SEVERAL LIABILITY OF BORROWERS**.

(a)     Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by Lender under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)     Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including any Obligations arising under this Section 7.7), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.  Accordingly, each Borrower hereby waives any and all suretyship defenses that would otherwise be available to such Borrower under applicable law.

(c)     If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due, whether upon maturity, acceleration, or otherwise, or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligations until such time as all of the Obligations are paid in full, and without the need for demand, protest, or any other notice or formality.

(d)     The Obligations of each Borrower under the provisions of this Section 7.7 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of the provisions of this Agreement (other than this Section 7.7(d)) or any other circumstances whatsoever.

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 47 of 175

WFB_000038

(e)	Without limiting the generality of the foregoing and except as otherwise expressly provided in this Agreement, each Borrower hereby waives presentments, demands for performance, protests and notices, including notices of acceptance of its joint and several liability, notice of any Advances, or any Letters of Credit issued under or pursuant to this Agreement, notice of the occurrence of any Default or Event of Default, notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Agreement, notices of the existence, creation, or incurring of new or additional Obligations or other financial accommodations or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Lender under or in respect of any of the Obligations, any right to proceed against any other Borrower or any other Person, to proceed against or exhaust any security held from any other Borrower or any other Person, to protect, secure, perfect, or ensure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any other Borrower, any other Person, or any collateral, to pursue any other remedy in Lender's or any Bank Product Provider's power whatsoever, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement), any right to assert against Lender or any Bank Product Provider, any defense (legal or equitable), set-off, counterclaim, or claim which any Borrower may now or at any time hereafter have against any other Borrower or any other party liable to Lender or any Bank Product Provider, any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Obligations or any security therefor, and any right or defense arising by reason of any claim or defense based upon an election of remedies by Lender or any Bank Product Provider including any defense based upon an impairment or elimination of such Borrower's rights of subrogation, reimbursement, contribution, or indemnity of such Borrower against any other Borrower.  Without limiting the generality of the foregoing, each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Lender at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Lender in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower.  Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this <u>Section 7.7</u> afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this <u>Section 7.7</u>, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this <u>Section 7.7</u> shall not be discharged except by performance and then only to the extent of such performance.  The Obligations of each Borrower under this <u>Section 7.7</u> shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any other Borrower or Lender.  Each of the Borrowers waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement hereof.  Any payment by any Borrower or other circumstance which operates to toll any statute of limitations as to any Borrower shall operate to toll the statute of limitations as to each of the Borrowers.  Each of the Borrowers waives any defense based on or arising out of any defense of any Borrower or any other Person, other than payment of the Obligations to the extent of such payment, based on or arising out of the disability of any Borrower or any other Person or the validity, legality or unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any Borrower other than payment of the Obligations to the extent of such payment.  Lender may foreclose upon any Collateral held by Lender by

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 48 of 175

WFB_000039

one or more judicial or nonjudicial sales or other dispositions, whether or not every aspect of any such sale is commercially reasonable or otherwise fails to comply with applicable law or may exercise any other right or remedy Lender or any Bank Product Provider may have against any Borrower or any other Person, or any security, in each case, without affecting or impairing in any way the liability of any of the Borrowers hereunder except to the extent the Obligations have been paid.

(f) Each Borrower represents and warrants to Lender that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. Each Borrower further represents and warrants to Lender that such Borrower has read and understands the terms and conditions of the Loan Documents. Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g) The provisions of this <u>Section 7.7</u> are made for the benefit of Lender, each Bank Product Provider, and their respective successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of Lender, any Bank Product Provider, or any of their successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this <u>Section 7.7</u> shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this <u>Section 7.7</u> will forthwith be reinstated in effect, as though such payment had not been made.

(h) Each Borrower hereby agrees that it will not enforce any of its rights that arise from the existence, payment, performance or enforcement of the provisions of this <u>Section 7.7</u>, including rights of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of Lender or any Bank Product Provider against any Borrower whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from any Borrower, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or rights, unless and until such time as all of the Obligations hereunder have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to Lender hereunder or under any of the Bank Product Agreements are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor. If any amount shall be paid to any Borrower in violation of the immediately preceding sentence, such amount shall be held in trust for the benefit of Lender and the Bank Product Providers, and shall forthwith be paid to Lender to be credited and applied to the Obligations and all other amounts payable under this Agreement, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Obligations or other amounts payable under this Agreement thereafter arising. Notwithstanding anything to the contrary contained in this Agreement, no Borrower may exercise any rights of subrogation, contribution, indemnity, reimbursement or other similar rights against, and may not proceed or seek recourse against or with respect to any property or asset of, any other Borrower (the "<u>Foreclosed Borrower</u>"), including after payment in full of the

Case: 20-40990 Doc# 17-1 Filed: 06/26/20 Entered: 06/26/20 08:45:29 Page 49 of 175 WFB_000040

Obligations, if all or any portion of the Obligations have been satisfied in connection with an exercise of remedies in respect of the Equity Interests of such Foreclosed Borrower whether pursuant to this Agreement or otherwise.

(i)     Each of the Borrowers hereby acknowledges and affirms that it understands that to the extent the Obligations are secured by real property located in California, the Borrowers shall be liable for the full amount of the liability hereunder notwithstanding the foreclosure on such real property by trustee sale or any other reason impairing such Borrower's right to proceed against any other Loan Party.  In accordance with Section 2856 of the California Civil Code or any similar laws of any other applicable jurisdiction, each of the Borrowers hereby waives until such time as the Obligations have been paid in full:

(i)     all rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to the Borrowers by reason of Sections 2787 to 2855, inclusive, 2899, and 3433 of the California Civil Code or any similar laws of any other applicable jurisdiction;

(ii)     all rights and defenses that the Borrowers may have because the Obligations are secured by real property located in California, meaning, among other things, that:  (A) Lender and the Bank Product Providers may collect from the Borrowers without first foreclosing on any real or personal property collateral pledged by any Loan Party, and (B) if Lender forecloses on any real property collateral pledged by any Loan Party, (1) the amount of the Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (2) Lender may collect from the Loan Parties even if, by foreclosing on the real property collateral, Lender has destroyed or impaired any right the Borrowers may have to collect from any other Loan Party, it being understood that this is an unconditional and irrevocable waiver of any rights and defenses the Borrowers may have because the Obligations are secured by real property (including, without limitation, any rights or defenses based upon Sections 580a, 580d, or 726 of the California Code of Civil Procedure or any similar laws of any other applicable jurisdiction); and

(iii)     all rights and defenses arising out of an election of remedies by Lender and the Bank Product Providers, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for the Obligations, has destroyed the Borrowers' rights of subrogation and reimbursement against any other Loan Party by the operation of Section 580d of the California Code of Civil Procedure or any similar laws of any other applicable jurisdiction or otherwise.

**SECTION 7.8.  INDEMNITY**.  Each Borrower and each other Loan Party indemnifies Lender and its Affiliates, Subsidiaries, directors, officers, employees, representatives, agents, and attorneys, and holds them harmless from and against any and all claims, debts, liabilities, demands, obligations, actions, causes of action, penalties, costs and expenses (including reasonable attorneys' fees), of every kind, which they may sustain or incur based upon or arising out of any of the Obligations, this Agreement, any of the Loan Documents, or the Collateral or any relationship or agreement between Lender and the Loan Parties, or any other matter, relating to any Loan Party, the Obligations or the Collateral; provided, that this indemnity will not extend to damages that a court of competent jurisdiction finally determines in a non-appealable judgment to have been caused by the indemnitee's own gross negligence or willful misconduct.  Regardless of any provision in this Agreement to the contrary, the indemnity agreement set forth in this Section will survive any termination of this Agreement or repayment of the Obligations and will for all purposes continue in full force and effect.

**SECTION 7.9.  GOVERNING LAW**.  The validity of this Agreement and the other Loan Documents (unless otherwise expressly provided in such Loan Document) and the construction,

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 50 of 175

WFB_000041

interpretation, and enforcement of this Agreement and the other Loan Documents, and the rights of the parties, as well as all claims, controversies or disputes arising under or related to this Agreement and the other Loan Documents will be determined under, governed by and construed in accordance with the laws of the State of California without regard conflicts of laws principles.

**SECTION 7.10. CONSEQUENTIAL DAMAGES**.  No claim may be made by any Loan Party against Lender, or any Affiliate, Subsidiary, director, officer, employee, representative, agent, attorney or attorney-in-fact of any of them for any special, indirect, consequential, or punitive damages in respect of any claim for breach of contract or other theory of liability arising out of or related to the transactions contemplated by this Agreement or any other Loan Document or any related act, omission, or event, and each Loan Party waives, releases, and agrees not to sue upon any claim for such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

**SECTION 7.11. SAVINGS CLAUSE**.  If at any time the interest rate set forth in any of the Loan Documents exceeds the maximum interest rate allowable under applicable law, the interest rate will be deemed to be such maximum interest rate allowable under applicable law.

**SECTION 7.12. RIGHT OF SETOFF; DEPOSIT ACCOUNTS**.  Upon the occurrence and during the continuation of an Event of Default, (a) each Loan Party authorizes Lender, at any time and from time to time, without notice, which is hereby expressly waived by such Loan Party, and whether or not Lender will have declared any extension of credit under this Agreement to be due and payable in accordance with the terms of this Agreement, to set off against, and to appropriate and apply to the payment of, the Obligations (whether matured or unmatured, fixed or contingent, liquidated or unliquidated), any and all amounts owing by Lender to such Loan Party (whether payable in U.S. dollars or any other currency, whether matured or unmatured, and in the case of deposits, whether general or special (except trust and escrow accounts), time or demand and however evidenced), and (b) pending any such action, to the extent necessary, to hold such amounts as collateral to secure such Obligations and to return as unpaid for insufficient funds any and all checks and other items drawn against any deposits so held as Lender, in its sole discretion, may elect.  Each Loan Party grants to Lender a security interest in all deposits and accounts maintained with Lender to secure the payment of all Obligations.

**SECTION 7.13. CONFIDENTIALITY**.  Lender agrees that material, non-public information regarding each Loan Party, its operations, assets, and existing and contemplated business plans will be treated by Lender in a confidential manner, and will not be disclosed by Lender to Persons who are not parties to this Agreement, except (i) to Lender's Affiliates, attorneys, representatives, agents and other advisors and to officers, directors and employees of Lender, (ii) as required by law or by any court, governmental or regulatory authority, (iii) as agreed by any Loan Party, (iv) if such information becomes generally available to the public, (v) in connection with any litigation or adversary proceeding involving claims related to this Agreement, (vi) the assignment, participation or pledge of Lender's interest in this Agreement, (vii) to equity owners of any Loan Party, and (viii) in connection with the exercise by Lender of any right or remedy under this Agreement, any other Loan Document or at law.  Lender may use the name, logos, and other insignia of the Borrowers and the maximum amount of the credit facilities provided under this Agreement in any "tombstone" or comparable advertising, on its website or in other marketing materials of Lender.

**SECTION 7.14. PATRIOT ACT; DUE DILIGENCE**.  Lender hereby notifies Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow Lender to identify each Loan Party in accordance with the Patriot Act. In addition, Lender shall have the right to periodically conduct due diligence on all Loan Parties, their senior management and key principals and legal and beneficial owners.  Each Loan Party agrees to

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 51 of 175

**WFB_000042**

cooperate in respect of the conduct of such due diligence and further agrees that the reasonable costs and charges for any such due diligence by Lender shall constitute Lender Expenses hereunder and be for the account of Borrowers.

SECTION 7.15.  JURISDICTION.

(a)     ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS MAY BE TRIED AND LITIGATED ONLY IN THE STATE OF CALIFORNIA AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE CITY OF LOS ANGELES AND THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA; PROVIDED THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  EACH LOAN PARTY AND LENDER WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT THEY MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 7.15.

(b)     EACH LOAN PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF LOS ANGELES AND THE STATE OF CALIFORNIA, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

SECTION 7.16.  WAIVER OF JURY TRIAL.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH LOAN PARTY AND LENDER WAIVE THEIR RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THE LOAN DOCUMENTS, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH, A "CLAIM").  EACH LOAN PARTY AND LENDER REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

SECTION 7.17.  ARBITRATION.

(A)     ARBITRATION.  THE PARTIES AGREE, UPON DEMAND BY ANY PARTY, WHETHER MADE BEFORE THE INSTITUTION OF A JUDICIAL PROCEEDING OR NOT MORE THAN 60 DAYS AFTER SERVICE OF A COMPLAINT, THIRD PARTY COMPLAINT, CROSS-CLAIM, COUNTERCLAIM OR ANY ANSWER THERETO OR ANY AMENDMENT TO ANY OF THE ABOVE TO SUBMIT TO BINDING ARBITRATION ALL CLAIMS,

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 52 of 175

WFB_000043

DISPUTES AND CONTROVERSIES BETWEEN OR AMONG THEM (AND THEIR RESPECTIVE EMPLOYEES, OFFICERS, DIRECTORS, ATTORNEYS, AND OTHER AGENTS), WHETHER IN TORT, CONTRACT OR OTHERWISE ARISING OUT OF OR RELATING TO IN ANY WAY (I) ANY CREDIT SUBJECT HERETO, OR ANY OF THE LOAN DOCUMENTS, AND THEIR NEGOTIATION, EXECUTION, COLLATERALIZATION, ADMINISTRATION, REPAYMENT, MODIFICATION, EXTENSION, SUBSTITUTION, FORMATION, INDUCEMENT, ENFORCEMENT, DEFAULT OR TERMINATION; OR (II) REQUESTS FOR ADDITIONAL CREDIT.

(B)     <u>GOVERNING RULES</u>.  ANY ARBITRATION PROCEEDING WILL (I) PROCEED IN A LOCATION IN LOS ANGELES COUNTY, CALIFORNIA SELECTED BY THE AMERICAN ARBITRATION ASSOCIATION ("<u>AAA</u>"); (II) BE GOVERNED BY THE FEDERAL ARBITRATION ACT (TITLE 9 OF THE UNITED STATES CODE), NOTWITHSTANDING ANY CONFLICTING CHOICE OF LAW PROVISION IN ANY OF THE DOCUMENTS BETWEEN THE PARTIES; AND (III) BE CONDUCTED BY THE AAA, OR SUCH OTHER ADMINISTRATOR AS THE PARTIES SHALL MUTUALLY AGREE UPON, IN ACCORDANCE WITH THE AAA'S COMMERCIAL DISPUTE RESOLUTION PROCEDURES, UNLESS THE CLAIM OR COUNTERCLAIM IS AT LEAST $1,000,000.00 EXCLUSIVE OF CLAIMED INTEREST, ARBITRATION FEES AND COSTS IN WHICH CASE THE ARBITRATION SHALL BE CONDUCTED IN ACCORDANCE WITH THE AAA'S OPTIONAL PROCEDURES FOR LARGE, COMPLEX COMMERCIAL DISPUTES (THE COMMERCIAL DISPUTE RESOLUTION PROCEDURES OR THE OPTIONAL PROCEDURES FOR LARGE, COMPLEX COMMERCIAL DISPUTES TO BE REFERRED TO HEREIN, AS APPLICABLE, AS THE "<u>RULES</u>").  IF THERE IS ANY INCONSISTENCY BETWEEN THE TERMS HEREOF AND THE RULES, THE TERMS AND PROCEDURES SET FORTH HEREIN SHALL CONTROL.  ANY PARTY WHO FAILS OR REFUSES TO SUBMIT TO ARBITRATION FOLLOWING A DEMAND BY ANY OTHER PARTY SHALL BEAR ALL COSTS AND EXPENSES INCURRED BY SUCH OTHER PARTY IN COMPELLING ARBITRATION OF ANY DISPUTE.

(C)     <u>NO WAIVER OF PROVISIONAL REMEDIES, SELF-HELP AND FORECLOSURE</u>.  THE ARBITRATION REQUIREMENT DOES NOT LIMIT THE RIGHT OF ANY PARTY BEFORE, DURING OR AFTER THE PENDENCY OF ANY ARBITRATION PROCEEDING TO (I) FORECLOSE AGAINST REAL OR PERSONAL PROPERTY COLLATERAL; (II) EXERCISE SELF-HELP REMEDIES RELATING TO COLLATERAL OR PROCEEDS OF COLLATERAL SUCH AS SETOFF OR REPOSSESSION; OR (III) OBTAIN PROVISIONAL OR ANCILLARY REMEDIES SUCH AS REPLEVIN, WRIT OF POSSESSION, INJUNCTIVE RELIEF, ATTACHMENT, GARNISHMENT OR THE APPOINTMENT OF A RECEIVER.  THIS EXCLUSION DOES NOT CONSTITUTE A WAIVER OF THE RIGHT OR OBLIGATION OF ANY PARTY TO SUBMIT ANY DISPUTE TO ARBITRATION OR REFERENCE HEREUNDER, INCLUDING THOSE ARISING FROM THE EXERCISE OF THE ACTIONS DETAILED IN <u>SECTIONS (I)</u>, <u>(II)</u> AND <u>(III)</u> OF THIS PARAGRAPH.

(D)     <u>ARBITRATOR QUALIFICATIONS AND POWERS</u>.  ANY ARBITRATION PROCEEDING IN WHICH THE AMOUNT IN CONTROVERSY IS $5,000,000.00 OR LESS WILL BE DECIDED BY A SINGLE ARBITRATOR SELECTED ACCORDING TO THE RULES, AND WHO SHALL NOT RENDER AN AWARD OF GREATER THAN $5,000,000.00. ANY DISPUTE IN WHICH THE AMOUNT IN CONTROVERSY EXCEEDS $5,000,000.00 SHALL BE DECIDED BY MAJORITY VOTE OF A PANEL OF THREE ARBITRATORS; PROVIDED HOWEVER, THAT ALL THREE ARBITRATORS MUST ACTIVELY PARTICIPATE IN ALL HEARINGS AND DELIBERATIONS, EXCEPT THAT A SINGLE

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 53 of 175

WFB_000044

ARBITRATOR MAY DECIDE PRE-HEARING DISCOVERY DISPUTES.  THE ARBITRATOR(S) WILL BE A NEUTRAL ATTORNEY LICENSED IN THE STATE OF CALIFORNIA OR A NEUTRAL RETIRED JUDGE OF THE STATE OR FEDERAL JUDICIARY OF  CALIFORNIA, IN EITHER CASE WITH A MINIMUM OF TEN YEARS EXPERIENCE IN THE SUBSTANTIVE LAW APPLICABLE TO THE SUBJECT MATTER OF THE DISPUTE TO BE ARBITRATED.  THE ARBITRATOR(S) WILL DETERMINE WHETHER OR NOT AN ISSUE IS ARBITRATABLE AND WILL GIVE EFFECT TO THE STATUTES OF LIMITATION OR REPOSE IN DETERMINING ANY CLAIM.  IN ANY ARBITRATION PROCEEDING THE ARBITRATOR(S) WILL DECIDE (BY DOCUMENTS ONLY OR WITH A HEARING AT THE ARBITRATOR'S DISCRETION) ANY PRE-HEARING MOTIONS WHICH ARE SIMILAR TO MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM OR MOTIONS FOR SUMMARY ADJUDICATION.  THE ARBITRATOR(S) SHALL RESOLVE ALL DISPUTES IN ACCORDANCE WITH THE SUBSTANTIVE LAW OF CALIFORNIA AND MAY GRANT ANY REMEDY OR RELIEF THAT A COURT OF SUCH STATE COULD ORDER OR GRANT WITHIN THE SCOPE HEREOF AND SUCH ANCILLARY RELIEF AS IS NECESSARY TO MAKE EFFECTIVE ANY AWARD.  THE ARBITRATOR(S) SHALL ALSO HAVE THE POWER TO AWARD RECOVERY OF ALL COSTS AND FEES, TO IMPOSE SANCTIONS AND TO TAKE SUCH OTHER ACTION AS THE ARBITRATOR(S) DEEMS NECESSARY TO THE SAME EXTENT A JUDGE COULD PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, THE CALIFORNIA RULES OF CIVIL PROCEDURE OR OTHER APPLICABLE LAW.  JUDGMENT UPON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED IN ANY COURT HAVING JURISDICTION.  THE INSTITUTION AND MAINTENANCE OF AN ACTION FOR JUDICIAL RELIEF OR PURSUIT OF A PROVISIONAL OR ANCILLARY REMEDY SHALL NOT CONSTITUTE A WAIVER OF THE RIGHT OF ANY PARTY, INCLUDING THE PLAINTIFF, TO SUBMIT THE CONTROVERSY OR CLAIM TO ARBITRATION IF ANY OTHER PARTY CONTESTS SUCH ACTION FOR JUDICIAL RELIEF.

(E)     **DISCOVERY.**  IN ANY ARBITRATION PROCEEDING, DISCOVERY WILL BE PERMITTED IN ACCORDANCE WITH THE RULES.  ALL DISCOVERY SHALL BE EXPRESSLY LIMITED TO MATTERS DIRECTLY RELEVANT TO THE DISPUTE BEING ARBITRATED AND MUST BE COMPLETED NO LATER THAN 20 DAYS BEFORE THE HEARING DATE.  ANY REQUESTS FOR AN EXTENSION OF THE DISCOVERY PERIODS, OR ANY DISCOVERY DISPUTES, WILL BE SUBJECT TO FINAL DETERMINATION BY THE ARBITRATOR(S) UPON A SHOWING THAT THE REQUEST FOR DISCOVERY IS ESSENTIAL FOR THE PARTY'S PRESENTATION AND THAT NO ALTERNATIVE MEANS FOR OBTAINING INFORMATION IS AVAILABLE.

(F)     **CLASS PROCEEDINGS AND CONSOLIDATIONS.**  NO PARTY HERETO SHALL BE ENTITLED TO JOIN OR CONSOLIDATE DISPUTES BY OR AGAINST OTHERS IN ANY ARBITRATION, EXCEPT PARTIES WHO HAVE EXECUTED ANY LOAN DOCUMENT, OR TO INCLUDE IN ANY ARBITRATION ANY DISPUTE AS A REPRESENTATIVE OR MEMBER OF A CLASS, OR TO ACT IN ANY ARBITRATION IN THE INTEREST OF THE GENERAL PUBLIC OR IN A PRIVATE ATTORNEY GENERAL CAPACITY.

(G)     **PAYMENT OF ARBITRATION COSTS AND FEES.**  THE ARBITRATOR(S) SHALL AWARD ALL COSTS AND EXPENSES OF THE ARBITRATION PROCEEDING.

(H)     **REAL PROPERTY COLLATERAL; JUDICIAL REFERENCE.** NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO DISPUTE SHALL BE

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 54 of 175

WFB_000045

**SUBMITTED TO ARBITRATION IF THE DISPUTE CONCERNS INDEBTEDNESS SECURED DIRECTLY OR INDIRECTLY, IN WHOLE OR IN PART, BY ANY REAL PROPERTY UNLESS (I) THE HOLDER OF THE MORTGAGE, LIEN OR SECURITY INTEREST SPECIFICALLY ELECTS IN WRITING TO PROCEED WITH THE ARBITRATION, OR (II) ALL PARTIES TO THE ARBITRATION WAIVE ANY RIGHTS OR BENEFITS THAT MIGHT ACCRUE TO THEM BY VIRTUE OF THE SINGLE ACTION RULE STATUTE OF CALIFORNIA, THEREBY AGREEING THAT ALL INDEBTEDNESS AND OBLIGATIONS OF THE PARTIES, AND ALL MORTGAGES, LIENS AND SECURITY INTERESTS SECURING SUCH INDEBTEDNESS AND OBLIGATIONS, SHALL REMAIN FULLY VALID AND ENFORCEABLE. IF ANY SUCH DISPUTE IS NOT SUBMITTED TO ARBITRATION, THE DISPUTE SHALL BE REFERRED TO A REFEREE IN ACCORDANCE WITH CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 638 ET SEQ., AND THIS GENERAL REFERENCE AGREEMENT IS INTENDED TO BE SPECIFICALLY ENFORCEABLE IN ACCORDANCE WITH SAID SECTION 638. A REFEREE WITH THE QUALIFICATIONS REQUIRED HEREIN FOR ARBITRATORS SHALL BE SELECTED PURSUANT TO THE AAA'S SELECTION PROCEDURES. JUDGMENT UPON THE DECISION RENDERED BY A REFEREE SHALL BE ENTERED IN THE COURT IN WHICH SUCH PROCEEDING WAS COMMENCED IN ACCORDANCE WITH CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 644 AND 645.**

(I)     **MISCELLANEOUS. TO THE MAXIMUM EXTENT PRACTICABLE, THE AAA, THE ARBITRATOR(S) AND THE PARTIES SHALL TAKE ALL ACTION REQUIRED TO CONCLUDE ANY ARBITRATION PROCEEDING WITHIN 180 DAYS OF THE FILING OF THE DISPUTE WITH THE AAA. NO ARBITRATOR(S) OR OTHER PARTY TO AN ARBITRATION PROCEEDING MAY DISCLOSE THE EXISTENCE, CONTENT OR RESULTS THEREOF, EXCEPT FOR DISCLOSURES OF INFORMATION BY A PARTY REQUIRED IN THE CONNECTION WITH FINANCIAL REPORTING IN THE ORDINARY COURSE OF ITS BUSINESS OR BY APPLICABLE LAW OR REGULATION. IF MORE THAN ONE AGREEMENT FOR ARBITRATION BY OR BETWEEN THE PARTIES POTENTIALLY APPLIES TO A DISPUTE, THE ARBITRATION PROVISION MOST DIRECTLY RELATED TO THE LOAN DOCUMENTS OR THE SUBJECT MATTER OF THE DISPUTE SHALL CONTROL. THIS ARBITRATION PROVISION SHALL SURVIVE TERMINATION, AMENDMENT OR EXPIRATION OF ANY OF THE LOAN DOCUMENTS OR ANY RELATIONSHIP BETWEEN THE PARTIES.**

(J)     **WAIVER OF JURY TRIAL. THE PARTIES HERETO HEREBY ACKNOWLEDGE THAT BY AGREEING TO BINDING ARBITRATION THEY HAVE IRREVOCABLY WAIVED THEIR RESPECTIVE RIGHTS TO A JURY TRIAL WITH RESPECT TO ANY ACTION, CLAIM OR OTHER PROCEEDING ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER AGREEMENT OR DOCUMENT DELIVERED IN CONNECTION HEREWITH, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THEREUNDER, OR THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT.**

**SECTION 7.18. BANK PRODUCT PROVIDERS**. Each Bank Product Provider shall be deemed a third party beneficiary hereof and of the provisions of the other Loan Documents for purposes of any reference in a Loan Document to the parties for whom Lender is acting. Lender hereby agrees to act as agent for such Bank Product Providers and, by virtue of entering into a Bank Product Agreement, the applicable Bank Product Provider shall be automatically deemed to have appointed Lender as its agent and to have accepted the benefits of the Loan Documents; it being understood and agreed that the rights

and benefits of each Bank Product Provider under the Loan Documents consist exclusively of such Bank Product Provider's being a beneficiary of the Liens and security interests (and, if applicable, guarantees) granted to Lender and the right to share in and receive payments and collections of the Collateral and payments from Lender from amounts charged to the Loan Account or that are otherwise collected from the Loan Parties for the account of a Bank Product Provider as more fully set forth herein and in the other Loan Documents. In addition, each Bank Product Provider, by virtue of entering into a Bank Product Agreement, shall be automatically deemed to have agreed that Lender shall have the right, but shall have no obligation, to establish, maintain, relax, or release Reserves in respect of the Bank Product Obligations and that if Reserves are established there is no obligation on the part of Lender to determine or ensure whether the amount of any such Reserve is appropriate or not. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no Bank Product Provider (other than Lender in its capacity as lender hereunder) shall have any voting or approval rights hereunder solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or any other Loan Party.

[signature page follows]

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 56 of 175

WFB_000047

The parties have caused this Agreement to be executed as of the date on page 1.

LENDER:

WELLS FARGO BANK, NATIONAL
ASSOCIATION

By: _____
Name: JAMES CAMPBELL
Title: Authorized Signatory

Address:
2450 Colorado Avenue, Suite 3000W
Santa Monica, CA 90404
Attention: Relationship Manager— Fairn &
Swanson
Fax No.: 877.720.4156
Email: gary.whitaker@wellsfargo.com

BORROWER:

FAIRN & SWANSON INC.

By: _____
Name: _____
Title: _____

Address:
400 Lancaster Street
Oakland, CA 94601
Attention: Joel Sjostrom
Fax No.: 510.436.4510
Email: joels@fairn.com

[signature page]

*WFB/Fairn & Swanson*
*Credit Agreement*
DB2/ 32051652

WFB_000048

The parties have caused this Agreement to be executed as of the date on page 1.

LENDER:

WELLS FARGO BANK, NATIONAL
ASSOCIATION

By:_____
Name:_____
Title:  Authorized Signatory

Address:
2450 Colorado Avenue, Suite 3000W
Santa Monica, CA  90404
Attention: Relationship Manager— Fairn &
Swanson
Fax No.:  877.720.4156
Email:  gary.whitaker@wellsfargo.com

BORROWER:

FAIRN & SWANSON INC.

By:_____
Name:_____
Title:_____

Address:
400 Lancaster Street
Oakland, CA  94601
Attention:  Joel Sjostrom
Fax No.:  510.436.4510
Email:  joels@fairn.com

[signature page]

*WFB/Fairn & Swanson*
*Credit Agreement*
DB2/ 32051652

SCHEDULE A TO CREDIT AGREEMENT

FEES

---

**On the Closing Date:**

Closing Fee.  A non-refundable closing fee of $15,000 which will be fully earned and payable upon the execution of this Agreement.

---

**Monthly:**

(a)  Unused Line Fee.  A fee equal to 0.15% per annum on the daily average of the Maximum Revolver Amount reduced by outstanding Advances and Letter of Credit Usage, which fee will be calculated on a monthly basis by Lender and will be due and payable in arrears on the first day of each month and on the Termination Date.

(b)  Cash Management and Other Service Fees.  Fees for cash management services and other Bank Products and services provided to Borrowers by Lender, in accordance with the agreements entered into between any of the Borrowers and Lender from time to time, including Lender's customary fees and charges with respect to the disbursement of funds or the receipt of funds to or for the account of any of the Borrowers (whether by wire transfer or otherwise).

(c)  Letter of Credit Fees.  A Letter of Credit fee which will accrue at a rate equal to the Applicable Margin per annum *times* the daily balance of the undrawn amount of all outstanding Letters of Credit (calculated on the basis of a 360-day year and the actual number of days elapsed), payable monthly in arrears on the first day of each month and on the Termination Date and continuing until all undrawn Letters of Credit have expired or have been returned for cancellation. All fees upon the occurrence of any other activity with respect to any Letter of Credit (including, without limitation, the issuance, transfer, amendment, extension or cancellation of any Letter of Credit and honoring of draws under any Letter of Credit) will be determined in accordance with Lender's standard fees and charges then in effect.

---

**Upon demand by Lender or as otherwise specified in this Agreement:**

(a)  Collateral Exam Fees, Costs and Expenses.  Lender's fees, costs and expenses in connection with any collateral exams or inspections conducted by or on behalf of Lender at the current rates established from time to time by Lender as its fee for collateral exams or inspections (which fees are currently $1,000 per day per examiner) or such greater amount as may be charged by any examiner engaged by Lender, *plus* all actual out-of-pocket costs and expenses incurred in conducting any collateral exam or inspection; provided, however, so long as no Default or Event of Default shall have occurred and be continuing, (i) Borrowers shall be obligated to reimburse Lender for fees, costs and expenses related to not more than two (2) such collateral exams and inspections during any calendar year, and (ii) the fees, costs and expenses related to each collateral exam and inspection shall not exceed $10,000.  In addition, Borrower will reimburse Lender for all fees and expenses related to collateral examinations or inspections obtained prior to the Closing Date.

(b)  Appraisal Fees, Costs and Expenses.  Lender's fees, costs and expenses (including any fees, costs and expenses incurred by any Person employed by Lender to appraise the Collateral) in connection with any appraisal of all or any part of the Collateral, or any assessment of any Loan Party's or any of its Subsidiaries' business valuation, conducted at the request of Lender; provided, however, so long as no

Event of Default shall have occurred and be continuing, Borrowers shall be obligated to reimburse Lender for fees, costs and expenses related to not more than one (1) such appraisals of each type of Collateral per calendar year. In addition, Borrowers will be obligated to reimburse Lender for all fees, costs and expenses related to appraisals obtained prior to the Closing Date.

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 60
of 175

WFB_000051

# SCHEDULE B TO CREDIT AGREEMENT

## DISCLOSURE SCHEDULE

Section 2.3          Pending Litigation:  [None].

Section 5.7          Permitted Liens:  [None].

Section 2.8          Environmental Matters:  [None].

Section 2.10         Material Contracts:

| Lease Name & Address | Lessor | Expiration Date |
|---|---|---|
| Oakland HQ, 400 Lancaster Street, Oakland Ca. 94601 | JV Rental LLC | 8.31.2020 |
| Seattle Office, 9875 40th Ave So., Seattle, WA  98118 | (8 Norfolk, LLC | 12.31.2021 |
| Florida Office, 701 NW 33rd Street, Suite 150, Pompano Beach, FL. 33064 | Prologis, Inc | 6.30.2019 |
| Otay Mesa Warehouse, 1351 Air Wing Road, Suite 3 | B&Y Properties, Inc | 12.31.2018 |

Sections 2.15, 4.13      Location of Inventory

[see next page]

Baja Duty Free - Gateway
4490 Camino De La Plaza
San Ysidro, CA 92173

Baja Duty Free - Trolley
4590 Border Village Rd
San Ysidro, CA 92173

Baja Duty Free - Border Village
4590 Border Village Rd
San Ysidro, CA 92173

Baja Duty Free - Otay
Mesa Store
2455 Otay Center Dr, Ste.
120
San Diego, CA 92154

Baja Duty Free - Otay Mesa Warehouse
1351 Air Wing Road, Ste3
San Diego, CA 92154

Baja Duty Free - Tecate
405 Tecate Rd
Tecate, CA 91980

Baja Duty Free - Calexico
245 Imperial Avenue
Calexico, CA 92231

Baja Duty Free - Laredo
1420 Grant Street
Laredo, TX 78040

Baja Duty Free - El Paso
800 S. Stanton St.
El Paso, TX 79901

Baja Duty Free - Eagle Pass
198 Commercial St.
Eagle Pass, TX 78852

Fairn and Swanson, Inc.
9875 - 40th Avenue South
Seattle, WA 98118

Fairn and Swanson, Inc.
701 NW 33rd St, Suite 150
Pompano Beach, FL 33064

Fairn and Swanson, Inc.
400 Lancaster St
Oakland, CA 94601


Section 5.2          Permitted Indebtedness:

    1.    Uhlig Survivor's Trust - $500K existing Note

Section 5.5          Existing Loans, Advances, and Investments:  [None].

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 62
of 175
WFB_000053

SCHEDULE C TO CREDIT AGREEMENT

FINANCIAL STATEMENTS

| | |
|---|---|
| **as soon as available, but in any event within 30 days after the end of each month during each of Borrowers' fiscal years,** | (a)  an unaudited consolidated and consolidating balance sheet, income statement, and statement of shareholder's equity covering Borrowers' and their Subsidiaries' operations during such period and compared to the prior period and plan, together with a corresponding discussion and analysis of results from management, and<br><br>(b)  a Compliance Certificate along with the underlying calculations, including the calculations to establish compliance with the financial covenants set forth in this Agreement. |
| **as soon as available, but in any event within 120 days after the end of each of Borrowers' fiscal years,** | (c)  consolidated and consolidating financial statements of Borrowers and their Subsidiaries for each such fiscal year, audited by independent certified public accountants reasonably acceptable to Lender and certified, without any qualifications (including any (i) "going concern" or like qualification or exception, (ii) qualification or exception as to the scope of such audit, or (iii) qualification which relates to the treatment or classification of any item) and which, as a condition to the removal of such qualification, would require an adjustment to such item, the effect of which would be to cause any noncompliance with the provisions of Section 4.3 of the Agreement), by such accountants to have been prepared in accordance with GAAP (such audited financial statements to include a balance sheet, income statement, statement of cash flow, and statement of shareholder's equity, and, if prepared, such accountants' letter to management), and<br><br>(d) a Compliance Certificate with the underlying calculations, including the calculations to establish compliance with the financial covenants set forth in this Agreement. |
| **as soon as available, but in any event within 30 days prior to the start of each of Borrowers' fiscal years,** | (e) copies of Borrowers' and their respective Subsidiaries' forecasted (i) balance sheets, and (ii) profit and loss statements, all prepared on a basis consistent with Borrowers' historical financial statements, together with appropriate supporting details and a statement of underlying assumptions, in form and substance satisfactory to Lender, in its Permitted Discretion, for the forthcoming fiscal year, month by month, certified by the chief financial officer of the Administrative Borrower as being such officer's good faith estimate of the financial performance of Borrowers and their Subsidiaries during the period covered thereby. |
| **promptly, but in any event within 5 days after any Borrower has knowledge of any event or condition that constitutes a Default or an Event of Default,** | (f) notice of such event or condition and a statement of the curative action that Borrowers propose to take with respect thereto. |

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 63 of 175

WFB_000054

| | |
|---|---|
| **promptly after the commencement thereof, but in any event within 5 days after the service of process with respect thereto on any Loan Party or any of its Subsidiaries,** | (g)   notice of all actions, suits, or proceedings brought by or against any Loan Party or any of its Subsidiaries before any governmental authority which reasonably could be expected to result in a Material Adverse Effect. |
| **upon request of Lender,** | (h)   such other information as Lender may reasonably request relating to the financial condition of any Loan Party or its Subsidiaries or otherwise. |

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 64
of 175

**WFB_000055**

SCHEDULE D TO CREDIT AGREEMENT

COLLATERAL REPORTING

| | |
|---|---|
| **Weekly (no later than Wednesday of each week, or, so long as agreed to by Lender in its Permitted Discretion, if a Monthly Reporting Period is in effect, monthly (no later than the 15th day of each month),** | (a)  a borrowing base certificate in form and substance acceptable to Lender, <br><br> (b)   a detailed aging, by total, of each Borrower's Accounts, together with a reconciliation and supporting documentation for any reconciling items noted, <br><br> (c)   a monthly Account roll-forward, in a format acceptable to Lender in its discretion, tied to the beginning and ending account receivable balances of Borrowers' general ledger, <br><br> (d)  a detailed calculation of those Accounts and Inventory that are not eligible for the Borrowing Base, <br><br> (e)   Inventory system/perpetual reports specifying the cost and the wholesale market value of each Borrower's Inventory, by category, with additional detail showing additions to and deletions therefrom, together with a reconciliation to Borrowers' general ledger, and <br><br> (f)  a summary aging, by vendor, of each Loan Party's accounts payable and any book overdraft and an aging, by vendor, of any held checks. |
| **Monthly (no later than the 30th day of each month),** | (g)   a reconciliation of Accounts, accounts payable and Inventory of Borrowers' general ledger to its monthly financial statements, including any book reserves related to each category. |
| **Quarterly (no later than the 45th day after the end of each fiscal quarter),** | (h)  a report regarding each Loan Party's and its Subsidiaries' accrued, but unpaid, *ad valorem* taxes, and <br><br> (i)  a supplement to the Perfection Certificate providing updates thereto, if any. |
| **Annually (no later than 90 days after the end of each fiscal year),** | (j)  a detailed list of each Loan Party's and its Subsidiary's customers, with address and contact information. |
| **Upon request by Lender,** | (k)    such other reports, documents, notices and information as to the Collateral and as to any Loan Party and its Subsidiaries as Lender may reasonably request. |

WFB_000056

SCHEDULE E TO CREDIT AGREEMENT

FORM OF COMPLIANCE CERTIFICATE

[on Administrative Borrowers' Letterhead]

To:     Wells Fargo Bank, National Association
       2450 Colorado Avenue, Suite 3000W
       Santa Monica, CA 90404
       Attention: Relationship Manager— Fairn & Swanson

Re:     Compliance Certificate dated [_____]

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), dated as of November 10, 2017, by and between WELLS FARGO BANK, NATIONAL ASSOCIATION ("Lender"), and FAIRN & SWANSON INC., a California corporation ("Fairn & Swanson"; Fairn & Swanson, together with any other Person that joins the Credit Agreement as a "Borrower" in accordance with the terms hereof, are referred to hereinafter each individually as a "Borrower", and individually and collectively, jointly and severally, as the "Borrowers"). Capitalized terms used in this Compliance Certificate have the meanings set forth in the Credit Agreement unless specifically defined herein.

Pursuant to Schedule C of the Credit Agreement, the undersigned officer of Administrative Borrower hereby certifies that:

1.     Attached is the financial information of Loan Parties which is required to be furnished to Lender pursuant to Section 4.1 of the Credit Agreement for the period ended _____ (the "Reporting Date"). Such financial information has been prepared in accordance with GAAP [(except for year-end adjustments and the lack of footnotes)][1] and fairly presents in all material respects the financial condition of Loan Parties.

2.     Such officer has reviewed the terms of the Credit Agreement and has made, or caused to be made under his/her supervision, a review in reasonable detail of the transactions and condition of Loan Parties during the accounting period covered by the financial statements delivered pursuant to Schedule C of the Credit Agreement.

3.     Such review has not disclosed the existence on and as of the date of this Certificate, and the undersigned does not have knowledge of the existence as of the date of this Certificate, of any event or condition that constitutes a Default or Event of Default.

4.     The representations and warranties of each of the Loan Parties set forth in the Credit Agreement and the other Loan Documents are true and correct in all material respects on and as of the date of this Certificate (except to the extent they relate to a specified date).

5.     As of the Reporting Date, each of the Loan Parties is in compliance with the applicable covenants contained in Article IV and Article V of the Credit Agreement as demonstrated on Schedule 1.

---

[1] Exclude bracketed language with annual audits.

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 66 of 175

WFB_000057

IN WITNESS WHEREOF, this Compliance Certificate is executed by the undersigned this [_____] day of [_____].

<div style="margin-left: 40%;">

FAIRN & SWANSON INC.,
as Administrative Borrower


By:_____
Name: _____
Title:_____

</div>

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 67
of 175

WFB_000058

SCHEDULE F TO CREDIT AGREEMENT

CONDITIONS SUBSEQUENT
(POST-CLOSING ITEMS)

1.      No later than 30 days after the Closing Date (or such longer period as permitted by Lender in Lender's sole discretion), Borrowers shall arrange for Lender to obtain Control Agreements for the JPMorgan Chase deposit accounts described in <u>Section 4.10</u> of the Credit Agreement.

2.      No later than 60 days after the Closing Date (or such longer period as permitted by Lender in Lender's sole discretion), Borrowers shall use commercially reasonable efforts to obtain Collateral Access Agreements for each location where Borrowers hold or store inventory, books and records, or any other personal property.

3.      No later than 15 days after the Closing Date (or such longer period as permitted by Lender in Lender's sole discretion), Borrowers shall obtain a file-stamped copy of the UCC-3 Amendment (in the form approved by Lender prior to the Closing Date) filed by Summit Funding Group, Inc. with respect to the UCC-1 Financing Statement filed May 30, 2017 as file number 177587673576.

# EXHIBIT B

# GUARANTY AND SECURITY AGREEMENT

This **GUARANTY AND SECURITY AGREEMENT** (this "Agreement"), dated as of November 10, 2017, among the Persons listed on the signature pages hereof as "Grantors" (each, a "Grantor" and collectively, the "Grantors"), and **WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association ("Wells Fargo"), in its capacity as Secured Party for itself, as Lender, and the Bank Product Providers (in such capacity, together with its successors and assigns in such capacity, "Secured Party").

## W I T N E S S E T H:

**WHEREAS**, pursuant to that certain Credit Agreement of even date herewith (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement") by and between Fairn & Swanson Inc., a California corporation ("Fairn & Swanson"; together with any other Person that joins the Credit Agreement as a "Borrower" in accordance with the terms thereof, are referred to hereinafter each individually as a "Borrower" and individually and collectively, jointly and severally, as the "Borrowers"), and Wells Fargo, as lender ("Lender"), Lender has agreed to make certain financial accommodations available to Borrowers from time to time pursuant to the terms and conditions thereof; and

**WHEREAS**, Secured Party has agreed to act as Secured Party for the benefit of itself, as Lender, and the Bank Product Providers in connection with the transactions contemplated by the Credit Agreement and this Agreement;

**WHEREAS**, in order to induce Lender to enter into the Credit Agreement and the other Loan Documents, to induce the Bank Product Providers to enter into the Bank Product Agreements, and to induce Lender and the Bank Product Providers to make financial accommodations to Borrowers as provided for in the Credit Agreement, the other Loan Documents and the Bank Product Agreements, (a) each Grantor (other than Borrowers) has agreed to guaranty the Guarantied Obligations, and (b) each Grantor has agreed to grant to Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, a continuing security interest in and to the Collateral in order to secure the prompt and complete payment, observance and performance of, among other things, the Secured Obligations; and

**WHEREAS**, each Grantor (other than Borrowers) is an Affiliate of a Borrower and, as such, will benefit by virtue of the financial accommodations extended to Borrowers by Lender.

**NOW, THEREFORE**, for and in consideration of the recitals made above and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.      <u>Definitions; Construction</u>.

    (a)    All initially capitalized terms used herein (including in the preamble and recitals hereof) without definition shall have the meanings ascribed thereto in the Credit Agreement. Any terms (whether capitalized or lower case) used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein or in the Credit Agreement; <u>provided that</u> to the extent that the Code is used to define any term used herein and if such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code

DB2/ 32072687.3

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 70 of 175

WFB_000060

shall govern. In addition to those terms defined elsewhere in this Agreement, as used in this Agreement, the following terms shall have the following meanings:

(i) "<u>Account</u>" means an account (as that term is defined in Article 9 of the Code).

(ii) "<u>Account Debtor</u>" means an account debtor (as that term is defined in the Code).

(iii) "<u>Activation Instruction</u>" has the meaning specified therefor in <u>Section 7(k)</u>.

(iv) "<u>Agreement</u>" has the meaning specified therefor in the preamble to this Agreement.

(v) "<u>Bank Product Obligations</u>" has the meaning specified therefor in the Credit Agreement.

(vi) "<u>Bank Product Provider</u>" has the meaning specified therefor in the Credit Agreement.

(vii) "<u>Books</u>" means books and records (including each Grantor's Records indicating, summarizing, or evidencing such Grantor's assets (including the Collateral) or liabilities, each Grantor's Records relating to such Grantor's business operations or financial condition, and each Grantor's goods or General Intangibles related to such information).

(viii) "<u>Borrower</u>" and "<u>Borrowers</u>" have the meaning specified therefor in the recitals to this Agreement.

(ix) "<u>Cash Equivalents</u>" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("<u>S&P</u>") or Moody's Investors Service, Inc. ("<u>Moody's</u>"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within one year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $1,000,000,000, (e) deposit accounts maintained with (i) any bank that satisfies the criteria described in <u>clause (d)</u> above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of <u>clause (d)</u> of this definition or of any recognized securities dealer having combined capital and surplus of not less than $1,000,000,000, having a term of not more than seven days, with respect to securities satisfying the criteria in <u>clauses (a)</u> or <u>(d)</u> above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria

2

DB2/ 32072687.3

described in underline(clause (d)) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

(x) "CFC" means a controlled foreign corporation (as that term is defined in the IRC) in which any Loan Party is a "United States shareholder" within the meaning of Section 951(b) of the IRC.

(xi) "Chattel Paper" means chattel paper (as that term is defined in the Code), and includes tangible chattel paper and electronic chattel paper.

(xii) "Code" means the California Uniform Commercial Code, as in effect from time to time; provided, however, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, priority, or remedies with respect to Secured Party's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of California, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies.

(xiii) "Collateral" has the meaning specified therefor in Section 3.

(xiv) "Collections" has the meaning specified therefor in the Credit Agreement.

(xv) "Commercial Tort Claims" means commercial tort claims (as that term is defined in the Code), and includes those commercial tort claims listed on Schedule 1.

(xvi) "Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

(xvii) "Control Agreement" has the meaning specified therefor in the Credit Agreement.

(xviii) "Controlled Account" has the meaning specified therefor in Section 7(k).

(xix) "Controlled Account Agreements" means those certain cash management agreements, in form and substance reasonably satisfactory to Secured Party, each of which is executed and delivered by a Grantor, Secured Party, and one of the Controlled Account Banks.

(xx) "Controlled Account Bank" has the meaning specified therefor in Section 7(k).

(xxi) "Copyrights" means any and all rights in any works of authorship, including (A) copyrights and moral rights, (B) copyright registrations and recordings thereof and all applications in connection therewith including those listed on Schedule 2, (C) income, license fees, royalties, damages, and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (D) the right to sue for past, present, and future infringements thereof, and (E) all of each Grantor's rights corresponding thereto throughout the world.

3

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 72 of 175

WFB_000062

(xxii)     "Copyright Security Agreement" means each Copyright Security Agreement executed and delivered by Grantors, or any of them, and Secured Party, in substantially the form of Exhibit A.

(xxiii)     "Credit Agreement" has the meaning specified therefor in the recitals to this Agreement.

(xxiv)     "Deposit Account" means a deposit account (as that term is defined in the Code).

(xxv)     "Equipment" means equipment (as that term is defined in the Code).

(xxvi)     "Equity Interests" has the meaning specified therefor in the Credit Agreement.

(xxvii)     "Event of Default" has the meaning specified therefor in the Credit Agreement.

(xxviii)     "Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guaranty of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest is or becomes illegal.

(xxix)     "Farm Products" means farm products (as that term is defined in the Code).

(xxx)     "Fixtures" means fixtures (as that term is defined in the Code).

(xxxi)     "Foreclosed Grantor" has the meaning specified therefor in Section 2(i)(iii).

(xxxii)     "General Intangibles" means general intangibles (as that term is defined in the Code), and includes payment intangibles, software, contract rights, rights to payment, rights under Hedge Agreements (including the right to receive payment on account of the termination (voluntarily or involuntarily) of such Hedge Agreements), rights arising under common law, statutes, or regulations, choses or things in action, goodwill, Intellectual Property, Intellectual Property Licenses, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, rights to payment and other rights under any royalty or licensing agreements, including Intellectual Property Licenses, infringement claims, pension plan refunds, pension plan refund claims, insurance premium rebates, tax refunds, and tax refund claims, interests in a partnership or limited liability company which do not constitute a security under Article 8 of the Code, and any other personal property other than Commercial Tort Claims, money, Accounts, Chattel Paper, Deposit Accounts, goods, Investment Property, Negotiable Collateral, and oil, gas, or other minerals before extraction.

4

DB2/ 32072687.3

(xxxiii) "Grantor" and "Grantors" have the respective meanings specified therefor in the preamble to this Agreement.

(xxxiv) "Guarantied Obligations" means all of the Obligations (including any Bank Product Obligations) now or hereafter existing, whether for principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), fees (including the fees provided for in the Fee Letter), Lender Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), or otherwise, and any and all expenses (including reasonable counsel fees and expenses) incurred by Secured Party, Lender, or any Bank Product Provider (or any of them) in enforcing any rights under the any of the Loan Documents. Without limiting the generality of the foregoing, Guarantied Obligations shall include all amounts that constitute part of the Guarantied Obligations and would be owed by Borrowers to Secured Party, Lender, or any Bank Product Provider but for the fact that they are unenforceable or not allowable, including due to the existence of a bankruptcy, reorganization, other Insolvency Proceeding or similar proceeding involving Borrowers or any guarantor; provided that, anything to the contrary contained in the foregoing notwithstanding, the Guarantied Obligations shall exclude any Excluded Swap Obligation.

(xxxv) "Guarantor" means each Grantor other than Borrowers.

(xxxvi) "Guaranty" means the guaranty set forth in Section 2 hereof.

(xxxvii) "Insolvency Proceeding" has the meaning specified therefor in the Credit Agreement.

(xxxviii) "Intellectual Property" means any and all Patents, Copyrights, Trademarks, trade secrets, know-how, inventions (whether or not patentable), algorithms, software programs (including source code and object code), processes, product designs, industrial designs, blueprints, drawings, data, customer lists, URLs and domain names, specifications, documentations, reports, catalogs, literature, and any other forms of technology or proprietary information of any kind, including all rights therein and all applications for registration or registrations thereof.

(xxxix) "Intellectual Property Licenses" means, with respect to any Person (the "Specified Party"), (A) any licenses or other similar rights provided to the Specified Party in or with respect to Intellectual Property owned or controlled by any other Person, and (B) any licenses or other similar rights provided to any other Person in or with respect to Intellectual Property owned or controlled by the Specified Party, in each case, including (x) any software license agreements (other than license agreements for commercially available off-the-shelf software that is generally available to the public which have been licensed to a Grantor pursuant to end-user licenses), (y) the license agreements listed on Schedule 3, and (z) the right to use any of the licenses or other similar rights described in this definition in connection with the enforcement of Lender's rights under the Loan Documents.

(xl) "Inventory" means inventory (as that term is defined in the Code).

(xli) "Investment Property" means (A) any and all investment property (as that term is defined in the Code), and (B) any and all of the following (regardless of whether classified as investment property under the Code): all Pledged Interests, Pledged Operating Agreements, and Pledged Partnership Agreements.

5

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 74 of 175

WFB_000064

(xlii)     "Lender" has the meaning specified therefor in the recitals to this Agreement.

(xliii)     "Lien" has the meaning specified therefor in the Credit Agreement.

(xliv)     "Loan Document" has the meaning specified therefor in the Credit Agreement.

(xlv)     "Negotiable Collateral" means letters of credit, letter-of-credit rights, instruments, promissory notes, drafts and documents (as each such term is defined in the Code).

(xlvi)     "Obligations" has the meaning specified therefor in the Credit Agreement.

(xlvii)     "Patents" means patents and patent applications, including (A) the patents and patent applications listed on Schedule 4, (B) all continuations, divisionals, continuations-in-part, re-examinations, reissues, and renewals thereof and improvements thereon, (C) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (D) the right to sue for past, present, and future infringements thereof, and (E) all of each Grantor's rights corresponding thereto throughout the world.

(xlviii)     "Patent Security Agreement" means each Patent Security Agreement executed and delivered by Grantors, or any of them, and Secured Party, in substantially the form of Exhibit B.

(xlix)     "Permitted Liens" has the meaning specified therefor in the Credit Agreement.

(l)     "Person" has the meaning specified therefor in the Credit Agreement.

(li)     "Pledged Companies" means each Person listed on Schedule 5 as a "Pledged Company", together with each other Person, all or a portion of whose Equity Interests are acquired or otherwise owned by a Grantor after the Closing Date.

(lii)     "Pledged Interests" means all of each Grantor's right, title and interest in and to all of the Equity Interests now owned or hereafter acquired by such Grantor, regardless of class or designation, including in each of the Pledged Companies, and all substitutions therefor and replacements thereof, all proceeds thereof and all rights relating thereto, also including any certificates representing the Equity Interests, the right to receive any certificates representing any of the Equity Interests, all warrants, options, share appreciation rights and other rights, contractual or otherwise, in respect thereof and the right to receive all dividends, distributions of income, profits, surplus, or other compensation by way of income or liquidating distributions, in cash or in kind, and all cash, instruments, and other property from time to time received, receivable, or otherwise distributed in respect of or in addition to, in substitution of, on account of, or in exchange for any or all of the foregoing.

(liii)     "Pledged Interests Addendum" means a Pledged Interests Addendum substantially in the form of Exhibit C.

6

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 75 of 175

WFB_000065

(liv) "Pledged Operating Agreements" means all of each Grantor's rights, powers, and remedies under the limited liability company operating agreements of each of the Pledged Companies that are limited liability companies.

(lv) "Pledged Partnership Agreements" means all of each Grantor's rights, powers, and remedies under the partnership agreements of each of the Pledged Companies that are partnerships.

(lvi) "Proceeds" has the meaning specified therefor in Section 3.

(lvii) "PTO" means the United States Patent and Trademark Office.

(lviii) "Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Grantor that has total assets exceeding $10,000,000 at the time the relevant guaranty, keepwell, or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

(lix) "Real Property" means any estates or interests in real property now owned or hereafter acquired by any Grantor and the improvements thereto.

(lx) "Record" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

(lxi) "Rescission" has the meaning specified therefor in Section 7(k).

(lxii) "Secured Obligations" means each and all of the following: (A) all of the present and future obligations of each of the Grantors arising from, or owing under or pursuant to, this Agreement (including the Guaranty), the Credit Agreement, or any of the other Loan Documents, (B) all Bank Product Obligations, and (C) all other Obligations of Borrowers and all other Guarantied Obligations of each Guarantor (including, in the case of each of clauses (A), (B) and (C), reasonable attorneys fees and expenses and any interest, fees, or expenses that accrue after the filing of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any Insolvency Proceeding); provided that, anything to the contrary contained in the foregoing notwithstanding, the Secured Obligations of the Guarantors shall exclude any Excluded Swap Obligation.

(lxiii) "Secured Party" has the meaning specified therefor in the preamble to this Agreement.

(lxiv) "Securities Account" means a securities account (as that term is defined in the Code).

(lxv) "Security Interest" has the meaning specified therefor in Section 3.

(lxvi) "Supporting Obligations" means supporting obligations (as such term is defined in the Code), and includes letters of credit and guaranties issued in support of Accounts, Chattel Paper, documents, General Intangibles, instruments or Investment Property.

(lxvii) "<u>Swap Obligation</u>" means, with respect to any Grantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

(lxviii) "<u>Trademarks</u>" means any and all trademarks, trade names, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, including (A) the trade names, registered trademarks, trademark applications, registered service marks and service mark applications listed on <u>Schedule 6</u>, (B) all renewals thereof, (C) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (D) the right to sue for past, present and future infringements and dilutions thereof, (E) the goodwill of each Grantor's business symbolized by the foregoing or connected therewith, and (F) all of each Grantor's rights corresponding thereto throughout the world.

(lxix) "<u>Trademark Security Agreement</u>" means each Trademark Security Agreement executed and delivered by Grantors, or any of them, and Secured Party, in substantially the form of <u>Exhibit D</u>.

(lxx) "<u>URL</u>" means "uniform resource locator," an internet web address.

(lxxi) "<u>VIN</u>" has the meaning specified therefor in <u>Section 5(h)</u>.

(b) Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein or in the Credit Agreement). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties. Any reference herein to the satisfaction, repayment, or payment in full of the Secured Obligations or the Guarantied Obligations shall mean (i) the payment or repayment in full in immediately available funds of (A) the principal amount of, and interest accrued with respect to, all outstanding Loans, together with the payment of any premium applicable to the repayment of the Loans, (B) all Lender Expenses that have accrued regardless of whether demand has been made therefor, (C) all fees or charges that have accrued hereunder or under any other Loan Document (including the Letter of Credit Fee and the Unused Line Fee), (ii) in the case of contingent reimbursement obligations with respect to Letters of Credit, providing cash collateral in accordance with the L/C Collateral Conditions (described in <u>Section 1.5(a)</u> of the Credit Agreement), (iii) in the case of obligations with respect to Bank Products (other than Hedge Obligations), providing cash collateral in accordance with <u>Section 1.5(a)</u> of the Credit Agreement, (iv) the receipt by Secured Party of cash collateral in order to secure any other contingent Secured Obligations or Guarantied Obligations for which a claim or demand for payment has been made at such time or in respect of matters or circumstances known to Secured Party or a Lender at the time that are reasonably expected to result in any loss, cost, damage or expense (including attorneys fees and legal expenses), such cash collateral to be in such amount as Secured Party reasonably

8

DB2/ 32072687.3

determines is appropriate to secure such contingent Secured Obligations or Guarantied Obligations, (v) the payment or repayment in full in immediately available funds of all other Secured Obligations or Guarantied Obligations (as the case may be) (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Hedge Agreements provided by Hedge Providers) other than (A) unasserted contingent indemnification obligations, (B) any Bank Product Obligations (other than Hedge Obligations) that, at such time, are allowed by the applicable Bank Product Provider to remain outstanding without being required to be repaid or cash collateralized, and (C) any Hedge Obligations that, at such time, are allowed by the applicable Hedge Provider to remain outstanding without being required to be repaid, and (vi) the termination of all of the Commitments of the Lender. Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein shall be satisfied by the transmission of a Record.

(c)     All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

2.     <u>Guaranty</u>.

(a)     In recognition of the direct and indirect benefits to be received by Guarantors from the proceeds of the Advances, the issuance of the Letters of Credit, and the entering into of the Bank Product Agreements and by virtue of the financial accommodations to be made to Borrowers, each of the Guarantors, jointly and severally, hereby unconditionally and irrevocably guarantees as a primary obligor and not merely as a surety the full and prompt payment when due, whether upon maturity, acceleration, or otherwise, of all of the Guarantied Obligations. If any or all of the Obligations constituting Guarantied Obligations becomes due and payable, each of the Guarantors, unconditionally and irrevocably, and without the need for demand, protest, or any other notice or formality, promises to pay such indebtedness to Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, together with any and all expenses (including Lender Expenses) that may be incurred by Secured Party, Lender or any Bank Product Provider in demanding, enforcing, or collecting any of the Guarantied Obligations (including the enforcement of any collateral for such Guarantied Obligations or any collateral for the obligations of the Guarantors under this Guaranty). If claim is ever made upon Secured Party, Lender or any Bank Product Provider for repayment or recovery of any amount or amounts received in payment of or on account of any or all of the Guarantied Obligations and any of Secured Party, Lender or any Bank Product Provider repays all or part of said amount by reason of (i) any judgment, decree, or order of any court or administrative body having jurisdiction over such payee or any of its property, or (ii) any settlement or compromise of any such claim effected by such payee with any such claimant (including any Borrower or any Guarantor), then and in each such event, each of the Guarantors agrees that any such judgment, decree, order, settlement, or compromise shall be binding upon the Guarantors, notwithstanding any revocation (or purported revocation) of this Guaranty or other instrument evidencing any liability of any Grantor, and the Guarantors shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

(b)     Additionally, each of the Guarantors unconditionally and irrevocably guarantees the payment of any and all of the Guarantied Obligations to Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, whether or not due or payable by any Loan Party upon the occurrence of any of the events specified in <u>Section 6.1(e)</u> of the Credit Agreement, and irrevocably and unconditionally promises to pay such indebtedness to Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, without the requirement of demand, protest, or any other notice or other formality, in lawful money of the United States.

<div align="center">9</div>

DB2/ 32072687.3

(c)     The liability of each of the Guarantors hereunder is primary, absolute, and unconditional, and is independent of any security for or other guaranty of the Guarantied Obligations, whether executed by any other Guarantor or by any other Person, and the liability of each of the Guarantors hereunder shall not be affected or impaired by (i) any payment on, or in reduction of, any such other guaranty or undertaking, (ii) any dissolution, termination, or increase, decrease, or change in personnel by any Grantor, (iii) any payment made to Secured Party, Lender, or any Bank Product Provider on account of the Obligations which Secured Party, Lender, or such Bank Product Provider repays to any Grantor pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding (or any settlement or compromise of any claim made in such a proceeding relating to such payment), and each of the Guarantors waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, or (iv) any action or inaction by Secured Party, Lender, or any Bank Product Provider, or (v) any invalidity, irregularity, avoidability, or unenforceability of all or any part of the Obligations or of any security therefor.

(d)     This Guaranty includes all present and future Guarantied Obligations including any under transactions continuing, compromising, extending, increasing, modifying, releasing, or renewing the Guarantied Obligations, changing the interest rate, payment terms, or other terms and conditions thereof, or creating new or additional Guarantied Obligations after prior Guarantied Obligations have been satisfied in whole or in part.  To the maximum extent permitted by law, each Guarantor hereby waives any right to revoke this Guaranty as to future Guarantied Obligations.  If such a revocation is effective notwithstanding the foregoing waiver, each Guarantor acknowledges and agrees that (i) no such revocation shall be effective until written notice thereof has been received by Secured Party, (ii) no such revocation shall apply to any Guarantied Obligations in existence on the date of receipt by Secured Party of such written notice (including any subsequent continuation, extension, or renewal thereof, or change in the interest rate, payment terms, or other terms and conditions thereof), (iii) no such revocation shall apply to any Guarantied Obligations made or created after such date to the extent made or created pursuant to a legally binding commitment of Lender or any Bank Product Provider in existence on the date of such revocation, (iv) no payment by any Guarantor, Borrower, or from any other source, prior to the date of Secured Party's receipt of written notice of such revocation shall reduce the maximum obligation of such Guarantor hereunder, and (v) any payment by Borrowers or from any source other than such Guarantor subsequent to the date of such revocation shall first be applied to that portion of the Guarantied Obligations as to which the revocation is effective and which are not, therefore, guarantied hereunder, and to the extent so applied shall not reduce the maximum obligation of such Guarantor hereunder.  This Guaranty shall be binding upon each Guarantor, its successors and assigns and inure to the benefit of and be enforceable by Secured Party (for the benefit of itself, as Lender, and the Bank Product Providers) and its successors, transferees, or assigns.

(e)     The guaranty by each of the Guarantors hereunder is a guaranty of payment and not of collection.  The obligations of each of the Guarantors hereunder are independent of the obligations of any other Guarantor or Grantor or any other Person and a separate action or actions may be brought and prosecuted against one or more of the Guarantors whether or not action is brought against any other Guarantor or Grantor or any other Person and whether or not any other Guarantor or Grantor or any other Person be joined in any such action or actions.  Each of the Guarantors waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement hereof.  Any payment by any Grantor or other circumstance which operates to toll any statute of limitations as to any Grantor shall operate to toll the statute of limitations as to each of the Guarantors.

DB2/ 32072687.3

WFB_000069

(f)　　Each of the Guarantors authorizes Secured Party, Lender, and the Bank Product Providers without notice or demand, and without affecting or impairing its liability hereunder, from time to time to:

(i)　　change the manner, place, or terms of payment of, or change or extend the time of payment of, renew, increase, accelerate, or alter:  (A) any of the Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon); or (B) any security therefor or any liability incurred directly or indirectly in respect thereof, and this Guaranty shall apply to the Obligations as so changed, extended, renewed, or altered;

(ii)　　take and hold security for the payment of the Obligations and sell, exchange, release, impair, surrender, realize upon, collect, settle, or otherwise deal with in any manner and in any order any property at any time pledged or mortgaged to secure the Obligations or any of the Guarantied Obligations (including any of the obligations of all or any of the Guarantors under this Guaranty) incurred directly or indirectly in respect thereof or hereof, or any offset on account thereof;

(iii)　　exercise or refrain from exercising any rights against any Grantor;

(iv)　　release or substitute any one or more endorsers, guarantors, any Grantor, or other obligors;

(v)　　settle or compromise any of the Obligations, any security therefor, or any liability (including any of those of any of the Guarantors under this Guaranty) incurred directly or indirectly in respect thereof or hereof, and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of any Grantor to its creditors;

(vi)　　apply any sums by whomever paid or however realized to any liability or liabilities of any Grantor to Secured Party, Lender, or any Bank Product Provider regardless of what liability or liabilities of such Grantor remain unpaid;

(vii)　　consent to or waive any breach of, or any act, omission, or default under, this Agreement, any other Loan Document, any Bank Product Agreement, or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify, or supplement this Agreement, any other Loan Document, any Bank Product Agreement, or any of such other instruments or agreements; or

(viii)　　take any other action that could, under otherwise applicable principles of law, give rise to a legal or equitable discharge of one or more of the Guarantors from all or part of its liabilities under this Guaranty.

(g)　　It is not necessary for Secured Party, Lender, or any Bank Product Provider to inquire into the capacity or powers of any of the Guarantors or the officers, directors or partners acting or purporting to act on their behalf, and any Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

(h)　　Each Guarantor jointly and severally guarantees that the Guarantied Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation, or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of Lender or any Bank Product Provider with respect thereto.  The obligations of each Guarantor under this Guaranty are independent of the Guarantied Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any

11

DB2/ 32072687.3

action is brought against any other Guarantor or whether any other Guarantor is joined in any such action or actions. The liability of each Guarantor under this Guaranty shall be absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defense it may now or hereafter have in any way relating to, any or all of the following:

(i)     any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(ii)    any change in the time, manner, or place of payment of, or in any other term of, all or any of the Guarantied Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including any increase in the Guarantied Obligations resulting from the extension of additional credit;

(iii)   any taking, exchange, release, or non-perfection of any Lien in and to any Collateral, or any taking, release, amendment, waiver of, or consent to departure from any other guaranty, for all or any of the Guarantied Obligations;

(iv)    the existence of any claim, set-off, defense, or other right that any Guarantor may have at any time against any Person, including Secured Party, Lender, or any Bank Product Provider;

(v)     any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Guarantied Obligations or any security therefor;

(vi)    any right or defense arising by reason of any claim or defense based upon an election of remedies by Lender or any Bank Product Provider including any defense based upon an impairment or elimination of such Guarantor's rights of subrogation, reimbursement, contribution, or indemnity of such Guarantor against any other Grantor or any guarantors or sureties;

(vii)   any change, restructuring, or termination of the corporate, limited liability company, or partnership structure or existence of any Grantor; or

(viii)  any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Grantor or any other guarantor or surety.

(i)     Waivers

(i)     Each of the Guarantors waives any right (except as shall be required by applicable statute and cannot be waived) to require Secured Party, Lender, or any Bank Product Provider to (i) proceed against any other Grantor or any other Person, (ii) proceed against or exhaust any security held from any other Grantor or any other Person, or (iii) protect, secure, perfect, or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any other Grantor, any other Person, or any collateral, or (iv) pursue any other remedy in Lender's or any Bank Product Provider's power whatsoever. Each of the Guarantors waives any defense based on or arising out of any defense of any Grantor or any other Person, other than payment of the Guarantied Obligations to the extent of such payment, based on or arising out of the disability of any Grantor or any other Person, or the validity, legality, or unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any Grantor other than payment of the Obligations to the extent of such payment. Secured Party may foreclose upon any Collateral held by Secured Party by one

12

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 81 of 175

WFB_000071

or more judicial or nonjudicial sales or other dispositions, whether or not every aspect of any such sale is commercially reasonable or otherwise fails to comply with applicable law or may exercise any other right or remedy Secured Party, Lender, or any Bank Product Provider may have against any Grantor or any other Person, or any security, in each case, without affecting or impairing in any way the liability of any of the Guarantors hereunder except to the extent the Guarantied Obligations have been paid.

(ii)     Each of the Guarantors waives all presentments, demands for performance, protests and notices, including notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Guaranty, and notices of the existence, creation, or incurring of new or additional Obligations or other financial accommodations. Each of the Guarantors waives notice of any Default or Event of Default under any of the Loan Documents. Each of the Guarantors assumes all responsibility for being and keeping itself informed of each Grantor's financial condition and assets and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope, and extent of the risks which each of the Guarantors assumes and incurs hereunder, and agrees that neither Secured Party nor Lender nor any Bank Product Provider shall have any duty to advise any of the Guarantors of information known to them regarding such circumstances or risks.

(iii)     To the fullest extent permitted by applicable law, each Guarantor hereby waives:  (A) any right to assert against Lender or any Bank Product Provider, any defense (legal or equitable), set-off, counterclaim, or claim which each Guarantor may now or at any time hereafter have against Borrowers or any other party liable to Lender or any Bank Product Provider; (B) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Guarantied Obligations or any security therefor; (C) any right or defense arising by reason of any claim or defense based upon an election of remedies by Lender or any Bank Product Provider including any defense based upon an impairment or elimination of such Guarantor's rights of subrogation, reimbursement, contribution, or indemnity of such Guarantor against Borrowers or other guarantors or sureties; and (D) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Guarantied Obligations shall similarly operate to defer or delay the operation of such statute of limitations applicable to such Guarantor's liability hereunder

(iv)     No Guarantor will exercise any rights that it may now or hereafter acquire against any Grantor or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Guaranty, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of Secured Party, Lender, or any Bank Product Provider against any Grantor or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from any Grantor or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guarantied Obligations and all other amounts payable under this Guaranty shall have been paid in full in cash and all of the Commitments have been terminated.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence, such amount shall be held in trust for the benefit of Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, and shall forthwith be paid to Secured Party to be credited and applied to the Guarantied Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Credit Agreement, or to be held as Collateral for any Guarantied Obligations or other amounts payable under this Guaranty thereafter arising.  Notwithstanding anything to the contrary contained in this Guaranty, no Guarantor may exercise any rights of subrogation, contribution, indemnity, reimbursement or other similar rights against, and may

13

DB2/ 32072687.3

not proceed or seek recourse against or with respect to any property or asset of, any other Grantor (the "Foreclosed Grantor"), including after payment in full of the Obligations, if all or any portion of the Obligations have been satisfied in connection with an exercise of remedies in respect of the Equity Interests of such Foreclosed Grantor whether pursuant to this Agreement or otherwise.

(v)     Each of the Guarantors hereby acknowledges and affirms that it understands that to the extent the Guarantied Obligations are secured by Real Property located in California, Guarantors shall be liable for the full amount of the liability hereunder notwithstanding the foreclosure on such Real Property by trustee sale or any other reason impairing such Guarantor's right to proceed against any Loan Party.  In accordance with Section 2856 of the California Code of Civil Procedure or any similar laws of any other applicable jurisdiction, each of the Guarantors hereby waives until such time as the Guarantied Obligations have been paid in full:

(1)     all rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to the Guarantors by reason of Sections 2787 to 2855, inclusive, 2899, and 3433 of the California Code of Civil Procedure or any similar laws of any other applicable jurisdiction;

(2)     all rights and defenses that the Guarantors may have because the Guarantied Obligations are secured by Real Property located in California, meaning, among other things, that:  (A) Secured Party, Lender, and the Bank Product Providers may collect from the Guarantors without first foreclosing on any real or personal property collateral pledged by Borrowers or any other Grantor, and (B) if Secured Party, on behalf of itself, forecloses on any Real Property collateral pledged by Borrowers or any other Grantor, (1) the amount of the Guarantied Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (2) Lender may collect from the Guarantors even if, by foreclosing on the Real Property collateral, Secured Party or Lender have destroyed or impaired any right the Guarantors may have to collect from any other Grantor, it being understood that this is an unconditional and irrevocable waiver of any rights and defenses the Guarantors may have because the Guarantied Obligations are secured by Real Property (including, without limitation, any rights or defenses based upon Sections 580a, 580d, or 726 of the California Code of Civil Procedure or any similar laws of any other applicable jurisdiction); and

(3)     all rights and defenses arising out of an election of remedies by Secured Party, Lender, and the Bank Product Providers, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for the Guarantied Obligations, has destroyed Guarantors' rights of subrogation and reimbursement against any Grantor by the operation of Section 580d of the California Code of Civil Procedure or any similar laws of any other applicable jurisdiction or otherwise.

(vi)     Each of the Guarantors represents, warrants, and agrees that each of the waivers set forth above is made with full knowledge of its significance and consequences and that if any of such waivers are determined to be contrary to any applicable law or public policy, such waivers shall be effective to the maximum extent permitted by law.

(j)     Keepwell. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Grantor to guaranty and otherwise honor all Obligations in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 2(j) for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 2(j), or otherwise under the Loan Documents, voidable under

14

DB2/ 32072687.3

applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until payment in full of the Guarantied Obligations. Each Qualified ECP Guarantor intends that this <u>Section 2(j)</u> constitute, and this <u>Section 2(j)</u> shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Grantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

3.     <u>Grant of Security</u>.  Each Grantor hereby unconditionally grants, assigns, and pledges to Secured Party, for the benefit of itself, as Lender, and each of the Bank Product Providers, to secure the Secured Obligations, a continuing security interest (hereinafter referred to as the "<u>Security Interest</u>") in all of such Grantor's right, title, and interest in and to the following, whether now owned or hereafter acquired or arising and wherever located (the "<u>Collateral</u>"):

    (a)     all of such Grantor's Accounts;

    (b)     all of such Grantor's Books;

    (c)     all of such Grantor's Chattel Paper;

    (d)     all of such Grantor's Commercial Tort Claims;

    (e)     all of such Grantor's Deposit Accounts;

    (f)     all of such Grantor's Equipment;

    (g)     all of such Grantor's Farm Products;

    (h)     all of such Grantor's Fixtures;

    (i)     all of such Grantor's General Intangibles;

    (j)     all of such Grantor's Inventory;

    (k)     all of such Grantor's Investment Property;

    (l)     all of such Grantor's Intellectual Property and Intellectual Property Licenses;

    (m)     all of such Grantor's Negotiable Collateral;

    (n)     all of such Grantor's Pledged Interests (including all of such Grantor's Pledged Operating Agreements and Pledged Partnership Agreements);

    (o)     all of such Grantor's Securities Accounts;

    (p)     all of such Grantor's Supporting Obligations;

    (q)     all of such Grantor's money, Cash Equivalents, or other assets of such Grantor that now or hereafter come into the possession, custody, or control of Secured Party (or its Secured Party or designee) or Lender; and

<div align="center">15</div>

DB2/ 32072687.3

(r)       all of the proceeds (as such term is defined in the Code) and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance or Commercial Tort Claims covering or relating to any or all of the foregoing, and any and all Accounts, Books, Chattel Paper, Deposit Accounts, Equipment, Fixtures, General Intangibles, Inventory, Investment Property, Intellectual Property, Negotiable Collateral, Pledged Interests, Securities Accounts, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing (the "Proceeds").  Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes proceeds of any indemnity or guaranty payable to any Grantor or Secured Party from time to time with respect to any of the Investment Property.

Notwithstanding anything contained in this Agreement to the contrary, the term "Collateral" shall not include: (i) voting Equity Interests of any CFC, solely to the extent that (y) such Equity Interests represent more than 65% of the outstanding voting Equity Interests of such CFC, and (z) pledging or hypothecating more than 65% of the total outstanding voting Equity Interests of such CFC would result in adverse tax consequences or the costs to the Grantors of providing such pledge are unreasonably excessive (as determined by Secured Party in consultation with Borrowers) in relation to the benefits to Secured Party and the Bank Product Providers of the security afforded thereby (which pledge, if reasonably requested by Secured Party, shall be governed by the laws of the jurisdiction of such Subsidiary); (ii) any rights or interest in any contract, lease, permit, license, or license agreement covering real or personal property of any Grantor if under the terms of such contract, lease, permit, license, or license agreement, or applicable law with respect thereto, the grant of a security interest or lien therein is prohibited as a matter of law or under the terms of such contract, lease, permit, license, or license agreement and such prohibition or restriction has not been waived or the consent of the other party to such contract, lease, permit, license, or license agreement has not been obtained (provided, that, (A) the foregoing exclusions of this clause (ii) shall in no way be construed (1) to apply to the extent that any described prohibition or restriction is ineffective under Section 9-406, 9-407, 9-408, or 9-409 of the Code or other applicable law, or (2) to apply to the extent that any consent or waiver has been obtained that would permit Secured Party's security interest or lien to attach notwithstanding the prohibition or restriction on the pledge of such contract, lease, permit, license, or license agreement and (B) the foregoing exclusions of clauses (i) and (ii) shall in no way be construed to limit, impair, or otherwise affect any of Secured Party's or any Bank Product Provider's continuing security interests in and liens upon any rights or interests of any Grantor in or to (1) monies due or to become due under or in connection with any described contract, lease, permit, license, license agreement, or Equity Interests (including any Accounts or Equity Interests), or (2) any proceeds from the sale, license, lease, or other dispositions of any such contract, lease, permit, license, license agreement, or Equity Interests); or (iii) any United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law, provided that upon submission and acceptance by the PTO of an amendment to allege use pursuant to 15 U.S.C. Section 1060(a) (or any successor provision), such intent-to-use trademark application shall be considered Collateral.

4.       Security for Secured Obligations.  The Security Interest created hereby secures the payment and performance of the Secured Obligations, whether now existing or arising hereafter.  Without

DB2/ 32072687.3

WFB_000075

limiting the generality of the foregoing, this Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by Grantors, or any of them, to Secured Party, Lender, the Bank Product Providers or any of them, but for the fact that they are unenforceable or not allowable (in whole or in part) as a claim in an Insolvency Proceeding involving any Grantor due to the existence of such Insolvency Proceeding.

5. <u>Grantors Remain Liable</u>. Anything herein to the contrary notwithstanding, (a) each of the Grantors shall remain liable under the contracts and agreements included in the Collateral, including the Pledged Operating Agreements and the Pledged Partnership Agreements, to perform all of the duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by Secured Party or Lender of any of the rights hereunder shall not release any Grantor from any of its duties or obligations under such contracts and agreements included in the Collateral, and (c) Lender shall not have any obligation or liability under such contracts and agreements included in the Collateral by reason of this Agreement, nor shall Lender be obligated to perform any of the obligations or duties of any Grantors thereunder or to take any action to collect or enforce any claim for payment assigned hereunder. Until an Event of Default shall occur and be continuing, except as otherwise provided in this Agreement, the Credit Agreement, or any other Loan Document, Grantors shall have the right to possession and enjoyment of the Collateral for the purpose of conducting the ordinary course of their respective businesses, subject to and upon the terms hereof and of the Credit Agreement and the other Loan Documents. Without limiting the generality of the foregoing, it is the intention of the parties hereto that record and beneficial ownership of the Pledged Interests, including all voting, consensual, dividend, and distribution rights, shall remain in the applicable Grantor until (i) the occurrence and continuance of an Event of Default and (ii) Secured Party has notified the applicable Grantor of Secured Party's election to exercise such rights with respect to the Pledged Interests pursuant to <u>Section 16</u>.

6. <u>Representations and Warranties</u>. In order to induce Secured Party to enter into this Agreement for the benefit of itself, as Lender, and the Bank Product Providers, each Grantor makes the following representations and warranties to Lender which shall be true, correct, and complete, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the Closing Date, and shall be true, correct, and complete, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the date of the making of each Advance (or other extension of credit) made thereafter, as though made on and as of the date of such Advance (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

(a) The name (within the meaning of Section 9-503 of the Code) and jurisdiction of organization of each Grantor is set forth on <u>Schedule 7</u> (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under the Loan Documents).

(b) The chief executive office of each Grantor is located at the address indicated on <u>Schedule 7</u> (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under the Loan Documents).

DB2/ 32072687.3

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 86 of 175

WFB_000076

(c)     Each Grantor's tax identification numbers and organizational identification numbers, if any, are identified on Schedule 7 (as such Schedule may be updated from time to time to reflect changes resulting from transactions permitted under the Loan Documents).

(d)     As of the Closing Date, no Grantor holds any commercial tort claims that exceed $100,000 in amount, except as set forth on Schedule 1.

(e)     Set forth on Schedule 9 (as such Schedule may be updated from time to time subject to Section 7(k)(iii) with respect to Controlled Accounts and provided that Grantors comply with Section 7(c) hereof) is a listing of all of Grantors' Deposit Accounts and Securities Accounts, including, with respect to each bank or securities intermediary (a) the name and address of such Person, and (b) the account numbers of the Deposit Accounts or Securities Accounts maintained with such Person.

(f)     Schedule 8 sets forth all Real Property owned by any of the Grantors as of the Closing Date.

(g)     As of the Closing Date: (i) Schedule 2 provides a complete and correct list of all registered Copyrights owned by any Grantor, all applications for registration of Copyrights owned by any Grantor, and all other Copyrights owned by any Grantor and material to the conduct of the business of any Grantor; (ii) Schedule 3 provides a complete and correct list of all Intellectual Property Licenses entered into by any Grantor pursuant to which (A) any Grantor has provided any license or other rights in Intellectual Property owned or controlled by such Grantor to any other Person (other than non-exclusive software licenses granted in the ordinary course of business) or (B) any Person has granted to any Grantor any license or other rights in Intellectual Property owned or controlled by such Person that is material to the business of such Grantor, including any Intellectual Property that is incorporated in any Inventory, software, or other product marketed, sold, licensed, or distributed by such Grantor; (iii) Schedule 4 provides a complete and correct list of all Patents owned by any Grantor and all applications for Patents owned by any Grantor; and (iv) Schedule 6 provides a complete and correct list of all registered Trademarks owned by any Grantor, all applications for registration of Trademarks owned by any Grantor, and all other Trademarks owned by any Grantor and material to the conduct of the business of any Grantor.

(h)     (i) (A) each Grantor owns exclusively or holds licenses in all Intellectual Property that is necessary in or material to the conduct of its business, and (B) all employees and contractors of each Grantor who were involved in the creation or development of any Intellectual Property for such Grantor that is necessary in or material to the business of such Grantor have signed agreements containing assignment of Intellectual Property rights to such Grantor and obligations of confidentiality;

(ii)     to each Grantor's knowledge after reasonable inquiry, no Person has infringed or misappropriated or is currently infringing or misappropriating any Intellectual Property rights owned by such Grantor, in each case, that either individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect;

(iii)     (A) to each Grantor's knowledge after reasonable inquiry, (1) such Grantor has never infringed or misappropriated and is not currently infringing or misappropriating any Intellectual Property rights of any Person, and (2) no product manufactured, used, distributed, licensed, or sold by or service provided by such Grantor has ever infringed or misappropriated or is currently infringing or misappropriating any Intellectual Property rights of any Person, in each case, except where such infringement either individually or in the aggregate could not reasonably be expected to result in a

18

DB2/ 32072687.3

Material Adverse Effect, and (B) there are no infringement or misappropriation claims or proceedings pending, or to any Grantor's knowledge after reasonable inquiry, threatened in writing against any Grantor, and no Grantor has received any written notice or other communication of any actual or alleged infringement or misappropriation of any Intellectual Property rights of any Person, in each case, except where such infringement either individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect;

       (iv)      to each Grantor's knowledge after reasonable inquiry, all registered Copyrights, registered Trademarks, and issued Patents that are owned by such Grantor and necessary in or material to the conduct of its business are valid, subsisting and enforceable and in compliance with all legal requirements, filings, and payments and other actions that are required to maintain such Intellectual Property in full force and effect; and

       (v)      each Grantor has taken reasonable steps to maintain the confidentiality of and otherwise protect and enforce its rights in all trade secrets owned by such Grantor that are necessary in or material to the conduct of the business of such Grantor.

       (i)      This Agreement creates a valid security interest in the Collateral of each Grantor, to the extent a security interest therein can be created under the Code, securing the payment of the Secured Obligations. Except to the extent a security interest in the Collateral cannot be perfected by the filing of a financing statement under the Code, all filings and other actions necessary or desirable to perfect and protect such security interest have been duly taken or will have been taken upon the filing of financing statements listing each applicable Grantor, as a debtor, and Secured Party, as secured party, in the jurisdictions listed next to each Grantor's name on <u>Schedule 11</u>. Upon the making of such filings, Secured Party shall have a first priority perfected security interest in the Collateral of each Grantor to the extent such security interest can be perfected by the filing of a financing statement. Upon filing of any Copyright Security Agreement with the United States Copyright Office, filing of any Patent Security Agreement and any Trademark Security Agreement with the PTO, and the filing of appropriate financing statements in the jurisdictions listed on <u>Schedule 11</u>, all action necessary or desirable to protect and perfect the Security Interest in and on each Grantor's Patents, Trademarks, or Copyrights has been taken and such perfected Security Interest is enforceable as such as against any and all creditors of and purchasers from any Grantor. All action by any Grantor necessary to protect and perfect such security interest on each item of Collateral has been duly taken.

       (j)      (i) Except for the Security Interest created hereby, each Grantor is and will at all times be the sole holder of record and the legal and beneficial owner, free and clear of all Liens other than Permitted Liens, of the Pledged Interests indicated on <u>Schedule 5</u> as being owned by such Grantor and, when acquired by such Grantor, any Pledged Interests acquired after the Closing Date; (ii) all of the Pledged Interests are duly authorized, validly issued, fully paid and nonassessable and the Pledged Interests constitute or will constitute the percentage of the issued and outstanding Equity Interests of the Pledged Companies of such Grantor identified on <u>Schedule 5</u> as supplemented or modified by any Pledged Interests Addendum; (iii) such Grantor has the right and requisite authority to pledge, the Investment Property pledged by such Grantor to Secured Party as provided herein; (iv) all actions necessary or desirable to perfect and establish the first priority of, or otherwise protect, Secured Party's Liens in the Investment Property, and the proceeds thereof, have been duly taken, upon (A) the execution and delivery of this Agreement; (B) the taking of possession by Secured Party (or its Secured Party or designee) of any certificates representing the Pledged Interests, together with undated powers (or other documents of transfer acceptable to Secured Party) endorsed in blank by the applicable Grantor; (C) the filing of financing statements in the applicable jurisdiction set forth on <u>Schedule 11</u> for such Grantor with respect to the Pledged Interests of such Grantor that are not represented by certificates, and (D) with

19

DB2/ 32072687.3

WFB_000078

respect to any Securities Accounts, the delivery of Control Agreements with respect thereto; and (v) each Grantor has delivered to and deposited with Secured Party all certificates representing the Pledged Interests owned by such Grantor to the extent such Pledged Interests are represented by certificates, and undated powers (or other documents of transfer acceptable to Secured Party) endorsed in blank with respect to such certificates. None of the Pledged Interests owned or held by such Grantor has been issued or transferred in violation of any securities registration, securities disclosure, or similar laws of any jurisdiction to which such issuance or transfer may be subject.

(k)     No consent, approval, authorization, or other order or other action by, and no notice to or filing with, any Governmental Authority or any other Person is required (i) for the grant of a Security Interest by such Grantor in and to the Collateral pursuant to this Agreement or for the execution, delivery, or performance of this Agreement by such Grantor, or (ii) for the exercise by Secured Party of the voting or other rights provided for in this Agreement with respect to the Investment Property or the remedies in respect of the Collateral pursuant to this Agreement, except as may be required in connection with such disposition of Investment Property by laws affecting the offering and sale of securities generally and except for consents, approvals, authorizations, or other orders or actions that have been obtained or given (as applicable) and that are still in force.  No Intellectual Property License of any Grantor that is necessary in or material to the conduct of such Grantor's business requires any consent of any other Person that has not been obtained in order for such Grantor to grant the security interest granted hereunder in such Grantor's right, title or interest in or to such Intellectual Property License.

(l)     Schedule 12 sets forth all motor vehicles owned by Grantors as of the Closing Date, by model, model year, and vehicle identification number ("VIN").

(m)     As to all limited liability company or partnership interests, issued under any Pledged Operating Agreement or Pledged Partnership Agreement, each Grantor hereby represents and warrants that the Pledged Interests issued pursuant to such agreement (A) are not dealt in or traded on securities exchanges or in securities markets, (B) do not constitute investment company securities, and (C) are not held by such Grantor in a Securities Account.  In addition, none of the Pledged Operating Agreements, the Pledged Partnership Agreements, or any other agreements governing any of the Pledged Interests issued under any Pledged Operating Agreement or Pledged Partnership Agreement, provide that such Pledged Interests are securities governed by Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction.

7.     Covenants.  Each Grantor, jointly and severally, covenants and agrees with Secured Party that from and after the date of this Agreement and until the date of termination of this Agreement in accordance with Section 23:

(a)     Possession of Collateral.  In the event that any Collateral, including Proceeds, is evidenced by or consists of Negotiable Collateral, Investment Property, or Chattel Paper having an aggregate value or face amount of $100,000 or more for all such Negotiable Collateral, Investment Property, or Chattel Paper, the Grantors shall promptly (and in any event within five (5) Business Days after acquisition thereof), notify Secured Party thereof, and if and to the extent that perfection or priority of Secured Party's Security Interest is dependent on or enhanced by possession, the applicable Grantor, promptly (and in any event within five (5) Business Days) after request by Secured Party, shall execute such other documents and instruments as shall be requested by Secured Party or, if applicable, endorse and deliver physical possession of such Negotiable Collateral, Investment Property, or Chattel Paper to Secured Party, together with such undated powers (or other relevant document of transfer acceptable to Secured Party) endorsed in blank as shall be requested by Secured Party, and shall do such other acts or

DB2/ 32072687.3

WFB_000079

things deemed necessary or desirable by Secured Party to protect Secured Party's Security Interest therein;

        (b)    <u>Chattel Paper</u>.

        (i)    Promptly (and in any event within five (5) Business Days) after request by Secured Party, each Grantor shall take all steps reasonably necessary to grant Secured Party control of all electronic Chattel Paper in accordance with the Code and all "transferable records" as that term is defined in Section 16 of the Uniform Electronic Transaction Act and Section 201 of the federal Electronic Signatures in Global and National Commerce Act as in effect in any relevant jurisdiction, to the extent that the aggregate value or face amount of such electronic Chattel Paper equals or exceeds $100,000;

        (ii)    If any Grantor retains possession of any Chattel Paper or instruments (which retention of possession shall be subject to the extent permitted hereby and by the Credit Agreement), promptly upon the request of Secured Party, such Chattel Paper and instruments shall be marked with the following legend: "This writing and the obligations evidenced or secured hereby are subject to the Security Interest of Wells Fargo Bank, National Association, as Secured Party for the benefit of itself, as Lender, and the Bank Product Providers";

        (c)    <u>Control Agreements</u>.

        (i)    Except to the extent otherwise excused by <u>Section 7(k)(iv)</u>, each Grantor shall obtain an authenticated Control Agreement (which may include a Controlled Account Agreement), from each bank maintaining a Deposit Account or Securities Account for such Grantor;

        (ii)    Except to the extent otherwise excused by <u>Section 7(k)(iv)</u>, each Grantor shall obtain an authenticated Control Agreement, from each issuer of uncertificated securities, securities intermediary, or commodities intermediary issuing or holding any financial assets or commodities to or for any Grantor, or maintaining a Securities Account for such Grantor; and

        (iii)    Except to the extent otherwise excused by <u>Section 7(k)(iv)</u>, each Grantor shall obtain an authenticated Control Agreement with respect to all of such Grantor's investment property;

        (d)    <u>Letter-of-Credit Rights</u>.  If the Grantors (or any of them) are or become the beneficiary of letters of credit having a face amount or value of $100,000 or more in the aggregate, then the applicable Grantor or Grantors shall promptly (and in any event within five (5) Business Days after becoming a beneficiary), notify Secured Party thereof and, promptly (and in any event within five (5) Business Days) after request by Secured Party, enter into a tri-party agreement with Secured Party and the issuer or confirming bank with respect to letter-of-credit rights assigning such letter-of-credit rights to Secured Party and directing all payments thereunder to Secured Party's account, all in form and substance reasonably satisfactory to Secured Party;

        (e)    <u>Commercial Tort Claims</u>.  If the Grantors (or any of them) obtain Commercial Tort Claims having a value, or involving an asserted claim, in the amount of $100,000 or more in the aggregate for all Commercial Tort Claims, then the applicable Grantor or Grantors shall promptly (and in any event within five (5) Business Days of obtaining such Commercial Tort Claim), notify Secured Party upon incurring or otherwise obtaining such Commercial Tort Claims and, promptly (and in any event within five (5) Business Days) after request by Secured Party, amend <u>Schedule 1</u> to describe such Commercial Tort Claims in a manner that reasonably identifies such Commercial Tort Claims and which

<div align="center">21</div>

is otherwise reasonably satisfactory to Secured Party, and hereby authorizes the filing of additional financing statements or amendments to existing financing statements describing such Commercial Tort Claims, and agrees to do such other acts or things deemed necessary or desirable by Secured Party to give Secured Party a first priority, perfected security interest in any such Commercial Tort Claim;

(f)     Government Contracts.  Other than Accounts and Chattel Paper the aggregate value of which does not at any one time exceed $100,000, if any Account or Chattel Paper arises out of a contract or contracts with the United States of America or any department, agency, or instrumentality thereof, Grantors shall promptly (and in any event within five (5) Business Days of the creation thereof) notify Secured Party thereof and, promptly (and in any event within five (5) Business Days) after request by Secured Party, execute any instruments or take any steps reasonably required by Secured Party in order that all moneys due or to become due under such contract or contracts shall be assigned to Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, and shall provide written notice thereof under the Assignment of Claims Act or other applicable law;

(g)     Intellectual Property.

(i)     Upon the request of Secured Party, in order to facilitate filings with the PTO and the United States Copyright Office, each Grantor shall execute and deliver to Secured Party one or more Copyright Security Agreements, Trademark Security Agreements, or Patent Security Agreements to further evidence Secured Party's Lien on such Grantor's Patents, Trademarks, or Copyrights, and the General Intangibles of such Grantor relating thereto or represented thereby;

(ii)     Each Grantor shall have the duty, with respect to Intellectual Property that is necessary in or material to the conduct of such Grantor's business, to protect and diligently enforce and defend at such Grantor's expense its Intellectual Property, including (A) to diligently enforce and defend, including promptly suing for infringement, misappropriation, or dilution and to recover any and all damages for such infringement, misappropriation, or dilution, and filing for opposition, interference, and cancellation against conflicting Intellectual Property rights of any Person, (B) to prosecute diligently any trademark application or service mark application that is part of the Trademarks pending as of the date hereof or hereafter until the termination of this Agreement, (C) to prosecute diligently any patent application that is part of the Patents pending as of the date hereof or hereafter until the termination of this Agreement, (D) to take all reasonable and necessary action to preserve and maintain all of such Grantor's Trademarks, Patents, Copyrights, Intellectual Property Licenses, and its rights therein, including paying all maintenance fees and filing of applications for renewal, affidavits of use, and affidavits of noncontestability, and (E) to require all employees, consultants, and contractors of each Grantor who were involved in the creation or development of such Intellectual Property to sign agreements containing assignment of Intellectual Property rights and obligations of confidentiality.  Each Grantor further agrees not to abandon any Intellectual Property or Intellectual Property License that is necessary in or material to the conduct of such Grantor's business.  Each Grantor hereby agrees to take the steps described in this Section 7(g)(ii) with respect to all new or acquired Intellectual Property to which it is now or later becomes entitled that is necessary in or material to the conduct of such Grantor's business;

(iii)     Grantors acknowledge and agree that Lender shall have no duties with respect to any Intellectual Property or Intellectual Property Licenses of any Grantor.  Without limiting the generality of this Section 7(g)(iii), Grantors acknowledge and agree that Lender shall not be under any obligation to take any steps necessary to preserve rights in the Collateral consisting of Intellectual Property or Intellectual Property Licenses against any other Person, but Lender may do so at its option from and after the occurrence and during the continuance of an Event of Default, and all expenses

22

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 91 of 175

WFB_000081

incurred in connection therewith (including reasonable fees and expenses of attorneys and other professionals) shall be for the sole account of Borrowers and shall be chargeable to the Loan Account;

(iv)    On each date on which a Compliance Certificate is to be delivered pursuant to Schedule C of the Credit Agreement (or, if an Event of Default has occurred and is continuing, more frequently if requested by Secured Party), each Grantor shall provide Secured Party with a written report of all new Patents, Trademarks or Copyrights that are registered or the subject of pending applications for registrations, and of all Intellectual Property Licenses that are material to the conduct of such Grantor's business, in each case, which were acquired, registered, or for which applications for registration were filed by any Grantor during the prior period and any statement of use or amendment to allege use with respect to intent-to-use trademark applications.  In the case of such registrations or applications therefor, which were acquired by any Grantor, each such Grantor shall file the necessary documents with the appropriate Governmental Authority identifying the applicable Grantor as the owner (or as a co-owner thereof, if such is the case) of such Intellectual Property.  In each of the foregoing cases, the applicable Grantor shall promptly cause to be prepared, executed, and delivered to Secured Party supplemental schedules to the applicable Loan Documents to identify such Patent, Trademark and Copyright registrations and applications therefor (with the exception of Trademark applications filed on an intent-to-use basis for which no statement of use or amendment to allege use has been filed) and Intellectual Property Licenses as being subject to the security interests created thereunder;

(v)    Anything to the contrary in this Agreement notwithstanding, in no event shall any Grantor, either itself or through any Secured Party, employee, licensee, or designee, file an application for the registration of any Copyright with the United States Copyright Office or any similar office or agency in another country without giving Secured Party written notice thereof at least five (5) Business Days prior to such filing and complying with Section 7(g)(i). Upon receipt from the United States Copyright Office of notice of registration of any Copyright, each Grantor shall promptly (but in no event later than five (5) Business Days following such receipt) notify (but without duplication of any notice required by Section 7(g)(iv)) Secured Party of such registration by delivering, or causing to be delivered, to Secured Party, documentation sufficient for Secured Party to perfect Secured Party's Liens on such Copyright. If any Grantor acquires from any Person any Copyright registered with the United States Copyright Office or an application to register any Copyright with the United States Copyright Office, such Grantor shall promptly (but in no event later than five (5) Business Days following such acquisition) notify Secured Party of such acquisition and deliver, or cause to be delivered, to Secured Party, documentation sufficient for Secured Party to perfect Secured Party's Liens on such Copyright.  In the case of such Copyright registrations or applications therefor which were acquired by any Grantor, each such Grantor shall promptly (but in no event later than five (5) Business Days following such acquisition) file the necessary documents with the appropriate Governmental Authority identifying the applicable Grantor as the owner (or as a co-owner thereof, if such is the case) of such Copyrights;

(vi)    Each Grantor shall take reasonable steps to maintain the confidentiality of, and otherwise protect and enforce its rights in, the Intellectual Property that is necessary in or material to the conduct of such Grantor's business, including, as applicable (A) protecting the secrecy and confidentiality of its confidential information and trade secrets by having and enforcing a policy requiring all current employees, consultants, licensees, vendors and contractors with access to such information to execute appropriate confidentiality agreements; (B) taking actions reasonably necessary to ensure that no trade secret falls into the public domain; and (C) protecting the secrecy and confidentiality of the source code of all software programs and applications of which it is the owner or licensee by having and enforcing a policy requiring any licensees (or sublicensees) of such source code to enter into license agreements with commercially reasonable use and non-disclosure restrictions; and

23

DB2/ 32072687.3

(vii)     No Grantor shall enter into any Intellectual Property License material to the conduct of the business to receive any license or rights in any Intellectual Property of any other Person unless such Grantor has used commercially reasonable efforts to permit the assignment of or grant of a security interest in such Intellectual Property License (and all rights of Grantor thereunder) to Secured Party (and any transferees of Secured Party).

(h)     <u>Investment Property</u>.

(i)     If any Grantor shall acquire, obtain, receive or become entitled to receive any Pledged Interests after the Closing Date, it shall promptly (and in any event within five (5) Business Days of acquiring or obtaining such Collateral) deliver to Secured Party a duly executed Pledged Interests Addendum identifying such Pledged Interests;

(ii)     Upon the occurrence and during the continuance of an Event of Default, following the request of Secured Party, all sums of money and property paid or distributed in respect of the Investment Property that are received by any Grantor shall be held by the Grantors in trust for the benefit of Secured Party segregated from such Grantor's other property, and such Grantor shall deliver it forthwith to Secured Party in the exact form received;

(iii)     Each Grantor shall promptly deliver to Secured Party a copy of each material notice or other material communication received by it in respect of any Pledged Interests;

(iv)     No Grantor shall make or consent to any amendment or other modification or waiver with respect to any Pledged Interests, Pledged Operating Agreement, or Pledged Partnership Agreement, or enter into any agreement or permit to exist any restriction with respect to any Pledged Interests if the same is prohibited pursuant to the Loan Documents;

(v)     Each Grantor agrees that it will cooperate with Secured Party in obtaining all necessary approvals and making all necessary filings under federal, state, local, or foreign law to effect the perfection of the Security Interest on the Investment Property or to effect any sale or transfer thereof;

(vi)     As to all limited liability company or partnership interests, issued under any Pledged Operating Agreement or Pledged Partnership Agreement, each Grantor hereby covenants that the Pledged Interests issued pursuant to such agreement (A) are not and shall not be dealt in or traded on securities exchanges or in securities markets, (B) do not and will not constitute investment company securities, and (C) are not and will not be held by such Grantor in a securities account. In addition, none of the Pledged Operating Agreements, the Pledged Partnership Agreements, or any other agreements governing any of the Pledged Interests issued under any Pledged Operating Agreement or Pledged Partnership Agreement, provide or shall provide that such Pledged Interests are securities governed by Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction.

(i)     <u>Real Property; Fixtures.</u>     Each Grantor covenants and agrees that upon the acquisition of any fee interest in Real Property having a fair market value in excess of $500,000 it will promptly (and in any event within two (2) Business Days of acquisition) notify Secured Party of the acquisition of such Real Property and will grant to Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, a first priority mortgage on each fee interest in Real Property now or hereafter owned by such Grantor and shall deliver such other documentation and opinions, in form and substance satisfactory to Secured Party, in connection with the grant of such mortgage as Secured Party shall request in its Permitted Discretion, including title insurance policies, financing statements, fixture

24

DB2/ 32072687.3

WFB_000083

filings and environmental audits and such Grantor shall pay all recording costs, intangible taxes and other fees and costs (including reasonable attorneys fees and expenses) incurred in connection therewith. Each Grantor acknowledges and agrees that, to the extent permitted by applicable law, all of the Collateral shall remain personal property regardless of the manner of its attachment or affixation to real property;

(j) <u>Transfers and Other Liens</u>. Grantors shall not (i) sell, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to, any of the Collateral, except as expressly permitted by the Credit Agreement, or (ii) create or permit to exist any Lien upon or with respect to any of the Collateral of any Grantor, except for Permitted Liens. The inclusion of Proceeds in the Collateral shall not be deemed to constitute Secured Party's consent to any sale or other disposition of any of the Collateral except as expressly permitted in this Agreement or the other Loan Documents;

(k) <u>Controlled Accounts; Controlled Investments</u>.

(i) Each Grantor shall (A) establish and maintain cash management services of a type and on terms reasonably satisfactory to Secured Party at one or more of the banks set forth on <u>Schedule 10</u> (each a "<u>Controlled Account Bank</u>"), and shall take reasonable steps to ensure that all of its Account Debtors forward payment of the amounts owed by them directly to such Controlled Account Bank, and (B) deposit or cause to be deposited promptly, and in any event no later than the first Business Day after the date of receipt thereof, all of their Collections (including those sent directly by their Account Debtors to a Grantor) into a bank account of such Grantor (each, a "<u>Controlled Account</u>") at one of the Controlled Account Banks.

(ii) Each Grantor shall establish and maintain Controlled Account Agreements with Secured Party and the applicable Controlled Account Bank, in form and substance reasonably acceptable to Secured Party. Each such Controlled Account Agreement shall provide, among other things, that (A) the Controlled Account Bank will comply with any instructions originated by Secured Party directing the disposition of the funds in such Controlled Account without further consent by the applicable Grantor, (B) the Controlled Account Bank waives, subordinates, or agrees not to exercise any rights of setoff or recoupment or any other claim against the applicable Controlled Account other than for payment of its service fees and other charges directly related to the administration of such Controlled Account and for returned checks or other items of payment, and (C) the Controlled Account Bank will forward, by daily sweep (or such other frequency approved by Secured Party in Secured Party's sole discretion), all amounts in the applicable Controlled Account to the Secured Party's Account. Notwithstanding the foregoing, Grantors may maintain operating accounts with one or more depository banks in connection with Grantors' El Paso, Eagle Pass, and Laredo, Texas locations, that are not subject to a Controlled Account Agreements to the extent permitted, and subject to the terms and conditions set forth, in the Credit Agreement.

(iii) So long as no Default or Event of Default has occurred and is continuing, Borrowers may amend <u>Schedule 10</u> to add or replace a Controlled Account Bank or Controlled Account and shall upon such addition or replacement provide to Secured Party an amended <u>Schedule 10</u>; <u>provided</u>, <u>however</u>, that (A) such prospective Controlled Account Bank shall be reasonably satisfactory to Secured Party, and (B) prior to the time of the opening of such Controlled Account, the applicable Grantor and such prospective Controlled Account Bank shall have executed and delivered to Secured Party a Controlled Account Agreement. Each Grantor shall close any of its Controlled Accounts (and establish replacement Controlled Accounts in accordance with the foregoing sentence) as promptly as practicable and in any event within forty-five (45) days after notice from Secured Party that the operating performance, funds transfer, or availability procedures or performance of the Controlled Account Bank

DB2/ 32072687.3

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 94 of 175

WFB_000084

with respect to Controlled Accounts or Secured Party's liability under any Controlled Account Agreement with such Controlled Account Bank is no longer acceptable in Secured Party's reasonable judgment.

(iv)     Other than (i) an aggregate amount of not more than $50,000 at any one time, in the case of Grantors, (ii) amounts deposited into Deposit Accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for any Grantor's employees, no Grantor will make, acquire, or permit to exist any investments permitted under Section 5.5 of the Credit Agreement consisting of cash, Cash Equivalents, or amounts credited to Deposit Accounts or Securities Accounts unless Grantor and the applicable bank or securities intermediary have entered into Control Agreements with Secured Party governing such investments in order to perfect (and further establish) Secured Party's Liens in such investments.

(l)     <u>Name, Etc</u>.  No Grantor will change its name, organizational identification number, jurisdiction of organization or organizational identity; <u>provided</u>, that Grantor may change its name upon at least 10 days prior written notice to Secured Party of such change.

(m)     <u>Motor Vehicles</u>.  Promptly (and in any event within five (5) Business Days) after request by Secured Party, with respect to all goods covered by a certificate of title owned by any Grantor, such Grantor shall deliver to Secured Party or Secured Party's designee, the certificates of title for all such goods and promptly (and in any event within ten (10)) Business Days) after request by Secured Party, such Grantor shall take all actions necessary to cause such certificates to be filed (with the Secured Party's Lien noted thereon) in the appropriate state motor vehicle filing office.

(n)     <u>Account Verification</u>.  Each Grantor will permit Secured Party, in Secured Party's name or in the name of a nominee of Secured Party, to verify the validity, amount or any other matter relating to any Account, by mail, telephone, facsimile transmission or otherwise.  Further, at the request of Secured Party, Grantors shall send requests for verification of Accounts or send notices of assignment of Accounts to Account Debtors and other obligors.

8.     <u>Relation to Other Security Documents</u>.  The provisions of this Agreement shall be read and construed with the other Loan Documents referred to below in the manner so indicated.

(a)     <u>Credit Agreement</u>. In the event of any conflict between any provision in this Agreement and a provision in the Credit Agreement, such provision of the Credit Agreement shall control.

(b)     <u>Patent, Trademark, Copyright Security Agreements</u>.  The provisions of the Copyright Security Agreements, Trademark Security Agreements, and Patent Security Agreements are supplemental to the provisions of this Agreement, and nothing contained in the Copyright Security Agreements, Trademark Security Agreements, or the Patent Security Agreements shall limit any of the rights or remedies of Secured Party hereunder.  In the event of any conflict between any provision in this Agreement and a provision in a Copyright Security Agreement, Trademark Security Agreement or Patent Security Agreement, such provision of this Agreement shall control.

26

9.    Further Assurances.

(a)    Each Grantor agrees that from time to time, at its own expense, such Grantor will promptly execute and deliver all further instruments and documents, and take all further action, that Secured Party may reasonably request, in order to perfect and protect the Security Interest granted hereby, to create, perfect or protect the Security Interest purported to be granted hereby or to enable Secured Party to exercise and enforce its rights and remedies hereunder with respect to any of the Collateral.

(b)    Each Grantor authorizes the filing by Secured Party of financing or continuation statements, or amendments thereto, and such Grantor will execute and deliver to Secured Party such other instruments or notices, as Secured Party may reasonably request, in order to perfect and preserve the Security Interest granted or purported to be granted hereby.

(c)    Each Grantor authorizes Secured Party at any time and from time to time to file, transmit, or communicate, as applicable, financing statements and amendments (i) describing the Collateral as "all personal property of debtor" or "all assets of debtor" or words of similar effect, (ii) describing the Collateral as being of equal or lesser scope or with greater detail, or (iii) that contain any information required by part 5 of Article 9 of the Code for the sufficiency or filing office acceptance. Each Grantor also hereby ratifies any and all financing statements or amendments previously filed by Secured Party in any jurisdiction.

(d)    Each Grantor acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement filed in connection with this Agreement without the prior written consent of Secured Party, subject to such Grantor's rights under Section 9-509(d)(2) of the Code.

10.    Secured Party's Right to Perform Contracts, Exercise Rights, etc.  Upon the occurrence and during the continuance of an Event of Default, Secured Party (or its designee) (a) may proceed to perform any and all of the obligations of any Grantor contained in any contract, lease, or other agreement and exercise any and all rights of any Grantor therein contained as fully as such Grantor itself could, (b) shall have the right to use any Grantor's rights under Intellectual Property Licenses in connection with the enforcement of Secured Party's rights hereunder, including the right to prepare for sale and sell any and all Inventory and Equipment now or hereafter owned by any Grantor and now or hereafter covered by such licenses, and (c) shall have the right to request that any Equity Interests that are pledged hereunder be registered in the name of Secured Party or any of its nominees.

11.    Secured Party Appointed Attorney-in-Fact.  Each Grantor hereby irrevocably appoints Secured Party its attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, at such time as an Event of Default has occurred and is continuing under the Credit Agreement, to take any action and to execute any instrument which Secured Party may reasonably deem necessary or advisable to accomplish the purposes of this Agreement, including:

(a)    to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection with the Accounts or any other Collateral of such Grantor;

(b)    to receive and open all mail addressed to such Grantor and to notify postal authorities to change the address for the delivery of mail to such Grantor to that of Secured Party;

DB2/ 32072687.3

WFB_000086

(c) to receive, indorse, and collect any drafts or other instruments, documents, Negotiable Collateral or Chattel Paper;

(d) to file any claims or take any action or institute any proceedings which Secured Party may deem necessary or desirable for the collection of any of the Collateral of such Grantor or otherwise to enforce the rights of Secured Party with respect to any of the Collateral;

(e) to repair, alter, or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any Person obligated to such Grantor in respect of any Account of such Grantor;

(f) to use any Intellectual Property or Intellectual Property Licenses of such Grantor, including but not limited to any labels, Patents, Trademarks, trade names, URLs, domain names, industrial designs, Copyrights, or advertising matter, in preparing for sale, advertising for sale, or selling Inventory or other Collateral and to collect any amounts due under Accounts, contracts or Negotiable Collateral of such Grantor; and

(g) Secured Party, on behalf of itself or the Bank Product Providers, shall have the right, but shall not be obligated, to bring suit in its own name to enforce the Intellectual Property and Intellectual Property Licenses and, if Secured Party shall commence any such suit, the appropriate Grantor shall, at the request of Secured Party, do any and all lawful acts and execute any and all proper documents reasonably required by Secured Party in aid of such enforcement.

To the extent permitted by law, each Grantor hereby ratifies all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof. This power of attorney is coupled with an interest and shall be irrevocable until this Agreement is terminated.

12. <u>Secured Party May Perform</u>. If any Grantor fails to perform any agreement contained herein, Secured Party may itself perform, or cause performance of, such agreement, and the reasonable expenses of Secured Party incurred in connection therewith shall be payable, jointly and severally, by Grantors.

13. <u>Secured Party's Duties</u>. The powers conferred on Secured Party hereunder are solely to protect Secured Party's interest in the Collateral, for the benefit of itself, as Lender, and the Bank Product Providers, and shall not impose any duty upon Secured Party to exercise any such powers. Except for the safe custody of any Collateral in its actual possession and the accounting for moneys actually received by it hereunder, Secured Party shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its actual possession if such Collateral is accorded treatment substantially equal to that which Secured Party accords its own property.

14. <u>Collection of Accounts, General Intangibles and Negotiable Collateral</u>. At any time upon the occurrence and during the continuance of an Event of Default, Secured Party or Secured Party's designee may (a) notify Account Debtors of any Grantor that the Accounts, General Intangibles, Chattel Paper or Negotiable Collateral of such Grantor have been assigned to Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, or that Secured Party has a security interest therein, and (b) collect the Accounts, General Intangibles and Negotiable Collateral of any Grantor directly, and any collection costs and expenses shall constitute part of such Grantor's Secured Obligations under the Loan Documents.

DB2/ 32072687.3

WFB_000087

15.     Disposition of Pledged Interests by Secured Party.  None of the Pledged Interests existing as of the date of this Agreement are, and none of the Pledged Interests hereafter acquired on the date of acquisition thereof will be, registered or qualified under the various federal or state securities laws of the United States and disposition thereof after an Event of Default may be restricted to one or more private (instead of public) sales in view of the lack of such registration.  Each Grantor understands that in connection with such disposition, Secured Party may approach only a restricted number of potential purchasers and further understands that a sale under such circumstances may yield a lower price for the Pledged Interests than if the Pledged Interests were registered and qualified pursuant to federal and state securities laws and sold on the open market.  Each Grantor, therefore, agrees that:  (a) if Secured Party shall, pursuant to the terms of this Agreement, sell or cause the Pledged Interests or any portion thereof to be sold at a private sale, Secured Party shall have the right to rely upon the advice and opinion of any nationally recognized brokerage or investment firm (but shall not be obligated to seek such advice and the failure to do so shall not be considered in determining the commercial reasonableness of such action) as to the best manner in which to offer the Pledged Interest or any portion thereof for sale and as to the best price reasonably obtainable at the private sale thereof; and (b) such reliance shall be conclusive evidence that Secured Party has handled the disposition in a commercially reasonable manner.

16.     Voting and Other Rights in Respect of Pledged Interests.

(a)     Upon the occurrence and during the continuation of an Event of Default, (i) Secured Party may, at its option, and with two (2) Business Days prior notice to any Grantor, and in addition to all rights and remedies available to Secured Party under any other agreement, at law, in equity, or otherwise, exercise all voting rights, or any other ownership or consensual rights (including any dividend or distribution rights) in respect of the Pledged Interests owned by such Grantor, but under no circumstances is Secured Party obligated by the terms of this Agreement to exercise such rights, and (ii) if Secured Party duly exercises its right to vote any of such Pledged Interests, each Grantor hereby appoints Secured Party, such Grantor's true and lawful attorney-in-fact and IRREVOCABLE PROXY to vote such Pledged Interests in any manner Secured Party deems advisable for or against all matters submitted or which may be submitted to a vote of shareholders, partners or members, as the case may be.  The power-of-attorney and proxy granted hereby is coupled with an interest and shall be irrevocable.

(b)     For so long as any Grantor shall have the right to vote the Pledged Interests owned by it, such Grantor covenants and agrees that it will not, without the prior written consent of Secured Party, vote or take any consensual action with respect to such Pledged Interests which would materially adversely affect the rights of Secured Party, Lender, or the Bank Product Providers, or the value of the Pledged Interests.

17.     Remedies.  Upon the occurrence and during the continuance of an Event of Default:

(a)     Secured Party may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein, in the other Loan Documents, or otherwise available to it, all the rights and remedies of a secured party on default under the Code or any other applicable law.  Without limiting the generality of the foregoing, each Grantor expressly agrees that, in any such event, Secured Party without demand of performance or other demand, advertisement or notice of any kind (except a notice specified below of time and place of public or private sale) to or upon any Grantor or any other Person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the Code or any other applicable law), may take immediate possession of all or any portion of the Collateral and (i) require Grantors to, and each Grantor hereby agrees that it will at its own expense and upon request of Secured Party forthwith, assemble all or part of the Collateral as directed by Secured Party and make it available to Secured Party at one or more locations where such Grantor

29

DB2/ 32072687.3

regularly maintains Inventory, and (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Secured Party's offices or elsewhere, for cash, on credit, and upon such other terms as Secured Party may deem commercially reasonable. Each Grantor agrees that, to the extent notification of sale shall be required by law, at least ten (10) days notification by mail to the applicable Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification and specifically such notification shall constitute a reasonable "authenticated notification of disposition" within the meaning of Section 9-611 of the Code. Secured Party shall not be obligated to make any sale of Collateral regardless of notification of sale having been given. Secured Party may adjourn any public sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Grantor agrees that (A) the internet shall constitute a "place" for purposes of Section 9-610(b) of the Code and (B) to the extent notification of sale shall be required by law, notification by mail of the URL where a sale will occur and the time when a sale will commence at least ten (10) days prior to the sale shall constitute a reasonable notification for purposes of Section 9-611(b) of the Code. Each Grantor agrees that any sale of Collateral to a licensor pursuant to the terms of a license agreement between such licensor and a Grantor is sufficient to constitute a commercially reasonable sale (including as to method, terms, manner, and time) within the meaning of Section 9-610 of the Code.

(b)     Secured Party is hereby granted a license or other right to use, without liability for royalties or any other charge, each Grantor's Intellectual Property, including but not limited to, any labels, Patents, Trademarks, trade names, URLs, domain names, industrial designs, Copyrights, and advertising matter, whether owned by any Grantor or with respect to which any Grantor has rights under license, sublicense, or other agreements (including any Intellectual Property License), as it pertains to the Collateral, in preparing for sale, advertising for sale and selling any Collateral, and each Grantor's rights under all licenses and all franchise agreements shall inure to the benefit of Secured Party.

(c)     Secured Party may, in addition to other rights and remedies provided for herein, in the other Loan Documents, or otherwise available to it under applicable law and without the requirement of notice to or upon any Grantor or any other Person (which notice is hereby expressly waived to the maximum extent permitted by the Code or any other applicable law), (i) with respect to any Grantor's Deposit Accounts in which Secured Party's Liens are perfected by control under Section 9-104 of the Code, instruct the bank maintaining such Deposit Account for the applicable Grantor to pay the balance of such Deposit Account to or for the benefit of Secured Party, and (ii) with respect to any Grantor's Securities Accounts in which Secured Party's Liens are perfected by control under Section 9-106 of the Code, instruct the securities intermediary maintaining such Securities Account for the applicable Grantor to (A) transfer any cash in such Securities Account to or for the benefit of Secured Party, or (B) liquidate any financial assets in such Securities Account that are customarily sold on a recognized market and transfer the cash proceeds thereof to or for the benefit of Secured Party.

(d)     Any cash held by Secured Party as Collateral and all cash proceeds received by Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied against the Secured Obligations in the order set forth in the Credit Agreement. In the event the proceeds of Collateral are insufficient to satisfy all of the Secured Obligations in full, each Grantor shall remain jointly and severally liable for any such deficiency.

(e)     Each Grantor hereby acknowledges that the Secured Obligations arise out of a commercial transaction, and agrees that if an Event of Default shall occur and be continuing Secured Party shall have the right to an immediate writ of possession without notice of a hearing. Secured Party shall have the right to the appointment of a receiver for the properties and assets of each Grantor, and

30

DB2/ 32072687.3

WFB_000089

each Grantor hereby consents to such rights and such appointment and hereby waives any objection such Grantor may have thereto or the right to have a bond or other security posted by Secured Party.

18. <u>Remedies Cumulative</u>. Each right, power, and remedy of Secured Party, Lender, or any Bank Product Provider as provided for in this Agreement, the other Loan Documents or any Bank Product Agreement now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power, or remedy provided for in this Agreement, the other Loan Documents and the Bank Product Agreements or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Secured Party, Lender, or any Bank Product Provider, of any one or more of such rights, powers, or remedies shall not preclude the simultaneous or later exercise by Secured Party, Lender or such Bank Product Provider of any or all such other rights, powers, or remedies.

19. <u>Marshaling</u>. Secured Party shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising. To the extent that it lawfully may, each Grantor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of Secured Party's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefits of all such laws.

20. <u>Indemnity and Expenses</u>.

(a) Each Grantor agrees to indemnify Secured Party and Lender from and against all claims, lawsuits and liabilities (including reasonable attorneys fees) growing out of or resulting from this Agreement (including enforcement of this Agreement) or any other Loan Document to which such Grantor is a party, except claims, losses or liabilities resulting from the gross negligence or willful misconduct of the party seeking indemnification as determined by a final non-appealable order of a court of competent jurisdiction. This provision shall survive the termination of this Agreement and the Credit Agreement and the repayment of the Secured Obligations.

(b) Grantors, jointly and severally, shall, upon demand, pay to Secured Party (or Secured Party, may charge to the Loan Account) all the Lender Expenses which Secured Party may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or, upon an Event of Default, the sale of, collection from, or other realization upon, any of the Collateral in accordance with this Agreement and the other Loan Documents, (iii) the exercise or enforcement of any of the rights of Secured Party hereunder or (iv) the failure by any Grantor to perform or observe any of the provisions hereof.

21. <u>Merger, Amendments; Etc.</u> THIS AGREEMENT, TOGETHER WITH THE OTHER LOAN DOCUMENTS, REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES. No waiver of any provision of this Agreement, and no consent to any departure by any Grantor herefrom, shall in any event be effective unless the same shall be in writing and signed by

31

DB2/ 32072687.3

Secured Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No amendment of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Secured Party and each Grantor to which such amendment applies.

22.     Addresses for Notices.  All notices and other communications provided for hereunder shall be given in the form and manner and delivered to Secured Party at its address specified in the Credit Agreement, and to any of the Grantors at their respective addresses specified in the Credit Agreement or Guaranty, as applicable, or, as to any party, at such other address as shall be designated by such party in a written notice to the other party.

23.     Continuing Security Interest: Assignments under Credit Agreement.

(a)     This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until the Obligations have been paid in full in accordance with the provisions of the Credit Agreement and the Commitments have expired or have been terminated, (ii) be binding upon each Grantor, and their respective successors and assigns, and (iii) inure to the benefit of, and be enforceable by, Secured Party, and its successors, transferees and assigns.  Without limiting the generality of the foregoing clause (iii), Lender may, in accordance with the provisions of the Credit Agreement, assign or otherwise transfer all or any portion of its rights and obligations under the Credit Agreement to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Lender herein or otherwise.  Upon payment in full of the Secured Obligations in accordance with the provisions of the Credit Agreement and the expiration or termination of the Commitments, the Guaranty made and the Security Interest granted hereby shall terminate and all rights to the Collateral shall revert to Grantors or any other Person entitled thereto.  At such time, upon Borrowers' request, Secured Party will authorize the filing of appropriate termination statements to terminate such Security Interest.  No transfer or renewal, extension, assignment, or termination of this Agreement or of the Credit Agreement, any other Loan Document, or any other instrument or document executed and delivered by any Grantor to Secured Party nor any additional Advances or other loans made by Lender to Borrowers, nor the taking of further security, nor the retaking or re-delivery of the Collateral to Grantors, or any of them, by Secured Party, nor any other act of Lender or the Bank Product Providers, or any of them, shall release any Grantor from any obligation, except a release or discharge executed in writing by Secured Party in accordance with the provisions of the Credit Agreement.  Secured Party shall not by any act, delay, omission or otherwise, be deemed to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by Secured Party and then only to the extent therein set forth.  A waiver by Secured Party of any right or remedy on any occasion shall not be construed as a bar to the exercise of any such right or remedy which Secured Party would otherwise have had on any other occasion.

(b)     Each Grantor agrees that, if any payment made by any Grantor or other Person and applied to the Secured Obligations is at any time annulled, avoided, set, aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be refunded or repaid, or the proceeds of any Collateral are required to be returned by Secured Party or Lender to such Grantor, its estate, trustee, receiver or any other party, including any Grantor, under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, any Lien or other Collateral securing such liability shall be and remain in full force and effect, as fully as if such payment had never been made. If, prior to any of the foregoing, (i) any Lien or other Collateral securing such Grantor's liability hereunder shall have been released or terminated by virtue of the foregoing clause (a), or (ii) any provision of the Guaranty hereunder shall have been terminated, cancelled or surrendered, such Lien, other Collateral or provision shall be reinstated in full force and effect and such prior release,

32

WFB_000091

termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of any such Grantor in respect of any Lien or other Collateral securing such obligation or the amount of such payment.

24. _Survival_. All representations and warranties made by the Grantors in this Agreement and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Secured Party or Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any loan or any fee or any other amount payable under the Credit Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or terminated.

25. <u>JURISDICTION</u>.

(a) ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE STATE OF CALIFORNIA AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE CITY OF LOS ANGELES AND THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA; PROVIDED THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT SECURED PARTY'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SECURED PARTY ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH GRANTOR AND SECURED PARTY WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF <u>FORUM</u> <u>NON</u> <u>CONVENIENS</u> OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 25(a)</u>.

(b) EACH GRANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF LOS ANGELES AND THE STATE OF CALIFORNIA, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT SECURED PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

26. <u>WAIVER OF JURY TRIAL</u>. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH GRANTOR AND SECURED PARTY WAIVE THEIR RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THE LOAN DOCUMENTS, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH, A "<u>CLAIM</u>"). EACH GRANTOR AND SECURED PARTY REPRESENT THAT EACH HAS REVIEWED THIS WAIVER

DB2/ 32072687.3

WFB_000092

AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

27. ARBITRATION.

(a) <u>ARBITRATION</u>. THE PARTIES HERETO AGREE, UPON DEMAND BY ANY PARTY, WHETHER MADE BEFORE THE INSTITUTION OF A JUDICIAL PROCEEDING OR NOT MORE THAN 60 DAYS AFTER SERVICE OF A COMPLAINT, THIRD PARTY COMPLAINT, CROSS-CLAIM, COUNTERCLAIM OR ANY ANSWER THERETO OR ANY AMENDMENT TO ANY OF THE ABOVE TO SUBMIT TO BINDING ARBITRATION ALL CLAIMS, DISPUTES AND CONTROVERSIES BETWEEN OR AMONG THEM (AND THEIR RESPECTIVE EMPLOYEES, OFFICERS, DIRECTORS, ATTORNEYS, AND OTHER AGENTS), WHETHER IN TORT, CONTRACT OR OTHERWISE ARISING OUT OF OR RELATING TO IN ANY WAY (I) ANY CREDIT SUBJECT HERETO, OR ANY OF THE LOAN DOCUMENTS, AND THEIR NEGOTIATION, EXECUTION, COLLATERALIZATION, ADMINISTRATION, REPAYMENT, MODIFICATION, EXTENSION, SUBSTITUTION, FORMATION, INDUCEMENT, ENFORCEMENT, DEFAULT OR TERMINATION; OR (II) REQUESTS FOR ADDITIONAL CREDIT.

(b) <u>GOVERNING RULES</u>. ANY ARBITRATION PROCEEDING WILL (I) PROCEED IN A LOCATION IN LOS ANGELES COUNTY, CALIFORNIA, SELECTED BY THE AMERICAN ARBITRATION ASSOCIATION ("<u>AAA</u>"); (II) BE GOVERNED BY THE FEDERAL ARBITRATION ACT (TITLE 9 OF THE UNITED STATES CODE), NOTWITHSTANDING ANY CONFLICTING CHOICE OF LAW PROVISION IN ANY OF THE DOCUMENTS BETWEEN THE PARTIES; AND (III) BE CONDUCTED BY THE AAA, OR SUCH OTHER ADMINISTRATOR AS THE PARTIES SHALL MUTUALLY AGREE UPON, IN ACCORDANCE WITH THE AAA'S COMMERCIAL DISPUTE RESOLUTION PROCEDURES, UNLESS THE CLAIM OR COUNTERCLAIM IS AT LEAST $1,000,000.00 EXCLUSIVE OF CLAIMED INTEREST, ARBITRATION FEES AND COSTS IN WHICH CASE THE ARBITRATION SHALL BE CONDUCTED IN ACCORDANCE WITH THE AAA'S OPTIONAL PROCEDURES FOR LARGE, COMPLEX COMMERCIAL DISPUTES (THE COMMERCIAL DISPUTE RESOLUTION PROCEDURES OR THE OPTIONAL PROCEDURES FOR LARGE, COMPLEX COMMERCIAL DISPUTES TO BE REFERRED TO HEREIN, AS APPLICABLE, AS THE "<u>RULES</u>"). IF THERE IS ANY INCONSISTENCY BETWEEN THE TERMS HEREOF AND THE RULES, THE TERMS AND PROCEDURES SET FORTH HEREIN SHALL CONTROL. ANY PARTY WHO FAILS OR REFUSES TO SUBMIT TO ARBITRATION FOLLOWING A DEMAND BY ANY OTHER PARTY SHALL BEAR ALL COSTS AND EXPENSES INCURRED BY SUCH OTHER PARTY IN COMPELLING ARBITRATION OF ANY DISPUTE.

(c) <u>NO WAIVER OF PROVISIONAL REMEDIES, SELF-HELP AND FORECLOSURE</u>. THE ARBITRATION REQUIREMENT DOES NOT LIMIT THE RIGHT OF ANY PARTY BEFORE, DURING OR AFTER THE PENDENCY OF ANY ARBITRATION PROCEEDING TO (I) FORECLOSE AGAINST REAL OR PERSONAL PROPERTY COLLATERAL; (II) EXERCISE SELF-HELP REMEDIES RELATING TO COLLATERAL OR PROCEEDS OF COLLATERAL SUCH AS SETOFF OR REPOSSESSION; OR (III) OBTAIN PROVISIONAL OR ANCILLARY REMEDIES SUCH AS REPLEVIN, WRIT OF POSSESSION, INJUNCTIVE RELIEF, ATTACHMENT, GARNISHMENT OR THE APPOINTMENT OF A RECEIVER. THIS EXCLUSION DOES NOT CONSTITUTE A WAIVER OF THE RIGHT OR OBLIGATION OF ANY PARTY TO SUBMIT ANY

34

WFB_000093

DISPUTE TO ARBITRATION OR REFERENCE HEREUNDER, INCLUDING THOSE ARISING FROM THE EXERCISE OF THE ACTIONS DETAILED IN SECTIONS (I), (II) AND (III) OF THIS PARAGRAPH.

(d) ARBITRATOR QUALIFICATIONS AND POWERS. ANY ARBITRATION PROCEEDING IN WHICH THE AMOUNT IN CONTROVERSY IS $5,000,000.00 OR LESS WILL BE DECIDED BY A SINGLE ARBITRATOR SELECTED ACCORDING TO THE RULES, AND WHO SHALL NOT RENDER AN AWARD OF GREATER THAN $5,000,000.00. ANY DISPUTE IN WHICH THE AMOUNT IN CONTROVERSY EXCEEDS $5,000,000.00 SHALL BE DECIDED BY MAJORITY VOTE OF A PANEL OF THREE ARBITRATORS; PROVIDED HOWEVER, THAT ALL THREE ARBITRATORS MUST ACTIVELY PARTICIPATE IN ALL HEARINGS AND DELIBERATIONS, EXCEPT THAT A SINGLE ARBITRATOR MAY DECIDE PRE-HEARING DISCOVERY DISPUTES. THE ARBITRATOR(S) WILL BE A NEUTRAL ATTORNEY LICENSED IN THE STATE OF CALIFORNIA OR A NEUTRAL RETIRED JUDGE OF THE STATE OR FEDERAL JUDICIARY OF CALIFORNIA, IN EITHER CASE WITH A MINIMUM OF TEN YEARS EXPERIENCE IN THE SUBSTANTIVE LAW APPLICABLE TO THE SUBJECT MATTER OF THE DISPUTE TO BE ARBITRATED. THE ARBITRATOR(S) WILL DETERMINE WHETHER OR NOT AN ISSUE IS ARBITRATABLE AND WILL GIVE EFFECT TO THE STATUTES OF LIMITATION OR REPOSE IN DETERMINING ANY CLAIM. IN ANY ARBITRATION PROCEEDING THE ARBITRATOR(S) WILL DECIDE (BY DOCUMENTS ONLY OR WITH A HEARING AT THE ARBITRATOR'S DISCRETION) ANY PRE-HEARING MOTIONS WHICH ARE SIMILAR TO MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM OR MOTIONS FOR SUMMARY ADJUDICATION. THE ARBITRATOR(S) SHALL RESOLVE ALL DISPUTES IN ACCORDANCE WITH THE SUBSTANTIVE LAW OF CALIFORNIA AND MAY GRANT ANY REMEDY OR RELIEF THAT A COURT OF SUCH STATE COULD ORDER OR GRANT WITHIN THE SCOPE HEREOF AND SUCH ANCILLARY RELIEF AS IS NECESSARY TO MAKE EFFECTIVE ANY AWARD. THE ARBITRATOR(S) SHALL ALSO HAVE THE POWER TO AWARD RECOVERY OF ALL COSTS AND FEES, TO IMPOSE SANCTIONS AND TO TAKE SUCH OTHER ACTION AS THE ARBITRATOR(S) DEEMS NECESSARY TO THE SAME EXTENT A JUDGE COULD PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, THE CALIFORNIA RULES OF CIVIL PROCEDURE OR OTHER APPLICABLE LAW. JUDGMENT UPON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED IN ANY COURT HAVING JURISDICTION. THE INSTITUTION AND MAINTENANCE OF AN ACTION FOR JUDICIAL RELIEF OR PURSUIT OF A PROVISIONAL OR ANCILLARY REMEDY SHALL NOT CONSTITUTE A WAIVER OF THE RIGHT OF ANY PARTY, INCLUDING THE PLAINTIFF, TO SUBMIT THE CONTROVERSY OR CLAIM TO ARBITRATION IF ANY OTHER PARTY CONTESTS SUCH ACTION FOR JUDICIAL RELIEF.

(e) DISCOVERY. IN ANY ARBITRATION PROCEEDING, DISCOVERY WILL BE PERMITTED IN ACCORDANCE WITH THE RULES. ALL DISCOVERY SHALL BE EXPRESSLY LIMITED TO MATTERS DIRECTLY RELEVANT TO THE DISPUTE BEING ARBITRATED AND MUST BE COMPLETED NO LATER THAN 20 DAYS BEFORE THE HEARING DATE. ANY REQUESTS FOR AN EXTENSION OF THE DISCOVERY PERIODS, OR ANY DISCOVERY DISPUTES, WILL BE SUBJECT TO FINAL DETERMINATION BY THE ARBITRATOR(S) UPON A SHOWING THAT THE REQUEST FOR DISCOVERY IS ESSENTIAL FOR THE PARTY'S PRESENTATION AND THAT NO ALTERNATIVE MEANS FOR OBTAINING INFORMATION IS AVAILABLE.

(f) CLASS PROCEEDINGS AND CONSOLIDATIONS. NO PARTY HERETO SHALL BE ENTITLED TO JOIN OR CONSOLIDATE DISPUTES BY OR AGAINST OTHERS IN

35

ANY ARBITRATION, EXCEPT PARTIES WHO HAVE EXECUTED ANY LOAN DOCUMENT, OR TO INCLUDE IN ANY ARBITRATION ANY DISPUTE AS A REPRESENTATIVE OR MEMBER OF A CLASS, OR TO ACT IN ANY ARBITRATION IN THE INTEREST OF THE GENERAL PUBLIC OR IN A PRIVATE ATTORNEY GENERAL CAPACITY.

(g) PAYMENT OF ARBITRATION COSTS AND FEES. THE ARBITRATOR(S) SHALL AWARD ALL COSTS AND EXPENSES OF THE ARBITRATION PROCEEDING.

(h) REAL PROPERTY COLLATERAL; JUDICIAL REFERENCE. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO DISPUTE SHALL BE SUBMITTED TO ARBITRATION IF THE DISPUTE CONCERNS INDEBTEDNESS SECURED DIRECTLY OR INDIRECTLY, IN WHOLE OR IN PART, BY ANY REAL PROPERTY UNLESS (I) THE HOLDER OF THE MORTGAGE, LIEN OR SECURITY INTEREST SPECIFICALLY ELECTS IN WRITING TO PROCEED WITH THE ARBITRATION, OR (II) ALL PARTIES TO THE ARBITRATION WAIVE ANY RIGHTS OR BENEFITS THAT MIGHT ACCRUE TO THEM BY VIRTUE OF THE SINGLE ACTION RULE STATUTE OF CALIFORNIA, THEREBY AGREEING THAT ALL INDEBTEDNESS AND OBLIGATIONS OF THE PARTIES, AND ALL MORTGAGES, LIENS AND SECURITY INTERESTS SECURING SUCH INDEBTEDNESS AND OBLIGATIONS, SHALL REMAIN FULLY VALID AND ENFORCEABLE. IF ANY SUCH DISPUTE IS NOT SUBMITTED TO ARBITRATION, THE DISPUTE SHALL BE REFERRED TO A REFEREE IN ACCORDANCE WITH CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 638 ET SEQ., AND THIS GENERAL REFERENCE AGREEMENT IS INTENDED TO BE SPECIFICALLY ENFORCEABLE IN ACCORDANCE WITH SAID SECTION 638. A REFEREE WITH THE QUALIFICATIONS REQUIRED HEREIN FOR ARBITRATORS SHALL BE SELECTED PURSUANT TO THE AAA'S SELECTION PROCEDURES. JUDGMENT UPON THE DECISION RENDERED BY A REFEREE SHALL BE ENTERED IN THE COURT IN WHICH SUCH PROCEEDING WAS COMMENCED IN ACCORDANCE WITH CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 644 AND 645.

(i) MISCELLANEOUS. TO THE MAXIMUM EXTENT PRACTICABLE, THE AAA, THE ARBITRATOR(S) AND THE PARTIES SHALL TAKE ALL ACTION REQUIRED TO CONCLUDE ANY ARBITRATION PROCEEDING WITHIN 180 DAYS OF THE FILING OF THE DISPUTE WITH THE AAA. NO ARBITRATOR(S) OR OTHER PARTY TO AN ARBITRATION PROCEEDING MAY DISCLOSE THE EXISTENCE, CONTENT OR RESULTS THEREOF, EXCEPT FOR DISCLOSURES OF INFORMATION BY A PARTY REQUIRED IN THE CONNECTION WITH FINANCIAL REPORTING IN THE ORDINARY COURSE OF ITS BUSINESS OR BY APPLICABLE LAW OR REGULATION. IF MORE THAN ONE AGREEMENT FOR ARBITRATION BY OR BETWEEN THE PARTIES POTENTIALLY APPLIES TO A DISPUTE, THE ARBITRATION PROVISION MOST DIRECTLY RELATED TO THE LOAN DOCUMENTS OR THE SUBJECT MATTER OF THE DISPUTE SHALL CONTROL. THIS ARBITRATION PROVISION SHALL SURVIVE TERMINATION, AMENDMENT OR EXPIRATION OF ANY OF THE LOAN DOCUMENTS OR ANY RELATIONSHIP BETWEEN THE PARTIES.

(j) WAIVER OF JURY TRIAL. THE PARTIES HERETO HEREBY ACKNOWLEDGE THAT BY AGREEING TO BINDING ARBITRATION THEY HAVE IRREVOCABLY WAIVED THEIR RESPECTIVE RIGHTS TO A JURY TRIAL WITH RESPECT TO ANY ACTION, CLAIM OR OTHER PROCEEDING ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER AGREEMENT OR DOCUMENT DELIVERED IN CONNECTION HEREWITH, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THEREUNDER, OR THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS. THIS

DB2/ 32072687.3

WFB_000095

PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT.

28.     Secured Party.  Each reference herein to any right granted to, benefit conferred upon or power exercisable by the "Secured Party" shall be a reference to Secured Party, for the benefit of itself, as Lender, and each of the Bank Product Providers.

29.     Miscellaneous.

(a)     This Agreement is a Loan Document.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

(b)     Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdiction.  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

(c)     Headings and numbers have been set forth herein for convenience only.  Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

(d)     Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against Lender or any Grantor, whether under any rule of construction or otherwise.  This Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

[signature pages follow]

DB2/ 32072687.3

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 106 of 175

WFB_000096

IN WITNESS WHEREOF, the undersigned parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

**GRANTORS:**

**FAIRN & SWANSON INC.,**
a California corporation

By: _____
    Name: _____
    Title: _____

[SIGNATURE PAGE TO GUARANTY AND SECURITY AGREEMENT]

DB2/ 32072687

**SECURED PARTY:**

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
a national banking association

By: _____
    Name: JAMES CAMPBELL
    Title: Authorized Signatory

[SIGNATURE PAGE TO GUARANTY AND SECURITY AGREEMENT]

DB2/ 32072687

**<u>SCHEDULE 1</u>**

COMMERCIAL TORT CLAIMS

[include specific case caption or descriptions per Official Code Comment 5 to Section 9-108 of the Code]

[None]

**<u>SCHEDULE 2</u>**

COPYRIGHTS

[None]

Guaranty and Security Agreement
DB2/ 32072687.3

**WFB_000100**

**<u>SCHEDULE 3</u>**


INTELLECTUAL PROPERTY LICENSES

[None]

DB2/ 32072687.3

**WFB_000101**

## **SCHEDULE 4**

PATENTS

[None]

DB2/ 32072687.3

WFB_000102

**<u>SCHEDULE 5</u>**

PLEDGED COMPANIES

[None]

WFB_000103

## __SCHEDULE 6__

TRADEMARKS

**UNITED STATES TRADEMARKS:**

Registrations:

| OWNER | REGISTRATION NUMBER | TRADEMARK |
|---|---|---|
| **Fairn & Swanson** | **87250592** | **Seawolf** |
| | **87250584** | **Purewolf** |

DB2/ 32072687.3

**WFB_000104**

**SCHEDULE 7**

NAME; CHIEF EXECUTIVE OFFICE; TAX IDENTIFICATION NUMBERS AND
ORGANIZATIONAL NUMBERS

| Legal Name | Type of Entity | Office Address | Federal Taxpayer Identification Number |
|---|---|---|---|
| Fairn & Swanson, Inc | S Corp | 400 Lancaster Street Oakland, Ca. 94601 | 94-112-1698 |

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 115
of 175
WFB_000105

# **SCHEDULE 8**

OWNED REAL PROPERTY

[None]

## SCHEDULE 9

### DEPOSIT ACCOUNTS AND SECURITIES ACCOUNTS

| Owner | Type of Account | Bank or Intermediary | Account Numbers |
|-------|-----------------|----------------------|-----------------|
| Fairn & Swanson Inc. | Checking | City National Bank | 450209805 |
| Fairn & Swanson Inc. | Checking | City National Bank | 450209821 |
| Fairn & Swanson Inc. | Checking | City National Bank | 450209856 |
| Fairn & Swanson Inc. | Checking | City National Bank | 450209864 |
| Fairn & Swanson Inc. | Checking | City National Bank | 450209872 |
| Fairn & Swanson Inc. | Checking | City National Bank | 450209880 |
| Fairn & Swanson Inc. | Checking | City National Bank | 450209899 |
| Fairn & Swanson Inc. | Checking | City National Bank | 450219630 |
| Fairn & Swanson Inc. | Checking | IBC Bank | 1410122921 |
| Fairn & Swanson Inc. | Checking | IBC Bank | 54305 |
| Fairn & Swanson Inc. | Checking | Chase Bank | 718560381 |
| Fairn & Swanson Inc. | Depository | Wells Fargo Bank | 4128215969 |
| Fairn & Swanson Inc. | Master Operating | Wells Fargo Bank | 4128215977 |
| Fairn & Swanson Inc. | Checking | Wells Fargo Bank | 4128216009 |
| Fairn & Swanson Inc. | Checking | Wells Fargo Bank | 4128216017 |
| Fairn & Swanson Inc. | Checking | Wells Fargo Bank | 4128216025 |
| Fairn & Swanson Inc. | Checking | Wells Fargo Bank | 4128216033 |
| Fairn & Swanson Inc. | Checking | Wells Fargo Bank | 4128216041 |
| Fairn & Swanson Inc. | Checking | Wells Fargo Bank | 4128216058 |
| Fairn & Swanson Inc. | Checking | Wells Fargo Bank | 4128216074 |
| Fairn & Swanson Inc. | Checking | Wells Fargo Bank | 4128225950 |

## SCHEDULE 10

### CONTROLLED ACCOUNT BANKS

| Owner | Type of Account | Bank or Intermediary | Account Numbers |
|---|---|---|---|
| Fairn & Swanson Inc. | Checking | City National Bank | 450209805 |
| Fairn & Swanson Inc. | Checking | Chase Bank | 718560381 |
| Fairn & Swanson Inc. | Depository | Wells Fargo Bank | 4128215969 |
| Fairn & Swanson Inc. | Master Operating | Wells Fargo Bank | 4128215977 |

WFB_000108

# **SCHEDULE 11**

LIST OF UNIFORM COMMERCIAL CODE FILING JURISDICTIONS

| Grantor | Jurisdictions |
|---|---|
| Fairn & Swanson Inc. | California |

WFB_000109

**SCHEDULE 12**

**MOTOR VEHICLES**

| Year | Make | Model | VIN No. / Serial No. |
|------|------|-------|----------------------|
| 1998 | Toyota | Tacoma | 4TANL42N4WZ174053 |
| 2000 | Mitsubishi | Fuso | JW6DEP1E9YM000301 |
| 2001 | GMC | Savana | 1GTHG35RX11118625 |
| 2001 | Isuzu | NPR | JALC4B14517000596 |
| 2002 | GMC | Yukon | 3GKFK16Z62G213599 |
| 2003 | Dodge | Grand Caravan | 1D4GP24333B281216 |
| 2003 | Ford | E150 | 1FMRE11W13HB08498 |
| 2003 | Ford | E150 | 1FMRE11W23HB08493 |
| 2003 | Ford | E150 | 1FMRE11W63HB08495 |
| 2004 | Ford | Club Wagon | 1FMRE11W44HA67558 |
| 2005 | Ford | Ranger | 1FTYR10UX5PA83386 |
| 2006 | Ford | E150 | 1FDRE11W46HA96142 |
| 2006 | Ford | E350 | 1FTSS34LX6HB09374 |
| 2006 | Ford | E350 | 1FTSS34S36HB13371 |
| 2007 | Chrysler | Town & Country | 1A4GP44R97B181070 |
| 2008 | Ford | Club Wagon | 1FDNE31L78DA24829 |
| 2010 | Rav4 | RG | JTMBF4DV1A5031377 |
| 2012 | Ford | Econoline | 1FTSS3EL4CDB17097 |
| 2014 | Ford | Econoline | 1FTSS3EL3EDA09315 |

**COPYRIGHT SECURITY AGREEMENT**

This COPYRIGHT SECURITY AGREEMENT (this "Copyright Security Agreement") is made this [___] day of [_____], 2017, by and among Grantors listed on the signature pages hereof (collectively, jointly and severally, "Grantors" and each individually "Grantor"), and **WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association ("Wells Fargo"), in its capacity as Secured Party for itself and the Bank Product Providers (in such capacity, together with its successors and assigns in such capacity, "Secured Party").

W I T N E S S E T H:

WHEREAS, pursuant to that certain Credit Agreement of even date herewith (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement by and between Fairn & Swanson Inc., a California corporation ("Borrower"), and Wells Fargo, as lender ("Lender"), Lender has agreed to make certain financial accommodations available to Borrower from time to time pursuant to the terms and conditions thereof; and

WHEREAS, Lender and the Bank Product Providers are willing to make the financial accommodations to Borrower as provided for in the Credit Agreement, the other Loan Documents, and the Bank Product Agreements, but only upon the condition, among others, that Grantors shall have executed and delivered to Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, that certain Guaranty and Security Agreement of even date herewith (including all annexes, exhibits or schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "Guaranty and Security Agreement"); and

WHEREAS, pursuant to the Guaranty and Security Agreement, Grantors are required to execute and deliver to Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, this Copyright Security Agreement;

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantors hereby agree as follows:

1.        DEFINED TERMS.  All initially capitalized terms used but not otherwise defined herein have the meanings given to them in the Guaranty and Security Agreement or, if not defined therein, in the Credit Agreement, and this Copyright Security Agreement shall be subject to the rules of construction set forth in Section 1(b) of the Guaranty and Security Agreement, which rules of construction are incorporated herein by this reference, *mutatis mutandis*.

2.        GRANT OF SECURITY INTEREST IN COPYRIGHT COLLATERAL.  Each Grantor hereby unconditionally grants, assigns, and pledges to Secured Party, for the benefit of itself, as Lender, and each of the Bank Product Providers, to secure the Secured Obligations, a continuing security interest (referred to in this Copyright Security Agreement as the "Security Interest") in all of such Grantor's right, title and interest in and to the following, whether now owned or hereafter acquired or arising (collectively, the "Copyright Collateral"):

(a)        all of such Grantor's Copyrights and Copyright Intellectual Property Licenses to which it is a party including those referred to on Schedule I;

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 121 of 175
WFB_000111

(b)     all renewals or extensions of the foregoing; and

(c)     all products and proceeds of the foregoing, including any claim by such Grantor against third parties for past, present or future infringement of any Copyright or any Copyright exclusively licensed under any Intellectual Property License, including the right to receive damages, or the right to receive license fees, royalties, and other compensation under any Copyright Intellectual Property License.

3.      <u>SECURITY FOR SECURED OBLIGATIONS</u>.  This Copyright Security Agreement and the Security Interest created hereby secures the payment and performance of the Secured Obligations, whether now existing or arising hereafter.  Without limiting the generality of the foregoing, this Copyright Security Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by Grantors, or any of them, to Secured Party, Lender, the Bank Product Providers or any of them, whether or not they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Grantor.

4.      <u>SECURITY AGREEMENT</u>.  The Security Interest granted pursuant to this Copyright Security Agreement is granted in conjunction with the security interests granted to Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, pursuant to the Guaranty and Security Agreement.  Each Grantor hereby acknowledges and affirms that the rights and remedies of Secured Party with respect to the Security Interest in the Copyright Collateral made and granted hereby are more fully set forth in the Guaranty and Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.  To the extent there is any inconsistency between this Copyright Security Agreement and the Guaranty and Security Agreement, the Guaranty and Security Agreement shall control.

5.      <u>AUTHORIZATION TO SUPPLEMENT</u>.  Grantors shall give Secured Party prior written notice of no less than five (5) Business Days before filing any additional application for registration of any copyright and prompt notice in writing of any additional copyright registrations granted therefor after the date hereof. Without limiting Grantors' obligations under this Section, Grantors hereby authorize Secured Party unilaterally to modify this Copyright Security Agreement by amending <u>Schedule I</u> to include any future United States registered copyrights or applications therefor of each Grantor. Notwithstanding the foregoing, no failure to so modify this Copyright Security Agreement or amend <u>Schedule I</u> shall in any way affect, invalidate or detract from Secured Party's continuing security interest in all Collateral, whether or not listed on <u>Schedule I.</u>

6.      <u>COUNTERPARTS</u>.  This Copyright Security Agreement is a Loan Document.  This Copyright Security Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Copyright Security Agreement. Delivery of an executed counterpart of this Copyright Security Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Copyright Security Agreement.  Any party delivering an executed counterpart of this Copyright Security Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Copyright Security Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Copyright Security Agreement.

7.      <u>JURISDICTION, JURY TRIAL WAIVER, AND ARBITRATION PROVISION</u>.  THIS COPYRIGHT  SECURITY  AGREEMENT  SHALL  BE  SUBJECT  TO  THE  PROVISIONS

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 122 of 175

WFB_000112

REGARDING JURISDICTION, JURY TRIAL WAIVER, AND ARBITRATION SET FORTH IN THE GUARANTY AND SECURITY AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

[SIGNATURE PAGE FOLLOWS]

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 123 of 175

WFB_000113

IN WITNESS WHEREOF, the parties hereto have caused this Copyright Security Agreement to be executed and delivered as of the day and year first above written.

.

**GRANTORS:**

**FAIRN & SWANSON INC.,**
a California corporation

By: _____
   Name:
   Title:

**ACCEPTED AND ACKNOWLEDGED BY**:

**SECURED PARTY:**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association

By: _____
   Name:
   Title:

[SIGNATURE PAGE TO COPYRIGHT SECURITY AGREEMENT]

SCHEDULE I
TO
**COPYRIGHT SECURITY AGREEMENT**

**COPYRIGHT REGISTRATIONS**

| Grantor | Country | Copyright | Registration No. | Registration Date |
|---------|---------|-----------|------------------|-------------------|
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |

**Copyright Licenses**

COPYRIGHT SECURITY AGREEMENT

DB2/ 32072687.3

WFB_000115

**PATENT SECURITY AGREEMENT**

        This PATENT SECURITY AGREEMENT (this "Patent Security Agreement") is made this [___] day of [_____], 2017, by and among the Grantors listed on the signature pages hereof (collectively, jointly and severally, "Grantors" and each individually "Grantor"), and **WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association ("Wells Fargo"), in its capacity as Secured Party for itself, as Lender, and the Bank Product Providers (in such capacity, together with its successors and assigns in such capacity, "Secured Party").

W I T N E S S E T H:

        WHEREAS, pursuant to that certain Credit Agreement of even date herewith (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement") by and between Fairn & Swanson Inc., a California corporation ("Borrower"), and Wells Fargo, as lender ("Lender"), Lender has agreed to make certain financial accommodations available to Borrower from time to time pursuant to the terms and conditions thereof; and

        WHEREAS, Lender and the Bank Product Providers are willing to make the financial accommodations to Borrower as provided for in the Credit Agreement, the other Loan Documents, and the Bank Product Agreements, but only upon the condition, among others, that the Grantors shall have executed and delivered to Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, that certain Guaranty and Security Agreement, of even date herewith (including all annexes, exhibits or schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "Guaranty and Security Agreement"); and

        WHEREAS, pursuant to the Guaranty and Security Agreement, Grantors are required to execute and deliver to Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, this Patent Security Agreement;

        NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor hereby agrees as follows:

        1.        DEFINED TERMS.  All initially capitalized terms used but not otherwise defined herein have the meanings given to them in the Guaranty and Security Agreement or, if not defined therein, in the Credit Agreement, and this Patent Security Agreement shall be subject to the rules of construction set forth in Section 1(b) of the Guaranty and Security Agreement, which rules of construction are incorporated herein by this reference, *mutatis mutandis*.

        2.        GRANT OF SECURITY INTEREST IN PATENT COLLATERAL. Each Grantor hereby unconditionally grants, assigns, and pledges to Secured Party, for the benefit of itself, as Lender, and each of the Bank Product Providers, to secure the Secured Obligations, a continuing security interest (referred to in this Patent Security Agreement as the "Security Interest") in all of such Grantor's right, title and interest in and to the following, whether now owned or hereafter acquired or arising (collectively, the "Patent Collateral"):

        (a)        all of its Patents and Patent Intellectual Property Licenses to which it is a party including those referred to on Schedule I;

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 126 of 175

WFB_000116

(b)     all divisionals, continuations, continuations-in-part, reissues, reexaminations, or extensions of the foregoing; and

(c)     all products and proceeds of the foregoing, including any claim by such Grantor against third parties for past, present or future infringement of any Patent or any Patent exclusively licensed under any Intellectual Property License, including the right to receive damages, or right to receive license fees, royalties, and other compensation under any Patent Intellectual Property License.

3.     <u>SECURITY FOR SECURED OBLIGATIONS</u>.  This Patent Security Agreement and the Security Interest created hereby secures the payment and performance of the Secured Obligations, whether now existing or arising hereafter.  Without limiting the generality of the foregoing, this Patent Security Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by Grantors, or any of them, to Secured Party, Lender, the Bank Product Providers or any of them, whether or not they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Grantor.

4.     <u>SECURITY AGREEMENT</u>.  The Security Interest granted pursuant to this Patent Security Agreement is granted in conjunction with the security interests granted to Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, pursuant to the Guaranty and Security Agreement.  Each Grantor hereby acknowledges and affirms that the rights and remedies of Secured Party with respect to the Security Interest in the Patent Collateral made and granted hereby are more fully set forth in the Guaranty and Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.  To the extent there is any inconsistency between this Patent Security Agreement and the Guaranty and Security Agreement, the Guaranty and Security Agreement shall control.

5.     <u>AUTHORIZATION TO SUPPLEMENT</u>.  If any Grantor shall obtain rights to any new patent application or issued patent or become entitled to the benefit of any patent application or patent for any divisional, continuation, continuation-in-part, reissue, or reexamination of any existing patent or patent application, the provisions of this Patent Security Agreement shall automatically apply thereto.  Grantors shall give prompt notice in writing to Secured Party with respect to any such new patent rights.  Without limiting Grantors' obligations under this Section, Grantors hereby authorize Secured Party unilaterally to modify this Patent Security Agreement by amending <u>Schedule I</u> to include any such new patent rights of each Grantor.  Notwithstanding the foregoing, no failure to so modify this Patent Security Agreement or amend <u>Schedule I</u> shall in any way affect, invalidate or detract from Secured Party's continuing security interest in all Collateral, whether or not listed on <u>Schedule I</u>.

6.     <u>COUNTERPARTS</u>.  This Patent Security Agreement is a Loan Document.  This Patent Security Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Patent Security Agreement.  Delivery of an executed counterpart of this Patent Security Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Patent Security Agreement.  Any party delivering an executed counterpart of this Patent Security Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Patent Security Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Patent Security Agreement.

7.     <u>JURISDICTION, JURY TRIAL WAIVER, AND ARBITRATION PROVISION</u>.  THIS PATENT SECURITY AGREEMENT SHALL BE SUBJECT TO THE PROVISIONS REGARDING

DB2/ 32072687.3

WFB_000117

JURISDICTION, JURY TRIAL WAIVER, AND ARBITRATION SET FORTH IN THE GUARANTY AND SECURITY AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

[SIGNATURE PAGE FOLLOWS]

DB2/ 32072687.3

WFB_000118

IN WITNESS WHEREOF, the parties hereto have caused this Patent Security Agreement to be executed and delivered as of the day and year first above written.

**GRANTORS:**

**FAIRN & SWANSON INC.,**
a California corporation

By: _____
    Name:
    Title:

**ACCEPTED AND ACKNOWLEDGED BY**:

**SECURED PARTY:**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association

By: _____
    Name:
    Title:

[SIGNATURE PAGE TO PATENT SECURITY AGREEMENT]

DB2/ 32072687.3

WFB_000119

## SCHEDULE I
### to
## PATENT SECURITY AGREEMENT

### Patents

| Grantor | Country | Patent | Application/ Patent No. | Filing Date |
|---------|---------|--------|-------------------------|-------------|
|         |         |        |                         |             |
|         |         |        |                         |             |
|         |         |        |                         |             |
|         |         |        |                         |             |
|         |         |        |                         |             |
|         |         |        |                         |             |
|         |         |        |                         |             |
|         |         |        |                         |             |

### Patent Licenses

DB2/ 32072687.3

WFB_000120

# EXHIBIT C

## **PLEDGED INTERESTS ADDENDUM**

 This Pledged Interests Addendum, dated as of _____ __, 20___ (this "Pledged Interests Addendum"), is delivered pursuant to Section 7 of the Guaranty and Security Agreement referred to below.  The undersigned hereby agrees that this Pledged Interests Addendum may be attached to that certain Guaranty and Security Agreement, dated as of November 10, 2017, (as amended, restated, supplemented, or otherwise modified from time to time, the "Guaranty and Security Agreement"), made by the undersigned, together with the other Grantors named therein, to **WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association, as Secured Party.  Initially capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Guaranty and Security Agreement or, if not defined therein, in the Credit Agreement, and this Pledged Interests Addendum shall be subject to the rules of construction set forth in Section 1(b) of the Guaranty and Security Agreement, which rules of construction are incorporated herein by this reference, *mutatis mutandis*.  The undersigned hereby agrees that the additional interests listed on Schedule I shall be and become part of the Pledged Interests pledged by the undersigned to Secured Party in the Guaranty and Security Agreement and any pledged company set forth on Schedule I shall be and become a "Pledged Company" under the Guaranty and Security Agreement, each with the same force and effect as if originally named therein.

 This Pledged interests Addendum is a Loan Document.  Delivery of an executed counterpart of this Pledged Interests Addendum by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Pledged Interests Addendum. If the undersigned delivers an executed counterpart of this Pledged Interests Addendum by telefacsimile or other electronic method of transmission, the undersigned shall also deliver an original executed counterpart of this Pledged Interests Addendum but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Pledged Interests Addendum.

 The undersigned hereby certifies that the representations and warranties set forth in Section 6 of the Guaranty and Security Agreement of the undersigned are true and correct as to the Pledged Interests listed herein on and as of the date hereof.

 THIS PLEDGED INTERESTS ADDENDUM SHALL BE SUBJECT TO THE PROVISIONS REGARDING JURISDICTION, JURY TRIAL WAIVER, AND ARBITRATION SET FORTH IN THE GUARANTY AND SECURITY AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned has caused this Pledged Interests Addendum to be executed and delivered as of the day and year first above written.

[_____]


By: _____
    Name:
    Title:

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 132 of 175

WFB_000122

# SCHEDULE I

TO

# PLEDGED INTERESTS ADDENDUM

Pledged Interests

| Name of Grantor | Name of Pledged Company | Number of Shares/Units | Class of Interests | Percentage of Class Owned | Certificate Nos. |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

2

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 133 of 175

WFB_000123

<u>**EXHIBIT D**</u>

**TRADEMARK SECURITY AGREEMENT**

This TRADEMARK SECURITY AGREEMENT (this "<u>Trademark Security Agreement</u>") is made this [\_\_\_] day of [_____], 2017, by and among Grantors listed on the signature pages hereof (collectively, jointly and severally, "<u>Grantors</u>" and each individually "<u>Grantor</u>"), and **WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association ("<u>Wells Fargo</u>"), in its capacity as Secured Party for itself, as Lender, and the Bank Product Providers (in such capacity, together with its successors and assigns in such capacity, "<u>Secured Party</u>").

W I T N E S S E T H :

WHEREAS, pursuant to that certain Credit Agreement of even date herewith (as amended, restated, supplemented, or otherwise modified from time to time, the "<u>Credit Agreement</u>") by and between Fairn & Swanson Inc., a California corporation ("<u>Borrower</u>"), and Wells Fargo, as lender ("<u>Lender</u>"), Lender has agreed to make certain financial accommodations available to Borrower from time to time pursuant to the terms and conditions thereof; and

WHEREAS, Lender and the Bank Product Providers are willing to make the financial accommodations to Borrower as provided for in the Credit Agreement, the other Loan Documents, and the Bank Product Agreements, but only upon the condition, among others, that Grantors shall have executed and delivered to Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, that certain Guaranty and Security Agreement, of even date herewith (including all annexes, exhibits or schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "<u>Guaranty and Security Agreement</u>"); and

WHEREAS, pursuant to the Guaranty and Security Agreement, Grantors are required to execute and deliver to Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, this Trademark Security Agreement;

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor hereby agrees as follows:

1.      <u>DEFINED TERMS</u>.  All initially capitalized terms used but not otherwise defined herein have the meanings given to them in the Guaranty and Security Agreement or, if not defined therein, in the Credit Agreement, and this Trademark Security Agreement shall be subject to the rules of construction set forth in <u>Section 1(b)</u> of the Guaranty and Security Agreement, which rules of construction are incorporated herein by this reference, *mutatis mutandis*.

2.      <u>GRANT OF SECURITY INTEREST IN TRADEMARK COLLATERAL</u>.  Each Grantor hereby unconditionally grants, assigns, and pledges to Secured Party, for the benefit of itself, as Lender, and each of the Bank Product Providers, to secure the Secured Obligations, a continuing security interest (referred to in this Trademark Security Agreement as the "<u>Security Interest</u>") in all of such Grantor's right, title and interest in and to the following, whether now owned or hereafter acquired or arising (collectively, the "<u>Trademark Collateral</u>"):

(a)      all of its Trademarks and Trademark Intellectual Property Licenses to which it is a party including those referred to on Schedule I;

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 134 of 175

**WFB_000124**

(b)      all goodwill of the business connected with the use of, and symbolized by, each Trademark and each Trademark Intellectual Property License; and

(c)      all products and proceeds (as that term is defined in the Code) of the foregoing, including any claim by such Grantor against third parties for past, present or future (i) infringement or dilution of any Trademark or any Trademarks exclusively licensed under any Intellectual Property License, including right to receive any damages, (ii) injury to the goodwill associated with any Trademark, or (iii) right to receive license fees, royalties, and other compensation under any Trademark Intellectual Property License.

3.      <u>SECURITY FOR SECURED OBLIGATIONS</u>.  This Trademark Security Agreement and the Security Interest created hereby secures the payment and performance of the Secured Obligations, whether now existing or arising hereafter.  Without limiting the generality of the foregoing, this Trademark Security Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by Grantors, or any of them, to Secured Party, Lender, the Bank Product Providers or any of them, whether or not they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Grantor.

4.      <u>SECURITY AGREEMENT</u>.  The Security Interest granted pursuant to this Trademark Security Agreement is granted in conjunction with the security interests granted to Secured Party, for the benefit of itself, as Lender, and the Bank Product Providers, pursuant to the Guaranty and Security Agreement.  Each Grantor hereby acknowledges and affirms that the rights and remedies of Secured Party with respect to the Security Interest in the Trademark Collateral made and granted hereby are more fully set forth in the Guaranty and Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.  To the extent there is any inconsistency between this Trademark Security Agreement and the Guaranty and Security Agreement, the Guaranty and Security Agreement shall control.

5.      <u>AUTHORIZATION TO SUPPLEMENT</u>.  If any Grantor shall obtain rights to any new trademarks, the provisions of this Trademark Security Agreement shall automatically apply thereto. Grantors shall give prompt notice in writing to Secured Party with respect to any such new trademarks or renewal or extension of any trademark registration.   Without limiting Grantors' obligations under this Section, Grantors hereby authorize Secured Party unilaterally to modify this Trademark Security Agreement by amending <u>Schedule I</u> to include any such new trademark rights of each Grantor. Notwithstanding the foregoing, no failure to so modify this Trademark Security Agreement or amend <u>Schedule I</u> shall in any way affect, invalidate or detract from Secured Party's continuing security interest in all Collateral, whether or not listed on <u>Schedule I</u>.

6.      <u>COUNTERPARTS</u>.  This Trademark Security Agreement is a Loan Document.  This Trademark Security Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Trademark Security Agreement.  Delivery of an executed counterpart of this Trademark Security Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Trademark Security Agreement.  Any party delivering an executed counterpart of this Trademark Security Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Trademark Security Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Trademark Security Agreement.

DB2/ 32072687.3

WFB_000125

7.      <u>JURISDICTION, JURY TRIAL WAIVER, AND ARBITRATION PROVISION</u>.  THIS TRADEMARK SECURITY AGREEMENT SHALL BE SUBJECT TO THE PROVISIONS REGARDING JURISDICTION, JURY TRIAL WAIVER, AND ARBITRATION SET FORTH IN THE GUARANTY AND SECURITY AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

[SIGNATURE PAGE FOLLOWS]

DB2/ 32072687.3

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 136 of 175

WFB_000126

IN WITNESS WHEREOF, the parties hereto have caused this Trademark Security Agreement to be executed and delivered as of the day and year first above written.

**GRANTORS:**                                    **FAIRN & SWANSON INC.,**
                                                 a California corporation

                                                 By: _____
                                                     Name:
                                                     Title:


                                                 **ACCEPTED AND ACKNOWLEDGED BY**:

**SECURED PARTY:**                               **WELLS FARGO BANK, NATIONAL
                                                 ASSOCIATION**, a national banking
                                                 association


                                                 By: _____
                                                     Name:
                                                     Title:


**[SIGNATURE PAGE TO TRADEMARK SECURITY AGREEMENT]**

DB2/ 32072687.3

WFB_000127

<div align="center">

**SCHEDULE I**
to
**TRADEMARK SECURITY AGREEMENT**

**Trademark Registrations/Applications**

</div>

| Grantor | Country | Mark | Application/ Registration No. | App/Reg Date |
|---------|---------|------|-------------------------------|--------------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

<div align="center">

**Trade Names**


**Common Law Trademarks**


**Trademarks Not Currently In Use**


**Trademark Licenses**

</div>

DB2/ 32072687.3

**WFB_000128**

# EXHIBIT C

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

┌ CT Fulfillment
 555 Capitol Mall, Suite 1000
 Sacramento, CA 95814

Account: 60574850
        608916581/1 ┘

**17-7608906670**

**10/03/2017 12:47**

**FILED**

CALIFORNIA
SECRETARY OF STATE

SOS

64437190002   UCC 1 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

---

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| FAIRN & SWANSON INC. | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 400 Lancaster Street | Oakland | | CA | 94601 | USA |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Wells Fargo Bank, National Association | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 2450 Colorado Avenue, Suite 3000W | Santa Monica | | CA | 90404 | USA |

4. **COLLATERAL:** This financing statement covers the following collateral:

All assets of Debtor, whether now existing or hereafter acquired.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Wells Fargo/Fairn & Swanson Inc. (file with CA Sec. of State)

UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

WFB_000155
EXHIBIT C

# EXHIBIT D

## FIRST AMENDMENT TO CREDIT AGREEMENT
## AND WAIVER OF DEFAULTS

THIS **FIRST AMENDMENT TO CREDIT AGREEMENT AND WAIVER OF DEFAULTS** (the "Amendment"), dated as of May 15, 2018, is entered into by and between **WELLS FARGO BANK, NATIONAL ASSOCIATION** ("Lender") and **FAIRN & SWANSON INC.**, a California corporation ("Borrower").

### RECITALS

A.     Borrower and Lender are parties to a Credit Agreement, dated November 10, 2017 (as heretofore amended, the "Credit Agreement"). Capitalized terms used in this Amendment have the meanings given to them in the Credit Agreement unless otherwise specified in this Amendment.

B.     Borrower failed to comply with the minimum EBITDA requirement set forth in Section 4.3(a) of the Credit Agreement for the one-month period ending January 31, 2018, the two-month period ending February 28, 2018, and the three-month period ending March 31, 2018, and such failures constitute Events of Default under the Credit Agreement (the "Existing Defaults").

C.     The Borrower has requested that (i) certain amendments be made to the Credit Agreement, and (ii) the Existing Defaults be waived, both of which Lender is willing to agree to pursuant to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, it is agreed as follows:

1.     Amendments to Credit Agreement. The Credit Agreement is hereby amended as follows:

1.1.     Section 4.3(a) of the Credit Agreement. Section 4.3(a) of the Credit Agreement is hereby amended and restated to read in its entirety as follows:

"(a)     Minimum EBITDA. Achieve EBITDA, measured on a month-end basis, of at least the required amount set forth in the following table for the applicable period set forth opposite thereto (numbers appearing between "< >" are negative):

| **Applicable Amount** | **Applicable Period** |
|---|---|
| $90,000 | 12 fiscal month period ending April 29, 2018 |
| $260,000 | 12 fiscal month period ending May 27, 2018 |
| $335,000 | 12 fiscal month period ending July 1, 2018 |
| $395,000 | 12 fiscal month period ending July 29, 2018 |

*WFB/Fairn & Swanson Inc.*
*First Amendment to Credit Agreement and Waiver of Defaults*

DB2/ 33263398.2

EXHIBIT D
Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 142
of 175   **WFB_000222**

| $565,000 | 12 fiscal month period ending August 26, 2018 |
|---|---|
| $365,000 | 12 fiscal month period ending September 30, 2018 |
| $345,000 | 12 fiscal month period ending October 28, 2018 |
| $250,000 | 12 fiscal month period ending November 25, 2018 |
| $<115,000> | 12 fiscal month period ending December 30, 2018 |
| $243,000 | 12 fiscal month period ending January 27, 2019 |
| $747,000 | 12 fiscal month period ending February 24, 2019 |

1.2.     Section 5.6(b) of the Credit Agreement.  Section 5.6(b) of the Credit Agreement is hereby amended and restated to read in its entirety as follows:

"(b)     Make any payments in respect of Indebtedness that has been subordinated to the Obligations; provided that with respect to the Uhlig Trust Debt, Fairn & Swanson may make:

(i)     Payments of accrued interest when due and payable, so long as no Event of Default has occurred or would result from any such payment; and

(ii)     Payments of principal when due and payable (but no prepayments), so long as the following conditions precedent are satisfied with respect to each such payment:  (A) no Event of Default has occurred or would result from any such payment; (B) Fairn & Swanson shall be in compliance with Section 4.3(a) of this Agreement for the most-recently ended twelve fiscal month period prior to any such payment, calculated on a pro forma basis as though such proposed payment was made during such twelve fiscal month measurement period; (C) Fairn & Swanson shall have achieved a Fixed Charge Coverage Ratio of not less than 1.25 to 1.0 for the most-recently ended twelve fiscal month period prior to any such payment, calculated on a pro forma basis as though such proposed payment was made during such twelve fiscal month measurement period; (D) Excess Availability for the 30 day period prior to such payment (as though such payment was made on the first day of such 30-day period), and immediately after giving effect to such payment, shall not be less than $5,000,000; and (E) Fairn & Swanson shall provide notice to Wells Fargo of each such payment at least 15 days prior to making any such payment, together with a calculation of the pro forma financial covenants and the pro forma Excess Availability to evidence compliance with clauses (B), (C), and (D) of this paragraph.

2.     Waiver of Existing Defaults.  Upon the terms and subject to the conditions set forth in this Amendment (including, but not limited to, the effectiveness of this Amendment in

2

accordance with Section 5 of this Amendment), Lender shall be deemed to have waived the Existing Defaults. This waiver shall be effective only in this specific instance and for the specific purpose for which it is given, and this waiver shall not entitle the Borrower to any other or further waiver in any similar or other circumstances.

3.        No Other Changes. Except as explicitly amended by this Amendment or the other Loan Documents delivered in connection with this Amendment, all of the terms and conditions of the Credit Agreement and the other Loan Documents shall remain in full force and effect and shall apply to any advance or letter of credit thereunder. This Amendment shall be deemed to be a "Loan Document" (as defined in the Credit Agreement).

4.        Amendment Fee. In consideration of the agreements set forth herein, Borrower hereby agrees to pay to Lender an amendment fee in the amount of $10,000 (the "Amendment Fee"), which fee is non-refundable when paid and is fully-earned as of the date of this Amendment. The Amendment Fee shall be paid in full on the date of this Amendment.

5.        Conditions Precedent. This Amendment shall be effective when Lender shall have received the following:

        5.1.    A duly executed copy of this Amendment from Borrower;

        5.2.    A duly executed copy of the Acknowledgement of Subordinated Creditor and Amendment of Subordination Agreement in the form attached to this Amendment;

        5.3.    A Certificate of Authority from Borrower that states that there have been no changes to Borrower's charter documents, provides a copy of the approval resolutions of Borrower's board of directors (with respect to this Amendment), and confirms that the officer(s) of Borrower that sign this Amendment are duly appointed and acting officers of Borrower; and

        5.4.    The Amendment Fee.

6.        Representations and Warranties. Borrower hereby represents and warrants to Lender as follows:.

        6.1.    Borrower has all requisite power and authority to execute this Amendment and any other agreements or instruments required hereunder and to perform all of its obligations hereunder, and this Amendment has been duly executed and delivered by Borrower and constitutes the legal, valid and binding obligation of Borrower, enforceable in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

        6.2.    The execution, delivery and performance by Borrower of this Amendment and any other agreements or instruments required hereunder have been duly authorized by all necessary corporate action and do not (i) require any authorization, consent or approval by any

*WFB/Fairn & Swanson Inc.*
*First Amendment to Credit Agreement and Waiver of Defaults*
DB2/ 33263398.2

Case: 20-40990     Doc# 17-1     Filed: 06/26/20     Entered: 06/26/20 08:45:29     Page 144 of 175

WFB_000224

Governmental Authority, (ii) violate any material provision of any federal, state or local law, rule or regulation or of any order, judgement or decree presently in effect, binding on the Borrower, or the certificate of incorporation or by-laws of Borrower, or (iii) result in a breach of or constitute a default under any Material Contract to which Borrower is a party or by which Borrower or any of their properties may be bound or affected, other than consents or approvals that have been obtained and that are still in force and effect and except for consents or approvals, the failure to obtain would not individually or in the aggregate reasonably be expected to cause a Material Adverse Change.

6.3. All of the representations and warranties contained in Article II of the Credit Agreement are true and correct in all material respects (except (i) that the Existing Defaults have occurred, and (ii) such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date hereof as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date (in which case such representations and warranties continue to be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date).

7. References. All references in the Credit Agreement to "this Agreement" shall be deemed to refer to the Credit Agreement as amended hereby; and any and all references in the other Loan Documents to the Credit Agreement shall be deemed to refer to the Credit Agreement as amended hereby.

8. No Waiver. Except as expressly provided in Section 2 of this Amendment, the execution of this Amendment and the acceptance of all other agreements and instruments related hereto shall not be deemed to be a waiver of any Default or Event of Default under the Credit Agreement or a waiver of any breach, default or event of default under any Loan Document or other document held by Lender, whether or not known to Lender and whether or not existing on the date of this Amendment.

9. Costs and Expenses. Borrower agrees (i) to pay all fees, costs, and expenses of counsel to Lender for the services performed by such counsel in connection with the preparation of this Amendment and the documents and instruments incidental hereto, and (ii) that Lender may, at any time or from time to time in its sole discretion and without further authorization by Borrower, make an Advance to Borrower under the Credit Agreement, or apply the proceeds of any Advance, for the purpose of paying any such fees, disbursements, costs and expenses.

10. Release. Borrower and the Subordinated Creditor executing the attached Acknowledgement of Subordinated Creditor and Amendment of Subordination Agreement each hereby absolutely and unconditionally releases and forever discharges the Lender, and any and all participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors and assigns thereof, together with all of the present and former directors, officers, agents, employees, and attorneys of any of the foregoing, from any and all claims, demands or causes of action of any kind, nature or description, whether arising in law or equity

4

Case: 20-40990   Doc# 17-1   Filed: 06/26/20   Entered: 06/26/20 08:45:29   Page 145
of 175                                                          **WFB_000225**

or upon contract or tort or under any state or federal law or otherwise, which either Borrower or Subordinated Creditor has had, now has or has made claim to have against any such person for or by reason of any act, omission, matter, cause or thing whatsoever arising out of or occurring in connection with, or otherwise related to, the Credit Agreement, any of the other Loan Documents, or this Amendment, or relating to the subject matter of this Amendment, arising from the beginning of time to and including the date of this Amendment, whether such claims, demands and causes of action are matured or unmatured or known or unknown. It is the intention of Borrower and Subordinated Creditor in executing this release that the same shall be effective as a bar to each and every claim, demand and cause of action specified and in furtherance of this intention each of Borrower and Subordinated Creditor waives and relinquishes all rights and benefits under Section 1542 of the Civil Code of the State of California, which provides:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MIGHT HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

The parties acknowledge that each may hereafter discover facts different from or in addition to those now known or believed to be true with respect to such claims, demands, or causes of action and agree that this instrument shall be and remain effective in all respects notwithstanding any such differences or additional facts.

11.    Miscellaneous. This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts, taken together, shall constitute one and the same instrument. Transmission by facsimile or "pdf" file of an executed counterpart of this Amendment shall be deemed to constitute due and sufficient delivery of such counterpart. Any party hereto may request an original counterpart of any party delivering such electronic counterpart. This Amendment and the rights and obligations of the parties hereto and thereto shall be construed in accordance with, and governed by, the laws of the State of California. All of the terms of Sections 7.15, 7.16, and 7.17 of the Credit Agreement are hereby incorporated by reference into this Amendment, *mutatis mutandis*. In the event of any conflict between this Amendment and the Credit Agreement, the terms of this Amendment shall govern. This Amendment shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, however, that Borrower may not assign this Amendment or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void ab initio. No amendment or modification of this Amendment shall be effective unless it has been agreed to by Lender in a writing that specifically states that it is intended to amend or modify this Amendment.

[Signature Page Follows]

5

*WFB/Fairn & Swanson Inc.*
*First Amendment to Credit Agreement and Waiver of Defaults*
DB2/ 33263398.2

WFB_000226

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed as of the date first above written.

**BORROWER:**

**FAIRN & SWANSON INC.**

By: _____

Name: _____

Title: _____

**LENDER:**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By: _____

Name: Gary Whitaker

Its: Authorized Signatory

[Signature page 1]

*WFB/Fairn & Swanson Inc.*
*First Amendment to Credit Agreement and Waiver of Defaults*
DB2/ 33263398

# EXHIBIT E

## SECOND AMENDMENT TO CREDIT AGREEMENT

THIS **SECOND AMENDMENT TO CREDIT AGREEMENT** (the "Amendment"), dated as of July 10, 2018, is entered into by and between **WELLS FARGO BANK, NATIONAL ASSOCIATION** ("Lender") and **FAIRN & SWANSON INC.**, a California corporation ("Borrower").

### RECITALS

A.      Borrower and Lender are parties to a Credit Agreement, dated November 10, 2017 (as amended by the First Amendment to Credit Agreement and Waiver of Defaults, dated May 15, 2018, and as further amended from time to time, the "Credit Agreement"). Capitalized terms used in this Amendment have the meanings given to them in the Credit Agreement unless otherwise specified in this Amendment.

B.      The Borrower has requested that certain amendments be made to the Credit Agreement, and Lender is willing to agree to such amendments pursuant to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, it is agreed as follows:

1.      Amendments to Credit Agreement. The Credit Agreement is hereby amended as follows:

1.1.    Section 1.1(a) of the Credit Agreement—Maximum Revolver Amount. In Section 1.1(a) of the Credit Agreement, the Maximum Revolver Amount is hereby increased from "$32,000,000" to "$34,000,000".

2.      No Other Changes. Except as explicitly amended by this Amendment or the other Loan Documents delivered in connection with this Amendment, all of the terms and conditions of the Credit Agreement and the other Loan Documents shall remain in full force and effect and shall apply to any advance or letter of credit thereunder. This Amendment shall be deemed to be a "Loan Document" (as defined in the Credit Agreement).

3.      Amendment Fee. [Intentionally Omitted].

4.      Conditions Precedent. This Amendment shall be effective when Lender shall have received the following:

4.1.    A duly executed copy of this Amendment from Borrower;

*WFB/Fairn & Swanson Inc.*
*Second Amendment to Credit Agreement*

DB2/ 33776161.1

4.2. A duly executed copy of the Acknowledgement of Subordinated Creditor in the form attached to this Amendment; and

4.3. A Certificate of Authority from Borrower that states that there have been no changes to Borrower's charter documents, provides a copy of the approval resolutions of Borrower's board of directors (with respect to this Amendment), and confirms that the officer(s) of Borrower that sign this Amendment are duly appointed and acting officers of Borrower.

5. <u>Representations and Warranties</u>. Borrower hereby represents and warrants to Lender as follows:

5.1. Borrower has all requisite power and authority to execute this Amendment and any other agreements or instruments required hereunder and to perform all of its obligations hereunder, and this Amendment has been duly executed and delivered by Borrower and constitutes the legal, valid and binding obligation of Borrower, enforceable in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

5.2. The execution, delivery and performance by Borrower of this Amendment and any other agreements or instruments required hereunder have been duly authorized by all necessary corporate action and do not (i) require any authorization, consent or approval by any Governmental Authority, (ii) violate any material provision of any federal, state or local law, rule or regulation or of any order, judgement or decree presently in effect, binding on the Borrower, or the certificate of incorporation or by-laws of Borrower, or (iii) result in a breach of or constitute a default under any Material Contract to which Borrower is a party or by which Borrower or any of their properties may be bound or affected, other than consents or approvals that have been obtained and that are still in force and effect and except for consents or approvals, the failure to obtain would not individually or in the aggregate reasonably be expected to cause a Material Adverse Change.

5.3. All of the representations and warranties contained in <u>Article II</u> of the Credit Agreement are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date hereof as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date (in which case such representations and warranties continue to be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date).

6. <u>References</u>. All references in the Credit Agreement to "this Agreement" shall be deemed to refer to the Credit Agreement as amended hereby; and any and all references in the other Loan Documents to the Credit Agreement shall be deemed to refer to the Credit Agreement as amended hereby.

2

7.    No Waiver. The execution of this Amendment and the acceptance of all other agreements and instruments related hereto shall not be deemed to be a waiver of any Default or Event of Default under the Credit Agreement or a waiver of any breach, default or event of default under any Loan Document or other document held by Lender, whether or not known to Lender and whether or not existing on the date of this Amendment.

8.    Costs and Expenses. Borrower agrees (i) to pay all fees, costs, and expenses of counsel to Lender for the services performed by such counsel in connection with the preparation of this Amendment and the documents and instruments incidental hereto, and (ii) that Lender may, at any time or from time to time in its sole discretion and without further authorization by Borrower, make an Advance to Borrower under the Credit Agreement, or apply the proceeds of any Advance, for the purpose of paying any such fees, disbursements, costs and expenses.

9.    Release. Borrower and the Subordinated Creditor executing the attached Acknowledgement of Subordinated Creditor each hereby absolutely and unconditionally releases and forever discharges the Lender, and any and all participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors and assigns thereof, together with all of the present and former directors, officers, agents, employees, and attorneys of any of the foregoing, from any and all claims, demands or causes of action of any kind, nature or description, whether arising in law or equity or upon contract or tort or under any state or federal law or otherwise, which either Borrower or Subordinated Creditor has had, now has or has made claim to have against any such person for or by reason of any act, omission, matter, cause or thing whatsoever arising out of or occurring in connection with, or otherwise related to, the Credit Agreement, any of the other Loan Documents, or this Amendment, or relating to the subject matter of this Amendment, arising from the beginning of time to and including the date of this Amendment, whether such claims, demands and causes of action are matured or unmatured or known or unknown. It is the intention of Borrower and Subordinated Creditor in executing this release that the same shall be effective as a bar to each and every claim, demand and cause of action specified and in furtherance of this intention each of Borrower and Subordinated Creditor waives and relinquishes all rights and benefits under Section 1542 of the Civil Code of the State of California, which provides:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> TO EXIST IN HIS OR HER FAVOR AT THE TIME OF
> EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM
> OR HER MIGHT HAVE MATERIALLY AFFECTED HIS OR
> HER SETTLEMENT WITH THE DEBTOR."

The parties acknowledge that each may hereafter discover facts different from or in addition to those now known or believed to be true with respect to such claims, demands, or causes of action and agree that this instrument shall be and remain effective in all respects notwithstanding any such differences or additional facts.

3

*WFB/Fairn & Swanson Inc.*
*Second Amendment to Credit Agreement*
DB2/ 33776161.1

WFB_000230

10. Miscellaneous. This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts, taken together, shall constitute one and the same instrument. Transmission by facsimile or "pdf" file of an executed counterpart of this Amendment shall be deemed to constitute due and sufficient delivery of such counterpart. Any party hereto may request an original counterpart of any party delivering such electronic counterpart. This Amendment and the rights and obligations of the parties hereto and thereto shall be construed in accordance with, and governed by, the laws of the State of California. All of the terms of Sections 7.15, 7.16, and 7.17 of the Credit Agreement are hereby incorporated by reference into this Amendment, *mutatis mutandis*. In the event of any conflict between this Amendment and the Credit Agreement, the terms of this Amendment shall govern. This Amendment shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, however, that Borrower may not assign this Amendment or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void ab initio. No amendment or modification of this Amendment shall be effective unless it has been agreed to by Lender in a writing that specifically states that it is intended to amend or modify this Amendment.

[Signature Page Follows]

4

*WFB/Fairn & Swanson Inc.*
*Second Amendment to Credit Agreement*
DB2/ 33776161.1

WFB_000231

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed as of the date first above written.

**BORROWER:**

**FAIRN & SWANSON INC.**

By: _____

Name: _____

Title: _____

**LENDER:**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By: _____

Name: Gary Whitaker

Its: Authorized Signatory

[Signature page]

*WFB/Fairn & Swanson Inc.*
*Second Amendment to Credit Agreement*
DB2/ 33776161

# EXHIBIT F

# THIRD AMENDMENT TO CREDIT AGREEMENT

THIS **THIRD AMENDMENT TO CREDIT AGREEMENT** (the "Amendment"), dated as of February 18, 2020, is entered into by and between **WELLS FARGO BANK, NATIONAL ASSOCIATION** ("Lender") and **FAIRN & SWANSON INC.**, a California corporation ("Borrower").

## RECITALS

A.    Borrower and Lender are parties to a Credit Agreement, dated November 10, 2017 (as amended by the First Amendment to Credit Agreement and Waiver of Defaults, dated May 15, 2018, and the Second Amendment to Credit Agreement, dated July 10, 2018, and as further amended from time to time, the "Credit Agreement"). Capitalized terms used in this Amendment have the meanings given to them in the Credit Agreement unless otherwise specified in this Amendment.

B.    Certain Events of Default have occurred as described on Schedule 1 attached to this Amendment (the "Existing Defaults"). The Existing Defaults have not been waived by Lender, and Lender continues to reserve all of its rights and remedies that Lender is entitled to exercise as a result of the Existing Defaults.

C.    Notwithstanding the occurrence and continuation of the Existing Defaults, the Borrower has requested that certain amendments be made to the Credit Agreement, and Lender is willing to agree to such amendments pursuant to the terms and conditions set forth herein (including, but not limited to, Lender is not waiving the Existing Defaults and Lender reserves the right to exercise at any time Lender's rights and remedies as a result of the occurrence of the Existing Defaults).

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, it is agreed as follows:

1.    Amendments to Credit Agreement. The Credit Agreement is hereby amended as follows:

*WFB/Fairn & Swanson Inc.*
*Third Amendment to Credit Agreement*

EXHIBIT F
**WFB_000233**



1.2.    Section 5.6(b) of the Credit Agreement. Section 5.6(b) of the Credit Agreement is hereby amended and restated to read in its entirety as follows:

"(b)    Make any payments in respect of Indebtedness that has been subordinated to the Obligations, except to the extent permitted, if any, in any subordination agreement (in favor of Lender) entered into in connection with such Indebtedness.

1.3.    Definitions.

1.3.1.    Definition of "Applicable Margin". The defined term "Applicable Margin" that appears in Section 7.1 of the Credit Agreement is amended and restated to read in its entirety as follows:

"Applicable Margin" means (i) 2%, on and prior to January 31, 2020, and (ii) 3.0%, on and after February 1, 2020.

1.3.2.    Definition of "Permitted Indebtedness". The defined term "Permitted Indebtedness" that appears in Section 7.1 of the Credit Agreement is amended and restated to read in its entirety as follows:

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 156
of 175                                                                    **WFB_000234**

"Permitted Indebtedness" means (a) Indebtedness in respect of the Obligations, (b) Indebtedness as of the Closing Date set forth on Schedule B to this Agreement, (c) Permitted Purchase Money Indebtedness, (d) Indebtedness arising in connection with the endorsement of instruments or other payment items for deposit, (e) the incurrence by any Loan Party of Indebtedness under Hedge Agreements that is incurred for the bona fide purpose of hedging the interest rate, commodity, or foreign currency risks associated with such Loan Party's operations and not for speculative purposes, (f) Indebtedness incurred in the ordinary course of business in respect of credit cards, credit card processing services, debit cards, stored value cards, commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards"), or Cash Management Services, and (g) any Indebtedness (x) the terms and conditions of which have been approved by Lender in writing in Lender's sole and absolute discretion, and (y) that has been, and at all times remains, subordinated to the Obligations pursuant to a written subordination agreement in favor of Lender that is satisfactory in form and substance to Lender in the Lender's sole and absolute discretion.

1.3.3. Definition of "Third Amendment Effective Date". The following defined term "Third Amendment Effective Date" is hereby added to Section 7.1 of the Credit Agreement in the appropriate alphabetical position:

"Third Amendment Effective Date" means February 18, 2020.

1.4. Schedule A to Credit Agreement. Schedule A to the Credit Agreement is hereby replaced in its entirety with Schedule A attached to this Amendment.

1.5. Schedule D to Credit Agreement. Schedule D to the Credit Agreement is hereby replaced in its entirety with Schedule D attached to this Amendment.

2. No Other Changes; No Waiver of Existing Defaults; Reservation of Rights and Remedies; Discretionary Advances.

2.1. Except as explicitly amended by this Amendment or the other Loan Documents delivered in connection with this Amendment, all of the terms and conditions of the Credit Agreement and the other Loan Documents shall remain in full force and effect and shall apply to any advance or letter of credit thereunder. This Amendment shall be deemed to be a "Loan Document" (as defined in the Credit Agreement).

2.2. Borrower acknowledges and agrees that:

(i) The Existing Defaults have occurred;

(ii) The Existing Defaults have not been waived by Lender;

(iii) By entering into this Amendment, Lender is not waiving (and shall not be deemed to have waived) the Existing Defaults;

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 157
                                    of 175                          WFB_000235

(iv)     Although Lender is not presently exercising any of its rights and remedies available as a result of the Existing Defaults, Lender reserves Lender's right to do so at any time in its sole discretion without further notice (except for such notice as is required by the Loan Documents or applicable law);

(v)     Nothing in this Amendment, or the making of any Advances to the Borrower under the Credit Agreement or the issuance of Letters of Credit under or in connection with the Credit Agreement should be construed to be a waiver, modification or release of the Existing Defaults or any other breach, default or Event of Default, whether now existing or hereafter arising, or any of the Lender's rights and remedies under the Credit Agreement, the other Loan Documents, any other agreement, instrument or document between the Lender and the Borrower or by the Borrower in favor of the Lender, and applicable law;

(vi)     Lender shall not be obligated to make any further Advances, or issue any Letters of Credit, *and any such Advances or Letters of Credit shall be made or issued in the sole discretion of Lender*; and

(vii)     Any forbearance by the Lender in the exercise of rights or remedies, or any Advances made or Letters of Credit issued, shall not constitute a course of dealing or a course of conduct, and Lender may discontinue any such forbearance, or discontinue Advances or Letters of Credit, at any time without notice (except for such notice as is required by the Loan Documents or applicable law).

3.     Amendment Fee.  In consideration of the agreements set forth herein, Borrower hereby agrees to pay to Lender an amendment fee in the amount of $35,000 (the "Amendment Fee"), which fee is non-refundable when paid and is fully-earned as of the date of this Amendment. The Amendment Fee shall be paid in full on the date of this Amendment.  Lender is hereby authorized by Borrower to charge Borrower's Loan Account for the amount of the Amendment Fee.

4.     Conditions Precedent.  This Amendment shall be effective when Lender shall have received the following:

4.1.     A duly executed copy of this Amendment from Borrower;

4.2.     A duly executed copy of the Acknowledgement of Subordinated Creditors in the form attached to this Amendment;

4.3.     A Certificate of Authority from Borrower that states that there have been no changes to Borrower's charter documents, provides a copy of the approval resolutions of Borrower's board of directors (with respect to this Amendment), and confirms that the officer(s) of Borrower that sign this Amendment are duly appointed and acting officers of Borrower; and

4.4.     The Amendment Fee.

Case: 20-40990     Doc# 17-1     Filed: 06/26/20     Entered: 06/26/20 08:45:29     Page 158
of 175                                                          WFB_000236

5.    Representations and Warranties.  Borrower hereby represents and warrants to Lender as follows:

5.1.    Borrower has all requisite power and authority to execute this Amendment and any other agreements or instruments required hereunder and to perform all of its obligations hereunder, and this Amendment has been duly executed and delivered by Borrower and constitutes the legal, valid and binding obligation of Borrower, enforceable in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

5.2.    The execution, delivery and performance by Borrower of this Amendment and any other agreements or instruments required hereunder have been duly authorized by all necessary corporate action and do not (i) require any authorization, consent or approval by any Governmental Authority, (ii) violate any material provision of any federal, state or local law, rule or regulation or of any order, judgement or decree presently in effect, binding on the Borrower, or the certificate of incorporation or by-laws of Borrower, or (iii) result in a breach of or constitute a default under any Material Contract to which Borrower is a party or by which Borrower or any of their properties may be bound or affected, other than consents or approvals that have been obtained and that are still in force and effect and except for consents or approvals, the failure to obtain would not individually or in the aggregate reasonably be expected to cause a Material Adverse Change.

5.3.    Other than the occurrence of the Existing Defaults, all of the representations and warranties contained in the Loan Documents, including, but not limited to, Article II of the Credit Agreement, are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date hereof as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date (in which case such representations and warranties continue to be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date).

6.    References.  All references in the Credit Agreement to "this Agreement" shall be deemed to refer to the Credit Agreement as amended hereby; and any and all references in the other Loan Documents to the Credit Agreement shall be deemed to refer to the Credit Agreement as amended hereby.

7.    No Waiver.  The execution of this Amendment and the acceptance of all other agreements and instruments related hereto shall not be deemed to be a waiver of any Existing Default or any other Default or Event of Default under the Credit Agreement or a waiver of any breach, default or event of default under any Loan Document or other document held by Lender, whether or not known to Lender and whether or not existing on the date of this Amendment.

8.    Costs and Expenses.  Borrower agrees (i) to pay all fees, costs, and expenses of counsel to Lender for the services performed by such counsel in connection with the preparation of this

WFB_000237

Amendment and the documents and instruments incidental hereto, and (ii) that Lender may, at any time or from time to time in its sole discretion and without further authorization by Borrower, make an Advance to Borrower under the Credit Agreement, or apply the proceeds of any Advance, for the purpose of paying any such fees, disbursements, costs and expenses.

9.      Release.  Borrower and the Subordinated Creditors executing the attached Acknowledgement of Subordinated Creditors each hereby absolutely and unconditionally releases and forever discharges the Lender, and any and all participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors and assigns thereof, together with all of the present and former directors, officers, agents, employees, and attorneys of any of the foregoing, from any and all claims, demands or causes of action of any kind, nature or description, whether arising in law or equity or upon contract or tort or under any state or federal law or otherwise, which any of Borrower or the Subordinated Creditors has had, now has or has made claim to have against any such person for or by reason of any act, omission, matter, cause or thing whatsoever arising out of or occurring in connection with, or otherwise related to, the Credit Agreement, any of the other Loan Documents, or this Amendment, or relating to the subject matter of this Amendment, arising from the beginning of time to and including the date of this Amendment, whether such claims, demands and causes of action are matured or unmatured or known or unknown.  It is the intention of Borrower and the Subordinated Creditors in executing this release that the same shall be effective as a bar to each and every claim, demand and cause of action specified and in furtherance of this intention each of Borrower and the Subordinated Creditors waives and relinquishes all rights and benefits under Section 1542 of the Civil Code of the State of California, which provides:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> THAT THE CREDITOR OR RELEASING PARTY DOES NOT
> KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT
> THE TIME OF EXECUTING THE RELEASE AND THAT, IF
> KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY
> AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR
> OR RELEASED PARTY."

The parties acknowledge that each may hereafter discover facts different from or in addition to those now known or believed to be true with respect to such claims, demands, or causes of action and agree that this instrument shall be and remain effective in all respects notwithstanding any such differences or additional facts.

10.      Miscellaneous.  This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts, taken together, shall constitute one and the same instrument.  Transmission by facsimile or "pdf" file of an executed counterpart of this Amendment shall be deemed to constitute due and sufficient delivery of such counterpart.  Any party hereto may request an original counterpart of any party delivering such electronic counterpart.  This Amendment and the rights and obligations of the parties hereto and thereto shall be construed in accordance with, and governed by, the laws of the State of California.  All of the terms of Sections 7.15, 7.16, and 7.17 of the Credit Agreement are hereby incorporated by reference into this Amendment, *mutatis*

WFB_000238

*mutandis*. In the event of any conflict between this Amendment and the Credit Agreement, the terms of this Amendment shall govern. This Amendment shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, however, that Borrower may not assign this Amendment or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void ab initio. No amendment or modification of this Amendment shall be effective unless it has been agreed to by Lender in a writing that specifically states that it is intended to amend or modify this Amendment.

[Signature Page Follows]

**SURVIVOR'S TRUST**

By: _____
MICHELLE STOLDT, co-trustee

By: _____
NICOLE UHLIG, as co-trustee

**NON-EXEMPT MARITAL TRUST**

By: _____
MICHELLE STOLDT, co-trustee

By: _____
NICOLE UHLIG, as co-trustee

**BYPASS TRUST**

By: _____
MICHELLE STOLDT, co-trustee

By: _____
NICOLE UHLIG, as co-trustee

WFB_000240

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed as of the date first above written.

**BORROWER:**

**FAIRN & SWANSON INC.**

By: _____

Name: NICOLE CHICO

Title: PRESIDENT

**LENDER:**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By: _____

Name: Gary Whitaker

Its: Authorized Signatory

[Signature page]

*WFB/Fairn & Swanson Inc.*
*Third Amendment to Credit Agreement*
DB2/ 37659617

WFB_000241

## ACKNOWLEDGEMENT OF SUBORDINATED CREDITORS

Dated as of: February 18, 2020

MICHELLE STOLDT and NICOLE UHLIG, as co-trustees of the SURVIVOR'S TRUST established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended (the "Survivor's Trust"), MICHELLE STOLDT and NICOLE UHLIG, as co-trustees of the NON-EXEMPT MARITAL TRUST established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended (the "Non-Exempt Marital Trust"), and MICHELLE STOLDT and NICOLE UHLIG, as co-trustees of the BYPASS TRUST established under the Wolfgang and Elke Uhlig Revocable Living Trust u/a/d April 16, 1998, as amended (the "Bypass Trust"; the Survivor's Trust, the Non-Exempt Marital Trust, and the Bypass Trust are sometimes referred herein individually as a "Subordinated Creditor" and collectively as the "Subordinated Creditors"), are parties to the Amended and Restated Subordination Agreement, dated February 18, 2020, made for the benefit of Wells Fargo Bank, National Association ("Lender") (as amended, modified or supplemented from time to time, the "Subordination Agreement"), and the Subordinated Creditors hereby (i) acknowledge and agree to the foregoing Third Amendment to Credit Agreement (the "Amendment") (including, but not limited to, Section 9 thereof), and (ii) except as provided below in this sentence and in the next sentence, confirm and agree that the Subordination Agreement is and shall continue to be, in full force and effect and is hereby ratified and confirmed in all respects, except that, upon the effectiveness of, and on and after the date of the Amendment, each reference in the Subordination Agreement to the Credit Agreement (as defined in the Amendment), "thereunder", "thereof" or words of like import referring to the "Credit Agreement", shall mean and be a reference to the Credit Agreement as amended or modified by the Amendment. Although Lender has informed the Subordinated Creditors of the Amendment, and the Subordinated Creditors have acknowledged the same, the Subordinated Creditors understand and agree that Lender has no duty under the Credit Agreement, the Subordination Agreement, or any other agreement with the Subordinated Creditors to so notify the Subordinated Creditors or to seek such an acknowledgement, and nothing contained herein is intended to or shall create such a duty as to any advances or transaction hereafter. This Acknowledgement of Subordinated Creditors ("Acknowledgement") may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts, taken together, shall constitute one and the same instrument. Transmission by facsimile or "pdf" file of an executed counterpart of this Acknowledgement shall be deemed to constitute due and sufficient delivery of such counterpart.

[signatures on next page]

SCHEDULE A TO CREDIT AGREEMENT

FEES

**On the Closing Date:**

Closing Fee. A non-refundable closing fee of $15,000 which will be fully earned and payable upon the execution of this Agreement.

**Monthly:**

(a) Unused Line Fee. A fee equal to 0.15% per annum on the daily average of the Maximum Revolver Amount reduced by outstanding Advances and Letter of Credit Usage, which fee will be calculated on a monthly basis by Lender and will be due and payable in arrears on the first day of each month and on the Termination Date.

(b) Cash Management and Other Service Fees. Fees for cash management services and other Bank Products and services provided to Borrowers by Lender, in accordance with the agreements entered into between any of the Borrowers and Lender from time to time, including Lender's customary fees and charges with respect to the disbursement of funds or the receipt of funds to or for the account of any of the Borrowers (whether by wire transfer or otherwise).

(c) Letter of Credit Fees. A Letter of Credit fee which will accrue at a rate equal to the Applicable Margin per annum *times* the daily balance of the undrawn amount of all outstanding Letters of Credit (calculated on the basis of a 360-day year and the actual number of days elapsed), payable monthly in arrears on the first day of each month and on the Termination Date and continuing until all undrawn Letters of Credit have expired or have been returned for cancellation. All fees upon the occurrence of any other activity with respect to any Letter of Credit (including, without limitation, the issuance, transfer, amendment, extension or cancellation of any Letter of Credit and honoring of draws under any Letter of Credit) will be determined in accordance with Lender's standard fees and charges then in effect.

**Upon demand by Lender or as otherwise specified in this Agreement:**

(a) Collateral Exam Fees, Costs and Expenses. Lender's fees, costs and expenses in connection with any collateral exams or inspections conducted by or on behalf of Lender at the current rates established from time to time by Lender as its fee for collateral exams or inspections (which fees are currently $1,000 per day per examiner) or such greater amount as may be charged by any examiner engaged by Lender, *plus* all actual out-of-pocket costs and expenses incurred in conducting any collateral exam or inspection; provided, however, so long as no Default or Event of Default shall have occurred and be continuing, Borrowers shall be obligated to reimburse Lender for fees, costs and expenses related to not more than four (4) such collateral exams and inspections during any 365 day period.

(b) Appraisal Fees, Costs and Expenses. Lender's fees, costs and expenses (including any fees, costs and expenses incurred by any Person employed by Lender to appraise the Collateral) in connection with any appraisal of all or any part of the Collateral, or any assessment of any

*WFB/Fairn & Swanson Inc.*
*Third Amendment to Credit Agreement*
DB2/ 37659617.4

WFB_000243

Loan Party's or any of its Subsidiaries' business valuation, conducted at the request of Lender; provided, however, so long as no Event of Default shall have occurred and be continuing, Borrowers shall be obligated to reimburse Lender for fees, costs and expenses related to not more than two (2) such appraisals of each type of Collateral during any 365 day period.

*WFB/Fairn & Swanson Inc.*
*Third Amendment to Credit Agreement*
DB2/ 37659617

WFB_000244

SCHEDULE D TO CREDIT AGREEMENT

COLLATERAL REPORTING

| Daily, on each Business Day, | (a) a borrowing base certificate in form and substance acceptable to Lender, |
| | (b) a detailed aging, by total, of each Borrower's Accounts, together with a reconciliation and supporting documentation for any reconciling items noted, |
| | (c) a monthly Account roll-forward, in a format acceptable to Lender in its discretion, tied to the beginning and ending account receivable balances of Borrowers' general ledger, and |
| | (d) Inventory system/perpetual reports specifying the cost and the wholesale market value of each Borrower's Inventory, by category. |
| **No less frequently than weekly (no later than Wednesday of each week),** | (e) a weekly Inventory roll-forward report showing additions to and deletions therefrom, together with a reconciliation to (i) the Inventory perpetual report delivered in support of each Borrowing Base Certificate as of each Friday of each week, and (ii) Borrowers' general ledger (delivered as of the end of each month), and |
| | (f) a summary aging, by vendor, of each Loan Party's accounts payable and any book overdraft and an aging, by vendor, of any held checks (including unvouchered accounts payable schedules). |
| **No less frequently than twice each month (no later than seven days after the required date of such calculation),** | (g) a detailed calculation of those Accounts and Inventory that are not eligible for the Borrowing Base, as of the last day of each month and as of the 15th day of each month (provided that if the 15th day is a Saturday, Sunday, or a federal holiday in the United States, such calculation shall be as of the next Business Day occurring after such Saturday, Sunday, or holiday, as applicable). |
| **Monthly (no later than the 30th day of each month),** | (h) a reconciliation of Accounts, accounts payable and Inventory of Borrowers' general ledger to its monthly financial statements, including any book reserves related to each category. |

*WFB/Fairn & Swanson Inc.*
*Third Amendment to Credit Agreement*
DB2/ 37659617.4

Case: 20-40990    Doc# 17-1    Filed: 06/26/20    Entered: 06/26/20 08:45:29    Page 167
of 175
**WFB_000245**

| | |
|---|---|
| **Quarterly (no later than the 45th day after the end of each fiscal quarter),** | (i)  a report regarding each Loan Party's and its Subsidiaries' accrued, but unpaid, *ad valorem* taxes, and<br><br>(j)  a supplement to the Perfection Certificate providing updates thereto, if any. |
| **Annually (no later than 90 days after the end of each fiscal year),** | (k)  a detailed list of each Loan Party's and its Subsidiary's customers, with address and contact information. |
| **Upon request by Lender,** | (l)   such other reports, documents, notices and information as to the Collateral and as to any Loan Party and its Subsidiaries as Lender may reasonably request. |

## SCHEDULE 1

## DESCRIPTION OF EXISTING DEFAULTS

1.    Breach of Section 4.3(a) of the Credit Agreement (*i.e.*, the minimum EBITDA requirement) for the twelve fiscal month periods ending December 30, 2018, January 27, 2019, and February 24, 2019.

2.    Breach of Section 4.3(b) of the Credit Agreement (*i.e.*, the minimum Fixed Charge Coverage Ratio), for the twelve month periods ending March 31, 2019, April 30, 2019, May 31, 2019, June 30, 2019, July 31, 2019, August 31, 2019, September 30, 2019, October 31, 2019, November 30, 2019, and December 31, 2019.

3.    Failure to provide accurate weekly collateral reporting as required by Schedule D to the Credit Agreement.

4.    Breach of Section 1.2(h) of the Credit Agreement, as an Overadvance Amount occurred (in the approximate amount of $735,000) and such Overadvance Amount was not immediately repaid as required by Section 1.2(h) of the Credit Agreement.

5.    Incurrence of additional Indebtedness of approximately $1,893,497 in violation of Section 5.2 of the Credit Agreement (the "Additional Indebtedness").

6.    Failure to deliver Borrower's 2018 audited financial statements required by Section 4.1 of, and Schedule C to, the Credit Agreement.

# EXHIBIT G

**Final Chapter 7 Trustee - Cash Collateral Budget**

| | June | July | Comments: |
|---|---|---|---|
| Rent (see detailed rent schedule below) | 269,251 | 270,918 | *per Debtor rent schedule (see below) |
| Payroll | 40,500 | 50,000 | |
| Security | 30,000 | 35,000 | as estimated or actual cost |
| Insurance | 100,000 | - | as estimated or actual cost |
| Warehouse Expenses | 5,000 | 5,000 | |
| Utilities / Security Deposits | 40,000 | 40,000 | as estimated or actual cost |
| KIS IT Services | 10,767 | 3,735 | June includes $7,032 pre-petition amount due |
| SAMCO Accounting Software | 6,283 | 1,650 | June includes $4,633 pre-petition amount due |
| Other Misc. Expenses | 10,000 | 10,000 | |
| Trustee's Counsel | 150,000 | 125,000 | @ $275k total |
| Trustee's Accountant | 25,000 | 25,000 | @ $50k total |
| Trustee Fee | - | 100,000 | @ $100k total |
| **Subtotal** | **686,801** | **666,302** | |
| **Anticipated total through 7/31/2020** | | **1,353,103** | Projected budget, actual results will vary |

| Location | Address | Rent/CAM | Rent/CAM | Landlord |
|---|---|---|---|---|
| **Seattle** | 9875 40TH Ave So., Seattle WA | $ 19,893 | $ 19,893 | **98 Norfolk LLC** |
| **Seattle** | 9875 40TH Ave So., Seattle WA | $ 2,652 | $ 2,652 | **98 Norfolk LLC** |
| **Oakland** | 400 Lancaster St, Oakland CA | $ 50,693 | $ 50,693 | **JV Rental** |
| **San Ysidro** | 4590 Border Village Rd, San Ysidro CA | $ 15,160 | $ 15,160 | **San Diego Prop Mgmt** |
| **San Ysidro** | 4590 Border Village Rd, San Ysidro CA | $ 3,750 | $ 3,750 | **San Diego Prop Mgmt** |
| **SY Office** | 195 Virginia Ave, San Ysidro CA | $ 2,000 | $ 2,000 | **NJ Units LLC** |
| **Eagle Pass** | 198 Commercial St, Eagle Pass TX | $ 5,000 | $ 5,000 | **Estate of A. Page Sloss** |
| **Eagle Pass** | 198 Commercial St, Eagle Pass TX | $ 649 | $ 649 | **Estate of A. Page Sloss** |
| **Eagle Pass (parking** | 140 Rio Grande St, Eagle Pass TX | $ 700 | $ 700 | **Violet Farhat** |
| **Gateway** | San Ysidro Shopping Ctr, 4490 Camino De La Plaza, San | $ 26,737 | $ 26,737 | **TKG San Ysidro Dev LLC** |
| **Gateway** | San Ysidro Shopping Ctr, 4490 Camino De La Plaza, San | $ 3,446 | $ 3,446 | **TKG San Ysidro Dev LLC** |
| **Otay Mesa Whse** | 1351 Air Wing Rd, San Diego CA | $ 10,864 | $ 10,864 | **Peter P. Tarantino** |
| **Calexico** | 245 Imperial Ave, Calexico CA | $ 9,000 | $ 9,000 | **Elke Uhlig** |
| **Trolley** | 723 E. San Ysiudro Blvd, San Ysidro CA | $ 11,250 | $ 11,250 | **Merchant Prop Mgmt** |
| **Trolley** | 723 E. San Ysiudro Blvd, San Ysidro CA | $ 3,168 | $ 3,168 | **Merchant Prop Mgmt** |
| **Laredo** | 1420 Grant St, Laredo TX | $ 2,363 | $ 2,363 | **Roberto Garza** |
| **El Paso** | 800 S. Stanton, El Paso TX | $ 4,382 | $ 4,382 | **Virginia Montano** |
| **Florida** | 701 NW 33rd Ste 150, Pompano FL | $ 55,565 | $ 57,232 | **Prologis** |
| **Florida** | 701 NW 33rd Ste 150, Pompano FL | $ 31,732 | $ 31,732 | **Prologis** |
| **San Luis** | 508 Archibald St, San Luis AZ | $ 2,067 | $ 2,067 | **Irma Barragan** |
| **San Luis** | 508 Archibald St, San Luis AZ | $ 79 | $ 79 | **Irma Barragan** |
| **Laredo Warehouse** | 417 Grand Central Blvd, laredo TX | $ 4,600 | $ 4,600 | **Ricardo Montalvo** |
| **Otay Store** | 2455 Otay Center Dr Ste120-121, San Diego CA | $ 3,501 | $ 3,501 | **Kroeger Family Properties** |
| | | $ 269,251 | $ 270,918 | |

*Insurance amount is an estimate. Insurance policy renews July 1.*

EXHIBIT G

# EXHIBIT 2

1  Mark S. Bostick (Bar No. 111241)
   Tracy Green (Bar No. 114876)
2  Lisa Lenherr (Bar No. 258091)
   **WENDEL ROSEN LLP**
3  1111 Broadway, 24th Floor
   Oakland, California 94607-4036
4  Telephone: (510) 834-6600
   Fax: (510) 834-1928
5  Email: mbostick@wendel.com
   Email: tgreen@wendel.com
6  Email: llenherr@wendel.com
   Attorneys for Lois I. Brady, Trustee

7

8

9            UNITED STATES BANKRUPTCY COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11                  OAKLAND DIVISION

12

13  In re                              Case No. 20-40990-RLE

14  FAIRN & SWANSON, INC.              Chapter 7

15
                  Debtor.             **ORDER GRANTING MOTION OF**
16                                    **CHAPTER 7 TRUSTEE FOR ENTRY OF**
                                      **ORDER: 1) APPROVING CASH**
17                                    **COLLATERAL STIPULATION**
                                      **PURSUANT TO 11 U.S.C. 363(b); AND 2)**
18                                    **AUTHORIZING TRUSTEE TO INCUR**
                                      **AND PAY CERTAIN ADMINISTRATIVE**
19                                    **EXPENSES**

20
                                      Date:    TBD
21                                    Time:    TBD
                                      Place:   By video
22                                    Judge:   The Honorable Roger L. Efremsky

23

24         Upon consideration of Trustee's Motion for Entry of Order: 1) Approving Cash Collateral

25  Stipulation Pursuant to 11 U.S.C. § 363(b); and 2) Authorizing Trustee to Incur and Pay Certain

26  Administrative Expenses filed on June ___, 2020, as Docket No. ___ (the "**Motion**"), this Court

27  having considered the Motion and the Cash Collateral Stipulation attached as Exhibit 1 to the

28  Motion (the "**Stipulation**") entered into by and among LOIS I. BRADY, as Chapter 7 Trustee

002644.0031\5895899.1
ORDER

("**Trustee**") of the above-captioned Fairn & Swanson, Inc. ("**Debtor**") bankruptcy estate, and

WELLS FARGO BANK, NATIONAL ASSOCIATION ("**Lender**"), and having completed an

interim hearing pursuant to 11 U.S.C. § 363 and Fed. R. Bankr. P. 4001(b) and (d), and for good

cause:

IT IS ORDERED that:

1.      The Motion is Granted on an interim basis pending a final hearing;

2.      Pending a final hearing, the Stipulation is approved and adopted in its entirety as

the Order of this Court;

3.      Trustee is authorized to incur and pay the Administrative Expenses (as defined in

the Motion);

4.      The Stipulation was negotiated at arm's length and in good faith by the parties, and

entry of this order is in the best interest of Debtor's estate and creditors;

5.      The terms of the Stipulation shall be binding upon the Trustee, Debtor, Lender and

other parties in interest in this Case;

6.      This Court shall retain sole and exclusive jurisdiction to hear and determine any

and all disputes or controversies arising from or related to the implementation, interpretation, or

enforcement of the Stipulation or this order;

7.      No stay shall apply to the effectiveness of the order; and

8.      A final hearing shall be held on July ___, 2020, at _____.


Approved as to form and content.

DATED:  June 25, 2020                          WENDEL ROSEN LLP


By:     _____
        Mark S. Bostick
        Lisa Lenherr
        Attorneys for Lois I. Brady, Trustee

Wendel Rosen LLP
1111 Broadway, 24 <sup>th</sup> Floor
Oakland, California 94607-4036

DATED: June 25, 2020                    PILLSBURY WINTHROP SHAW PITTMAN LLP


                                        By: _____
                                            Jonathan Doolittle
                                            Attorneys for Wells Fargo Bank, National
                                            Association


DATED: June 25, 2020                    GOLDBERG KOHN LTD.


                                        By: _____
                                            Jeremy M. Downs
                                            *(pro hac vice pending)*
                                            Attorneys for Wells Fargo Bank, National
                                            Association


                              *** **END OF ORDER** ***

Wendel Rosen LLP
1111 Broadway, 24 ᵗʰ Floor
Oakland, California 94607-4036